ORIGINAL



**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

2017 OCT 10 AM 9:52

DEPUTY CLERK

| | |
|---|---|
| KEMPER CORPORATE SERVICES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) **3 17 - CV 2769 - N** |
| v. | ) Case No. _____ |
| | ) |
| COMPUTER SCIENCES CORPORATION and | ) FILED UNDER SEAL |
| DXC TECHNOLOGY COMPANY, | ) |
| | ) |
| Defendants. | ) |

## APPENDIX IN SUPPORT OF MOTION TO CONFIRM ARBITRATION AWARD

Plaintiff Kemper Corporate Services, Inc, submits this Appendix in Support of Motion to

Confirm Arbitration Award in support thereof.

| Tab | App. | Description |
|-----|------|-------------|
| A | 1-5 | Declaration of Paul E. Veith |
| A-1 | 6-36 | Master Software License and Service Agreement between Computer Science Corp. and Unitrin Services Co., dated January 2, 2009 |
| A-2 | 37 | 10/08/15 email string re mediation |
| A-3 | 38-40 | 01/05/16 email and 1/21/16 letter re appointment of Stephen S. Strick as Arbitrator |
| A-4 | 41-54 | Report of Preliminary Hearings and Scheduling Order, dated March 3, 2016 |
| A-5 | 55-59 | 06/29/16 email string re amended arbitration schedule |
| A-6 | 60-62 | 10/20/16 email string re amended arbitration schedule |
| A-7 | 63-65 | 11/16/16 email string re amended arbitration schedule |
| A-8 | 66-70 | 02/14/17 email string re amended arbitration schedule |
| A-9 | 71-73 | 04/25/17 email string re post-hearing schedule |

| Tab | App. | Description |
|-----|------|-------------|
| A-10 | 74-79 | 07/18/16 email string re selecting Dallas, Texas as the hearing location |
| A-11 | 80-84 | 04/05/17 email string re CSC and DXC merger and name change |
| A-12 | 85-87 | 09/19/17 email string re Interim Award |
| A-13 | 88-136 | Partial Final Award, dated October 2, 2017 |
| B | 137-144 | Computer Science Corporation's Form 8-K filed with the SEC on March 31, 2017 |
| C | 145-150 | DXC Technology Company's Form 10-Q filed with the SEC on August 9, 2017 (excerpt) |
| D | 151-153 | DXC Technology Company's Form 8-K filed with the SEC on October 2, 2017 |

Dated: October 10, 2017

Respectfully Submitted,

/s/ Penny P. Reid
Penny P. Reid
State Bar No. 15402570
pried@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Paul E. Veith (*pro hac vice* motion forthcoming)
pveith@sidley.com
Chris K. Meyer (*pro hac vice* motion forthcoming)
cmeyer@sidley.com
Christopher Y. Lee (*pro hac vice* motion forthcoming)
chris.lee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for Kemper Corporate Services, Inc.*.

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2017, I sent the foregoing Appendix in Support of Motion to Confirm Arbitration Award to the following individuals:

By email and messenger:

David Pace (dpace@sumnerschick.com)
David Schick (dschick@sumnerschick.com)
**SUMNER SCHICK & PACE LLP**
3811 Turtle Creek Blvd., Suite 600
Dallas, Texas 75219
Telephone: (214) 965-9229
Facsimile: (214) 965-9215
*Attorneys for Computer Sciences Corporation*

By messenger:

Bill Deckelman
Executive Vice President, General Counsel and Secretary
**DXC TECHNOLOGY**
1775 Tysons Boulevard
Tysons, Virginia 22102

       /s/ Penny P. Reid
          Penny P. Reid

# Exhibit A

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| KEMPER CORPORATE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| COMPUTER SCIENCES CORPORATION and | ) | |
| DXC TECHNOLOGY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF PAUL E. VEITH

I, Paul E. Veith, declare as follows:

1.     I am a member of the bar of the State of Illinois and a partner in the law firm of Sidley Austin LLP.  I am one of the attorneys responsible for handling this case and the underlying arbitration proceeding on behalf of Kemper Corporate Services, Inc. ("Kemper").  I provide this declaration in support of Kemper's Motion to Confirm Arbitration Award.

2.     The information contained in this declaration is based on my personal knowledge and belief, and if called upon, I could testify thereto.

3.     On January 2, 2009, Kemper (then known as Unitrin Services Company) and Computer Sciences Corporation ("CSC") entered into a Master Software License and Service Agreement (the "MSLSA").  A true and correct copy of the MSLSA is attached hereto as Exhibit A-1.

4.     On October 7 and 8, 2015, Kemper and CSC engaged in non-binding mediation in Dallas, Texas.  At the conclusion of the two-day session, the parties agreed to continue mediation until October 16, 2015 for the purpose of conducting further discussions via telephone utilizing the services of the mediator.  At the same time, the parties agreed that the mediation in which

1

they were engaged satisfied the condition (pursuant to MSLSA § 9.2) that mediation precede the commencement of any arbitration proceeding. A true and correct copy of an email chain dated October 8, 2015 between the parties' counsel reflecting these agreements is attached hereto as Exhibit A-2.

5.     The mediation did not result in resolution, and on October 19, 2015, Kemper filed a Demand for Arbitration with the American Arbitration Association ("AAA") alleging claims against CSC and seeking to recover damages Kemper alleged it suffered as a result of a failed software development and implementation project.

6.     Pursuant to § 9.3(a) of the MSLSA, the parties agreed to a method for selection of an arbitrator, and on January 5, 2016 the AAA notified the parties that arbitrator Stephen S. Strick (the "Arbitrator") would be invited to serve. Mr. Strick's official appointment as the sole arbitrator followed on January 21, 2016. True and correct copies of the email and the letter appointing Mr. Strick as the Arbitrator are attached hereto as Exhibit A-3.

7.     On February 9, 2016, the Arbitrator conducted a telephonic preliminary hearing with counsel for the parties.

8.     On February 18, 2016, counsel for CSC submitted CSC's First Amended Answering Statement and Counterclaim.

9.     On March 1, 2016, the Arbitrator conducted another telephonic preliminary hearing with counsel for the parties.

10.     On March 3, 2016, the Arbitrator issued a Report of Preliminary Hearings and Scheduling Order ("ROPHSO"), which contained an agreed schedule as an attachment. A true and correct copy of the ROPHSO and its attachment is attached hereto as Exhibit A-4.

11.     The parties subsequently agreed to modifications to the schedule, which were approved by the Arbitrator.  True and correct copies of the Arbitrator's approval of modifications to the schedule are attached hereto as Exhibits A-5 (June 29, 2016), A-6 (October 20, 2016), A-7 (November 16, 2016), A-8 (February 14, 2017), A-9 (April 25, 2017).

12.     On March 9, 2016, counsel for Kemper submitted its Answer to CSC's First Amended Answering Statement and Counterclaim.

13.     On July 18, 2016, the Arbitrator approved the parties' agreement to conduct the arbitration in Dallas, Texas.  A true and correct copy of the email in which the Arbitrator approved the selection of Dallas as the hearing location is attached hereto as Exhibit A-10.

14.     Prior to the arbitration, the parties exchanged documents, propounded and responded to interrogatories, and conducted depositions of 19 lay witnesses.

15.     Kemper designated two expert witnesses and CSC designated three.  The experts submitted written reports and were deposed.

16.     On March 17, 2017, the parties engaged in a second mediation, which did not result in a resolution.  The second mediation was attended by CSC's executive vice president and general counsel, Bill Deckelman, among others.

17.     On March 20, 2017, the parties submitted pre-hearing briefs to the Arbitrator.

18.     On April 5, 2017, CSC's counsel informed the Arbitrator and counsel for Kemper that "CSC combined with the former HP Services business to form a new company named DXC."  A true and correct copy of the email from CSC's counsel is attached hereto as Exhibit A-11.

19.     Between April 13, 2017, and April 26, 2017, the Arbitrator presided over a 10-day evidentiary hearing in Dallas, Texas in which he heard testimony from 18 live witnesses,

3

003

nine deposition witnesses (all but one by video), and received approximately 620 exhibits in evidence. A portion of the evidentiary hearing was attended by, among others, Mr. Deckelman, who currently holds the title of executive vice president and general counsel of DXC Technology Company, and previously was in a similar role at CSC.

20.     On June 9, 2017, the parties submitted post-hearing briefs, and on June 30, the parties submitted post-hearing response briefs.  In its initial post-hearing brief, CSC stated in a footnote that it had "recently changed its name to 'DXC.'"

21.     On August 28, 2017, the Arbitrator heard closing arguments in Chicago, Illinois. The closing arguments were attended by, among others, Mr. Deckelman.

22.     On September 18, 2017, the parties made supplemental written submissions the Arbitrator had authorized at the closing arguments.

23.     On September 19, 2017, the Arbitrator indicated his intention to issue an award on a partial basis on or before October 2, 2017.  The Arbitrator also stated that he would "retain[] jurisdiction to decide all issues relating to this proceeding pending the issuance of a Final Award," and that the hearing "will remain open until evidence with respect to a possible award of prejudgement [sic] interest and possible award of costs and expenses is presented on the record and the hearings are officially closed by the tribunal pursuant to AAA R-39."  A true and correct copy of the September 19, 2017 email from the Arbitrator is attached hereto as Exhibit A-12.

24.     On October 2, 2017, the Arbitrator determined that Kemper met its burden of proving the elements of its breach of contract claim against CSC and awarded Kemper $84,296,581 in damages.  On CSC's counterclaim, the Arbitrator found that CSC was not

entitled to recovery.  A true and correct copy of the Arbitrator's Partial Final Award is attached hereto as Exhibit A-13.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 6, 2017, in Chicago, Illinois.

/s/ Paul E. Veith
Paul E. Veith

005

# Exhibit A-1

EXHIBIT
1

# MASTER SOFTWARE LICENSE AND SERVICE AGREEMENT
## BETWEEN

## Computer Sciences Corporation

---

## AND

## Unitrin Services Company

---

RESTRICTED INFORMATION –

CRAWFORD

KMPR-0108881

**Table of Contents**

| Section 1 | **License Terms** | Page |
|---|---|---|

| 1.1 | Scope and Definitions |
| 1.2 | License Grant |
| 1.3 | Term of License |
| 1.4 | Permitted Users |
| 1.5 | Source Code/Object Code |
| 1.6 | Site/Hardware |
| 1.7 | Operating Licensed Programs |
| 4 | |
| 1.8 | Copies |
| 1.9 | Ownership |

**Section 2    License Startup Activities**

| 2.1 | Delivery |
| 2.2 | Taxes |
| 2.3 | Installation |
| 2.4 | Acceptance Testing |
| 2.5 | Training |

**Section 3    Warranties**

| 3.1 | Intellectual Property Rights |
| 3.2 | Performance Warranties |
| 3.3 | Warranty Limitations |

**Section 4    Maintenance and Other Services**

| 4.1 | Summary |
| 4.2 | Telephone Support |
| 4.3 | Error Corrections |
| 4.4 | Updates |
| 4.5 | Status of Updates |
| 4.6 | Custom Modifications |

**Section 5    Confidentiality Provisions**

| 5.1 | Confidential Information |
| 5.2 | Confidentiality Obligations |
| 5.3 | Nonpublic Personal Information |

**Section 6    Pricing, Discounts and Payment Terms**

| 6.1 | License Fees |
| 6.2 | Maintenance Fees |

**Section 7    Remedies for Breach of Contract**

| 7.1 | CSC's Remedies |
| 7.2 | Customer's Remedies |

**Section 8.    Dispute Resolution**

| 8.1 | General |
| 8.2 | Non-Binding Mediation |
| 8.3 | Binding Arbitration |

Master Agreement 2008  P093-017A

2

CSC: Taylor

007

KMPR-0108882

**Section 9.**    **Miscellaneous Provisions**

9.1    Notices
9.2    Assignment/Delegation
9.3    Entire Agreement
9.4    Amendments
9.5    Waivers
9.6    Counterparts
9.7    Governing Law
9.8    Successors
9.9    Divestiture of Licensee Business

**Attachments:**

Exhibit A – Form of Product Order
Exhibit B – Travel Policies

RESTRICTED  INFORMATION –                    CRAWFORD                              008
                                                                        KMPR-0108883

## MASTER SOFTWARE LICENSE AND SERVICE AGREEMENT

This Master Software License and Service Agreement ("Agreement") is entered into on January 2, 2009, but is deemed effective as of November 1, 2008 (the "*Effective Date*") between **Computer Sciences Corporation** ("*CSC*") and Unitrin Services Company _ ("*Customer*").

### Section 1
### Structure of this Agreement

1.1    The Product Orders and Work Orders in this Agreement describe specific Licensed Programs and Services that CSC agrees to provide to Customer and may contain special terms related to such Licensed Programs and Services. The terms below apply to all dealings between CSC and Customer pursuant to this Agreement. If there is any conflict between a term of any Product Order, Work Order or other related agreements and a term of this Agreement, the term in the Product Order, Work Order or other related agreements controls.

1.2    This Agreement contemplates that:

(i) upon execution and delivery of this Agreement and a Product Order by the parties, the Customer shall acquire a license of each computer software program specified in the Product Order(s) for use by or on behalf of itself and the Authorized Companies (as defined below) as listed in a Product Order; and

(ii) this Agreement shall also be an "umbrella" or "enterprise" agreement under which the Customer may from time to time acquire licenses of one or more of CSC's then-available software programs and obtain Services related thereto for use by or on behalf of itself and the Authorized Companies.

1.3    Definitions:

**Acceptance Test Documents:**  Test folders presenting representative data and processing transactions for the data to be processed and processing activities covered by the System External Specifications and a Test Matrix showing the processing activities to occur on the test folders during System Test and the results expected to be achieved from such processing as defined by the System External Specifications.

**Affiliate:** means any entity that controls, is controlled by, or is under common control with an entity. For purposes of this Agreement, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

**Authorized Company:**  Any Affiliate of Customer that is an insurance company and is listed in a Product Order for so long as it remains an Affiliate of Customer.

**Authorized Lines of Business:**  All lines of property and casualty business as specified in a Product Order, underwritten in the United States by any Authorized Company except any specifically excluded lines.

**Authorized Location:**  The primary data center location in the United States and listed in a Product Order to which the software is delivered and owned and operated by Customer or an Authorized Company. CSC is only obligated to provide Maintenance and Enhancements at an Authorized Location.  However, Customer may operate multiple copies of the Licensed Product at data centers owned and operated in the U.S. by Customer or an Authorized Company as provided below, if the applicable Product Order for such Licensed Program authorizes Customer to operate multiple copies.  Otherwise, Customer may only use one copy of the core components of a Licensed Program, if any, at any time to process production data at the Authorized Location and if internet or network enabled, multiple copies of the web components of a Licensed Program by way of a secure web connection at the Remote Locations.  Core components are those components of the Licensed Program that are not internet or network enabled.

**Custom Modifications:**  shall mean the making of program changes or additions to a Licensed Program in accordance with the System External Specifications in accordance with Section 3.4.

**Customer:**  refers to the Customer above that acquires a license for use by or on behalf of itself and the Authorized

CSC: Taylor

CRAWFORD     009
KMPR-0108884

Companies to one or more Licensed Programs pursuant to Section 2.

**Customization:** Setting default variables and coding and loading the tables and files of a Licensed Program in accordance with Customer's specific data.

**Documentation:** Written materials and manuals (and machine-readable text subject to display and printout) describing the functional processes, assumptions, specifications and principles of operation of the base version of the computer programs to a Licensed Program and designated as the official documentation to such Licensed Program by CSC which CSC makes generally available to its customers with MESA in effect.

**Enhancements:** Any addition to, change in or modification of the most current Release of a Licensed Program which CSC makes generally available to licensees of the Licensed Program with MESA in effect, if and when such development is completed.

**Innovation Community:** Innovation Community is a method designed to ensure inclusion of mutually agreed upon Custom Modifications, which are specifically identified in a Work Order as being developed by CSC as part of the Innovation Community, into the base Licensed Program to be distributed in a generally available Release of the Licensed Program. The Innovation Community process includes CSC's base development personnel during the requirements phase to ensure that the Custom Modification(s) are developed by CSC in a manner that will allow such Customer Modification(s) to be added to the base Licensed Program without a negative impact on other licensees of the Licensed Program. The Custom Modification(s) will be warranted and governed pursuant to the terms and conditions of this Agreement and the applicable Work Order separately from the Licensed Program until such time as the Custom Modification has been incorporated into the base Licensed Program, at which time such Customer Modification will be subject to the terms and conditions of this Agreement and the applicable Product Order of the Licensed Program and, thereafter, such Custom Modification will be covered by MESA for as long as Customer is entitled to receive MESA for the Licensed Program.

**Innovation Community Modification:** Innovation Community Modification is a Custom Modification developed by CSC pursuant to the Innovation Community process.

**License Charge ("LC"):** The amount of money to be paid to CSC by Customer for the license to use the Licensed Program as available on the effective date hereof for the License Term.

**License Term:** The period of time Customer is authorized to use a Licensed Program as provided in the Product Order for the Licensed Program.

**Licensed Program:** The assembly of computer software programs set forth in the Product Orders. The Licensed Program includes all materials related thereto supplied to Customer under this Agreement, which may include, without limitation, flow charts, logic diagrams, Documentation, source codes, object codes, and materials of any type whatsoever (tangible or intangible and machine or human readable) which incorporate or reflect the design, specifications, or workings of such programs and any changes, additions or modifications provided through Maintenance or Enhancements. Licensed Program may refer to more than one Licensed Program, despite the use of the singular. Licensed Program, or components thereof, may operate on an zSeries host platform ("Host Licensed Program") or a microprocessor workstation platform or server platform or two (2) or all three (3) of the same.

**Maintenance:** The correction of a Nonconformity, at CSC's expense, in the most current and immediately preceding Release (plus any other Release made generally available during the immediately preceding twelve (12) months) of a Licensed Program for those parts of such Licensed Program which have not been modified or affected by any modification other than as part of the Innovation Community. Notwithstanding the preceding sentence and for purposes of clarification, any Innovation Community Modification, when completed and subsequently made generally available to all licensees with MESA in effect, will receive Maintenance support as part of the Licensed Program.

**Material:** is defined in Section 4.2.

**MESA:** The collective reference to Maintenance, Enhancements and Services Available.

**MESA Charge:** The amount of money to be paid monthly to CSC by Customer for the right to receive MESA for a Licensed Program.

Master Agreement 2008 P093-017A

5

CSC: Taylor

**MESA Term:** The period during which CSC shall be obligated to provide MESA for a Licensed Program as set forth in an Product Order.

**Nonconformity:** A failure of the most current or immediately preceding base Release (plus any other Release made generally available during the immediately preceding twelve (12) months) of a Licensed Program to operate in accordance with such Licensed Program's manuals designated by CSC and provided to Customer as Documentation to such programs.

**Product Order:** A document so named which by its terms is part of and incorporated by reference into this Agreement. Each Product Order will designate any Licensed Program licensed and additional terms applicable to such Licensed Program.

**Release:** An edition of the entire Licensed Program, including all available continuous delivery releases, which are made generally available to licensees of the Licensed Program with MESA in force.

**Remote Location:** A place of business of Customer in the United States where object code copies of a Workstation Licensed Program may be used by employees of Customer or an Authorized Company.

**Services:** is defined in Section 3.1.

**Services Available:** Services other than Maintenance and Enhancements which are available during the MESA Term at CSC's then current charges and conditions.

**System External Specifications ("SES"):** Specifications describing the data to be processed, purpose of the data's processing, assumptions applicable to the sources and uses of the data and the results desired from the processing of such data by a Custom Modification.

**System Test:** The integrated testing of the Licensed Program with the Custom Modification(s) developed pursuant to a Work Order using the Acceptance Test Documents. Completion of System Test shall be deemed completion of the Services.

**Test Matrix:** The detailed definition of test cases and the number and type of test cycles to be used during System Test.

**Unit Test:** The localized test of the Custom Modification programs without benefit of a fully integrated test.

**Updates:** is defined in Section 2.15(f).

**Work Order:** A document so named which by its terms is part of and incorporated by reference into this Agreement. Each Work Order will set forth the Services to be provided, fees to be paid and additional terms applicable to such Services.

**Section 2.**
**License Terms**

2.1    Scope of License

(a)    Subject to the other terms and conditions of this Agreement, upon execution of this Agreement and a Product Order by authorized representatives of the parties, CSC hereby grants to the Customer a personal, non-transferable, non-assignable and non-exclusive license to use each Licensed Program listed in such Product Order, together with all related Documentation, which license shall continue for the License Term. For purposes of clarification, the parties acknowledge and agree the concept of a "personal" license shall not be construed to limit or prohibit Customer from using the Licensed Program on behalf of the Authorized Companies.

(b)    A Product Order grants Customer only a license to use a Licensed Program for the License Term and does not grant or assign to Customer any legal or equitable title or other right in such Licensed Program or any modifications of such Licensed Program. Customer may not sell, assign, pledge, lease, transfer, license, sublicense or in any way encumber a Licensed Program or a Product Order.

Master Agreement 2008  P093-017A

6

CSC: Taylor

(c)    Subject to the terms hereof, each Licensed Program is licensed for use on the hardware and operating system platform set forth in such Licensed Program's Documentation. The license shall be limited to the use of the Licensed Program only at the Authorized Location and, if internet or network enabled, multiple copies of the web components of the License Program by way of a secure web connection at the Remote Locations and, if the applicable Product Order permits Customer's operation of multiple copies of the Licensed Program, then Customer may also operate the Licensed Program at other data centers operated by Customer and/or the Authorized Companies in the U.S., in either case, for the processing of data arising from the Authorized Lines of Business underwritten and risk assumed in the United States of America by Customer and any Authorized Company. In addition to the above, Customer may use the Licensed Programs to process policies not issued by Customer or an Authorized Company, but which policies are 100% reinsured by Customer or an Authorized Company, provided the DWP of such reinsured policies is included as part of Customer's total, reported DWP for purposes of License and MESA Charge calculations and the third party issuing such policy does not have access to the Licensed Programs. In the event Customer determines it is using a Licensed Program to process business for an Affiliate of Customer that Customer has inadvertently omitted from listing as an Authorized Company in the applicable Product Order, Customer shall: (a) promptly advise CSC thereof; and (b) unless otherwise agreed by the parties, pay any additional License or MESA Charges at the rates set forth in the applicable Product Order if the MESA Term is still in effect, or if the MESA Term is expired, pay any additional License or MESA Charges at CSC's then current applicable rates for the time period Customer utilized the Licensed Program for such Affiliate. If Customer desires to continue using the Licensed Program for such Affiliate, CSC and Customer shall execute an addendum to the applicable Product Order adding such Affiliate as an Authorized Company and Customer shall, unless otherwise agreed in such addendum, pay any additional License or MESA Charges at the rates set forth in the applicable Product Order if the MESA Term is still in effect; or, if the MESA Term has expired but CSC still offers MESA for such Licensed Program, renew MESA and pay new License or MESA Charges at CSC's then current applicable rates, terms and conditions. In the event Customer has disclosed the Licensed Program to such Affiliate, Customer shall be responsible for immediately obligating such Affiliate to the confidentiality and scope of use obligations in this Agreement. Provided Customer complies with the above, CSC will not terminate the Product Order or otherwise penalize Customer in connection with the Product Order, Work Order, this Agreement or other agreements between the parties for Customer's inadvertent failure to list an Affiliate as an Authorized Company.

2.2    <u>Responsibility:</u>    Customer has sole responsibility for Customer's use and operation of the Licensed Program, including monitoring and verifying input and output data, back-up of input and output data, providing data for any files or tables of such Licensed Program, and for maintaining the required Licensed Program operating environment. Customer shall establish and maintain the Licensed Program in the library structures, if any, described in the Licensed Program's Documentation. Customer shall be responsible for having the Authorized Companies comply with any obligations herein relative to such Authorized Company.

2.3    <u>Right to Modify:</u>    Customer may modify the Licensed Program however any modified Licensed Program (including such modification) shall remain subject to the provisions of Sections 2 and 4 hereof. Customer may not reverse engineer, reverse assemble or reverse compile any object code components of the Licensed Program.

2.4    <u>Future Licenses:</u>    After the Effective Date, Customer may from time to time acquire licenses of any of CSC's then-available software programs by executing a Product Order on a form supplied by CSC and mutually acceptable to Customer. The parties anticipate many of the Product Orders will be substantially in the form attached as Exhibit A. Upon execution and delivery of such Product Order by authorized representatives of both parties, CSC shall be deemed by this paragraph to have granted to Customer a license of each software program listed in such Product Order as provided herein and in the Product Order, together with all related Documentation. Customer shall have the right to extend the term of a license and/or the MESA Term for a Licensed Program if and to the extent set forth in the applicable Product Order.

2.5    <u>Term of License.</u>    The term of each license of a Licensed Program shall be set forth in the applicable Product Order, subject in either case to earlier termination pursuant to Sections 7.1 or 10.2.

2.6    <u>Permitted Users.</u>

(a)    A Licensed Program may be used by the employees (and any third party contractors approved by CSC pursuant to Section 4 below) of Customer and the Authorized Companies solely for the purposes set forth in Section 2 and the applicable Product Order. In addition, if Customer desires to disclose the Licensed Program, including any Materials, to any third party, Customer must get CSC's written approval pursuant to Section 4.3. Customer

Master Agreement 2008 P093-017A

7                                                    CSC: Taylor

assumes responsibility for assuring that the use of each Licensed Program by its employees, the employees of each Authorized Company and any approved third parties is in conformity with the terms and conditions of this Agreement. No Licensed Program may be used to conduct a service bureau or otherwise provide services to parties other than Customers and the Authorized Companies.

(b)     There shall be no limits on the number of concurrent users of a Licensed Program unless expressly stated on the applicable Product Order.

(c)     Use of a Licensed Program by a hardware maintenance contractor or an information systems consultant retained by Customer and approved in writing in advance by CSC shall not constitute a violation of the terms of this Agreement, provided that:  (i) Customer first complies with the obligations in Section 4.3; (ii) such use is purely incidental to the performance of such contractor's or consultant's services; and (iii) such CSC approved contractor or consultant abides by the confidentiality provisions contained in Section 4 hereof and the CSC non-disclosure agreement. Customer assumes responsibility for assuring compliance with such provisions by its CSC approved contractors and consultants.

2.7     Source Code/Object Code.  Licensed Programs shall be delivered to the Customer either in source code form and/or in machine-readable object code form as provided in the Product Order.

2.8     Site/Hardware.

(a)     Licenses under this Agreement are not "CPU" licenses (i.e., they are not tied to a specific computer hardware.)  Subject to this Section 2, a Licensed Program may be installed and run for development, testing and/or production on any standalone computer, single network server with multiple clients, or multiple network servers with multiple clients which are controlled by Customer or the Authorized Companies and located in the U.S., however, CSC is only obligated to provide MESA to one copy of the Licensed Programs at the Authorized Location as set forth below, but Customer may replicate and distribute the MESA any warranty service to all of its other production locations in accordance with this Agreement.  Customer may migrate a Licensed Program from one make (e.g., H.P., Dell, etc.) or class (e.g., Dell Y, Dell Z, etc.) of hardware, to another make or class supported by CSC, by notifying CSC. If a different version of such Licensed Program is required in order to run on such other make or class of hardware, CSC will deliver a copy of the required version to Customer if: (i) CSC makes such different version generally available at no additional charge to its other customers with MESA in effect; and (ii) the MESA Term is still in effect for such Licensed Program.   Customer will surrender the version being replaced as soon as practicable.  If Customer chooses to utilize services of a consultant which provides services from outside of the United States which will require disclosure of any part of a Licensed Program, Customer shall obtain CSC's prior written consent, which consent shall not unreasonably be withheld, and otherwise comply with the other obligations set forth in Section 4 below before any disclosure to such consultant.

(b)     Customer may transfer a Licensed Program to a back-up computer facility  (a "Hot Site") for testing, backups and temporary production purposes in emergency situations, which Hot Site is owned and operated solely by Customer or an Authorized Company in the United States.  If Customer's anticipated Hot Site is not owned and operated by Customer or an Authorized Company in the United States, Customer shall obtain CSC's prior written approval for such use of such facility, which consent shall not be unreasonably withheld.  Unless Customer is authorized in the applicable Product Order to operate multiple copies of the Licensed Program, Customer shall not operate the core components of a Licensed Program, if any, at more than one facility at a time.   Provided Customer first obtains prior written approval from CSC and complies with the obligations in Section 4.3, Customer may install and use a Licensed Program at a third party disaster recovery location in the U.S. (a "Third Party Hot Site") for testing, backup and temporary production purposes in emergency situations. However, CSC hereby consents to Customer's use of the Third Party Hot Site operated by its current vendor, Sungard Availability Services LP, provided CSC, Customer and such vendor first execute a CSC non-disclosure Agreement.  In the event Customer desires to use a different vendor's Third Party Hot Site, which vendor is not a competitor of CSC, Customer shall obtain prior approval from CSC and otherwise comply with the obligations of Section 4, except to the extent obtaining such prior approval is not feasible under the circumstances of an emergency situation, in which case Customer must immediately thereafter obtain CSC's prior written consent and otherwise comply with the provisions of Section 4 in order to continue using such alternative Third Party Hot Site. Customer may, to the extent necessary and provided Customer first complies with the obligations in Section 4.3, disclose a Licensed Program to Third Party Hot Site employees who require access to the Licensed Program to assist Customer with disaster recovery services. Customer agrees that production use of a Licensed Program at a Third Party Hot Site shall be limited to times when Customer's computer hardware or system is unavailable.  Transfer of a Licensed Program outside of the

Master Agreement 2008  P093-017A

8

CSC: Taylor

United States for any purpose shall require the prior, written consent of CSC. Any such transfer without CSC's prior written consent shall be void and shall constitute a material breach hereunder. Use of a Licensed Program simultaneously at the Authorized Location and a Hot Site (or a Third Party Hot Site) is permitted for a limited duration only as reasonably necessary to transition services to or from a Hot Site.

2.9    Operating Licensed Programs.

(a)    A Licensed Program may be run under any operating system specified in the applicable Product Order or the Licensed Program's Documentation for so long as it is supported by CSC or, if such Licensed Program is portable, on such other operating system as is then supported by CSC and set forth in the Documentation. CSC will use commercially reasonable efforts to try and keep each Licensed Program compatible with the latest versions (or one major Release prior to the latest version) of each operating system that is generally supported by CSC.

(b)    Subject to the limitations in this Agreement and in the Product Order including, but not limited to, the Authorized Location and CSC's obligation to provide MESA for one copy of the Licensed Program at the Authorized Location, Customer may migrate a Licensed Program from one operating system (e.g., MVS, UNIX, Windows, etc.) to another operating system that is supported by CSC and listed in the Documentation so long as Customer provides notice of the migration to CSC. If a different version of such Licensed Program is required in order to run on such other operating system, CSC will deliver a copy of the required version to Customer if: (i) CSC makes such different version generally available at no additional charge to its other customers with MESA; and (ii) the MESA Term for such Licensed Program is still in effect. Upon delivery of a replacement version, Customer will surrender or destroy the version being replaced as soon as practicable.

2.10    Copies.

(a)    Except as otherwise expressly limited in a Product Order and, subject to the other terms and conditions of this Agreement, Customer may make an unlimited number of copies of each Licensed Program as reasonably necessary for ongoing production, development, testing or archival purposes and Customer may make object code copies of workstation or internet or network enabled components of a Licensed Program for use at Remote Locations. Unless the applicable Product Order allows Customer to run multiple copies of the Licensed Program, Customer is limited to use of only one copy of the core components of a Licensed Program, if any, at any time to process production data. Core components are those components of the Licensed Program that are not internet or network enabled.

(b)    The above described rights to copy the Licensed Program are subject to the following conditions: (i) all such additional copies shall be made at Customer's cost and expense; (ii) all such copies shall reproduce any copyright, proprietary and confidentiality legends (whether printed or machine readable) placed upon or contained in the Licensed Program; (iii) all such additional copies shall be the property of CSC; (iv) Customer shall maintain appropriate written records of the number and location of all such copies, and shall furnish such information to CSC upon request; and (v) except as provided herein, all terms and conditions of this Agreement shall apply to all such copies except, CSC shall have no obligation or responsibility to render or provide any MESA or warranty services for such additional copies, and Customer shall be responsible for distributing MESA or warranty services received from CSC at the Authorized Location to the copies at the Remote Locations.

(c)    In the event that all of Customer's copies of a Licensed Program are lost or destroyed and the MESA Term is still in effect for such Licensed Program, CSC will provide a copy of the current Release of the Licensed Program at no additional charge.

2.11    Delivery. Each Licensed Program (and related Documentation) will be delivered to the Customer thereof at an Authorized Location specified in the corresponding Product Order. Risk of loss shall pass to Customer upon delivery. CSC will make, and Customer will take, delivery of one copy of the most current Release of the Licensed Program. Delivery shall be made as follows, unless otherwise set forth in the applicable Product Order.

[ x ]    Delivery of physical media

[ ]    Electronic delivery via dedicated circuit, internet connection or otherwise (describe)_____

[ ]    Delivery by CSC personnel, installation on Customer's electronic devices and removal of physical media from Customer's site ("Load and Leave")

Master Agreement 2008 P093-017A

9

CSC: Taylor

[ ]    Other (describe)_____

2.12    <u>Installation</u>.  Customer shall be responsible for installation of all Licensed Programs unless otherwise specified in a Product Order.  Customer may separately contract with CSC pursuant to a Work Order for implementation assistance if Customer so desires.  Initial delivery of each Licensed Program shall constitute fulfillment of CSC's obligation under this paragraph relative to such Licensed Program.

2.13    <u>Training</u>.  Customer may separately contract with CSC pursuant to a Work Order for training in the use of such Program.  The terms of such training, including fees, location and number of users to be trained will be specified in the relevant Work Order.

2.14    <u>U. S. Version</u>.  Each Licensed Program licensed to Customer shall be the United States of America version of the Licensed Program, unless otherwise expressly provided in a Product Order.

2.15    MESA

(a)    <u>Summary</u>.  During the MESA Term, CSC will provide MESA to Customer at the Authorized Location for the Licensed Program, subject to the conditions set forth in this Agreement and the applicable Product Order.  The expiration of the MESA Term will not cause the license of the affected Licensed Program to terminate, nor will it terminate MESA of other Licensed Programs under separate Product Orders.  The parties will attach as an exhibit to each Product Order a copy of CSC's service level goals applicable to such Licensed Program(s).

(b)    In order to receive Maintenance, a Customer representative at the Authorized Location shall advise CSC of a suspected Nonconformity and shall submit all necessary documentation for Nonconformity determination by CSC.  If the Nonconformity prevents Customer's use of substantially all of the functionality of the Licensed Program, CSC shall provide immediate Maintenance services at the Authorized Location.  In the event that it is determined that the problem is not a Nonconformity, Customer shall pay CSC for the reasonable efforts of CSC's personnel on CSC's standard time and materials basis, including reasonable travel, living and out-of-pocket expenses, if any.  Maintenance will normally be performed at CSC's offices and the materials and instructions necessary to correct the Nonconformity shall be delivered to Customer at the Authorized Location.  Customer will be responsible to distributing any such Maintenance or Enhancements from the Authorized Location to all of the other Remote Locations.

(c)    <u>Telephone Support</u>.    For as long as a Licensed Program is covered by Maintenance, and except as may otherwise be provided in a Product Order, CSC will provide telephone support to Customer Monday through Friday, between the hours of 9:00 AM and 5:00 PM (Eastern time), excluding CSC holidays, and thereafter from 5:00 PM until 9:00 AM CSC will have support available via beepers and/or cell phone.  Extended support beyond such hours may be available as specified in the applicable Product Order.  Telephone support means that Customer may call CSC and receive answers to questions regarding Nonconformities, error messages encountered and similar matters.  If the telephone support line is used to report Nonconformities, documentation of a Severity Level Category 1 or Severity Level Category 2 error (as defined in the Documentation to the Licensed Program) may be required by CSC in order to correct such error.  Customer shall have the following information available and ready to provide to CSC whenever Customer reports a Nonconformity: name and Release of Licensed Program, hardware make and class, operating system name and release, estimated error severity level and any other information reasonably required by CSC.

(d)    The cost associated with installing Maintenance and with shipping and installing Enhancements is Customer's responsibility.

(e)    Services made available to Customer should be subject to separate written Work Orders executed by authorized representatives of both parties.  If CSC furnishes any services beyond Maintenance and Enhancements at Customer's request without a separate written agreement, such additional services shall be provided at the applicable rates then (or most recently) in effect between the parties on an **"AS IS" BASIS WITHOUT EXPRESS OR IMPLIED WARRANTY** and Customer agrees to pay all reasonable travel, living and out-of-pocket expenses incurred by CSC's personnel providing such services.

(f)    <u>Updates</u>.  As a part of the MESA under this Agreement, CSC shall provide to Customer during the

Master Agreement 2008 P093-017A

10

CSC: Taylor

KMPR-0108890

applicable MESA Term all of the following items (collectively referred to as *"Updates"*) that are made generally available to all licensees of the Licensed Program with MESA in effect, if and when such development is completed:

(i)     error corrections and workarounds;

(ii)    upgrades, releases or versions that improve or expand existing functionality or performance;

(iii)   upgrades, releases or versions that add new functionality;

(iv)    upgrades, releases or versions that augment or maintain operating system compatibility or utilization or allow migration to other operating systems, and

(v)     amendments, supplements and corrections to Documentation.

(g)     <u>Status of Updates.</u>  All Updates supplied to Customer under Sections 2.15(f)(i) through (iv) shall be considered part of the Licensed Program and all Updates supplied pursuant to Section 2.15(f)(v) shall be considered Documentation for purposes of this Agreement.

### Section 3
### Services

3.1     <u>Services.</u>  CSC agrees to perform for Customer the services listed in one or more mutually satisfactory Work Orders executed by authorized representatives of the parties ("Services"), which Work Orders are incorporated into and form a part of this Agreement.  Services are delivered to the Authorized Location.

3.2     <u>Additional Services.</u>  After receipt by CSC of a request which adds to the Services, CSC may, at its discretion, take reasonable action and expend reasonable amounts of money based on Customer's request pursuant to the terms of this Agreement.

3.3     <u>Workspace.</u>  Customer shall at no charge supply on-site CSC employees with suitable workspace and storage facilities and reasonable telephone and general office resources and supplies.

3.4     <u>Custom Modifications.</u>   At any time during the MESA Term, Customer may request CSC to make Custom Modifications to a Licensed Program and CSC will make reasonable efforts to accommodate such request. All Custom Modifications shall be covered by a Work Order, in a form mutually satisfactory, which shall be executed by authorized representatives of CSC and such Customer and become part of this Agreement. Each such Work Order may include: (i) System External Specifications including detailed functional, design and performance specifications for such Custom Modifications (a *"Design Document"*), (ii) an estimated project timetable with defined milestones and deliverables and an overall estimated completion deadline, and (iii) an assignment of responsibility between CSC and Customer for provision of necessary information and completion of tasks.    In addition, the parties may agree in a Work Order to other arrangements concerning pricing and delivery dates on a guaranteed or fixed price basis.

3.5     <u>Management of Employees.</u>  Notwithstanding anything else to the contrary herein or in any Work Order, CSC shall be free to manage the location where its personnel performs Services to avoid the incursion of various types of taxes that may arise when its personnel perform Services at locations other than the location such personnel normally works.

### Section 4
### Proprietary Protection, Ownership and Confidentiality Provisions

4.1     <u>Ownership.</u>  All trademarks, service marks, patents, copyrights, trade secrets and other proprietary rights in or related to each Licensed Program, its Documentation and any Materials, are and will remain the exclusive property of CSC or its licensors, whether or not specifically perfected under applicable law.

4.2     <u>Customer's Assignment to CSC.</u>  Except as specifically provided otherwise in a Work Order, Customer agrees that all materials and related ideas, including, but not limited to, Customizations, Custom Modifications, SESs, and training materials ("Materials") developed by CSC pursuant to this Agreement, regardless of whether developed in conjunction with use of a Licensed Program by Customer, or jointly by Customer and CSC, including,

Master Agreement 2008  P093-017A

11

CSC: Taylor

but not limited to Materials which may be developed for Customer through the reimbursed or unreimbursed efforts of CSC's employees or its agents, shall be the exclusive property of CSC. CSC agrees that Customer shall have a license to use all Materials in Customer's own operations according to all of the terms and conditions of this Agreement and the applicable Product Order for any Licensed Program for which the Materials were developed for so long as Customer maintains a license to use such Licensed Program. Customer hereby transfers and assigns any and all rights in and to Materials to CSC, including any Copyrights thereto. Notwithstanding the foregoing, CSC acknowledges that Customer is in the insurance business and nothing contained herein shall prevent Customer from independently re-developing computer code for other systems of Customer which performs the same or similar function(s) as the Materials assigned to CSC above provided Customer does not use or reference any of CSC's (or it third party licensor's) confidential or trade secret information, including the Materials or Licensed Program, in such development. For purposes of clarification, subject to the scope of license, confidentiality and other terms and conditions herein and in the applicable Product Order(s), Customer may modify and use those portions of the Materials and/or Licensed Programs that are provided in source code as necessary to add additional functionality to satisfy Customer's and the Authorized Companies' internal business needs. In addition, Customer and CSC may agree in a Work Order that certain Services may result in specific work product to be owned by Customer without residual rights to CSC, which work product must be specifically identified in such Work Order.

4.3   <u>CSC Confidential Information</u>. Customer acknowledges that each Licensed Program (and the components thereof) as well as all Materials which are or may be developed pursuant to the Agreement contains unique, confidential and secret information and are the trade secret and confidential proprietary product of CSC. Customer shall take reasonable precautions to preserve the confidential information of CSC and in any event not less than the same precautions it takes for the preservation of the confidentiality of its own confidential information of like nature and not allow any person or entity to copy the Licensed Program or Materials in whole or in part in any manner except as expressly permitted in this Agreement. Customer shall not disclose or otherwise make the Licensed Program or Materials available to any person or entity other than (i) employees of Customer, (ii) employees of an Authorized Company, or (iii) as to internet or network enabled components of a Licensed Program only, Customer's insurance agents accessing the Licensed Program via a secure web site and, in each of the three cases above, only to the same required to have such knowledge for normal use of the Licensed Program. In the event Customer desires to disclose the Licensed Program to a third party, Customer must obtain CSC's prior written consent, not to be unreasonably withheld, and Customer, CSC and such third party must first execute a CSC non-disclosure agreement. For the purposes of this Agreement, it will be reasonable for CSC to withhold its approval if (x) such third party is a competitor of CSC; (y) CSC has an objective and reasonable basis for concern that such third party may not abide by the confidentiality provisions herein; or (z) that such third party is not financially secure to guarantee its obligations hereunder. For purposes of this Agreement, a "competitor of CSC" shall mean a person or entity in the business of developing, marketing, or servicing computer software products and/or providing outsourcing services in the financial services or insurance industry. Customer agrees to obligate each such employee, each Authorized Company, each such insurance agent, and each approved third party to a level of care sufficient to protect the Licensed Program and Materials from unauthorized use or disclosure. These obligations are independent covenants and shall continue after this Agreement is terminated.

4.4 <u>Customer Confidential Information</u>. CSC shall take reasonable precautions to preserve the confidential information of Customer and in any event not less than the same precautions it takes for the preservation of the confidentiality of its own confidential information of like nature, including all information provided by Customer to CSC which has been designated in writing as confidential or under circumstances which indicate its confidential nature.

Nonpublic personal information related to Customer's customers or other individuals related to Customer's business shall always be considered confidential information without the need for such written designation. As a standard practice, Customer agrees not to send or make available NPI to CSC. However, in special situations where this is not reasonably practicable, such as data conversion, Customer agrees to notify CSC in advance (in a Work Order or otherwise) so that CSC is aware and can plan for and take reasonable precautions to protect NPI. The following clause applies in the event and to the extent that, in connection with this Agreement, CSC obtains any nonpublic personal information ("NPI"), as defined in the Gramm-Leach-Bliley Act ("GLB") or as defined by an applicable privacy statute, rule or regulation (collectively referred to as the "Privacy Laws"). Notwithstanding the confidential provisions in this Agreement, if Customer discloses NPI to CSC, Customer will only do so pursuant to an exception set forth in both GLB and whatever, if any, Privacy Laws may be applicable. CSC shall not use, disclose or disseminate NPI for any purpose other than that for which it was provided. CSC will maintain physical, electronic, and procedural safeguards that comply with state and federal regulations applicable to CSC to guard all NPI. CSC's handling of any NPI, and the purpose for which the information may be used by it, shall be in compliance with all

Master Agreement 2008 P093-017A

CSC: Taylor

RESTRICTED INFORMATION –                    CRAWFORD                    017
KMPR-0108892

laws, regulations and rulings applicable to CSC, possibly including, but not limited to GLB. In the event of any security breach involving NPI, CSC shall provide prompt notification to Customer, and shall coordinate with Customer in connection with CSC's compliance with Privacy Laws applicable to CSC. The parties also agree that a violation of the covenants described in this paragraph may cause irreparable and substantial damage and that no adequate remedy may be available at law or in equity. As a result, Customer may seek to enjoin CSC through injunctive proceedings in addition to any other rights and remedies available at law or in equity. This provision regarding NPI survives the termination of this Agreement.

4.5     <u>Confidentiality Obligations</u>.   Except as may otherwise be permitted by this Agreement or as consented to in writing by Customer, CSC shall not disclose confidential information to any third party other than temporary contract employees or consultants for whom CSC shall be responsible for as it they were CSC employees. CSC shall take reasonable precautions to preserve the confidential information of Customer and in any event not less than the same precautions it takes for the preservation of the confidentiality of its own confidential information of like nature.

4.6     <u>Exceptions to Confidentiality</u>.   Confidential information does not include any information which: (a) is rightfully known to a receiving party without restriction on disclosure or use prior to disclosure by the disclosing party; (b) becomes publicly known through no wrongful act of the receiving party; (c) is independently developed by the receiving party without reference to or use of the confidential information, or (d) is approved for release in writing in advance by an authorized representative of the disclosing party. The existence of a copyright notice will not cause, or be construed as causing, any part of the confidential information or the Licensed Programs or Materials to be a published copyrighted work or to be in the public domain. Notwithstanding the above, it shall not be a violation of this Agreement for a receiving party to disclose any confidential Information if receiving party is ordered by a court or other governmental or regulatory authority of competent jurisdiction to disclose such confidential information. The receiving party shall not be liable for disclosure of such confidential information required by such an order if it complies with the following requirements: (i) to the extent reasonably possible, the receiving party shall notify the disclosing party of the required disclosure sufficiently prior to disclosure to permit disclosing party a reasonable opportunity to respond in a timely manner; (ii) the receiving party shall cooperate with disclosing party's efforts to maintain the confidentiality of the confidential information, which shall include assisting as necessary with a motion or similar request by disclosing party, at disclosing party's expense, for an order protecting the confidentiality of the confidential information, or for leave for disclosing party to intervene; and (iii) the receiving party will only disclose that portion of the confidential information which it is legally required to disclose. Notwithstanding the foregoing, confidential information disclosed pursuant to this exception shall remain and be treated as confidential for any and all other purposes.

### Section 5
### Pricing and Payment Terms

5.1     <u>Payment Terms and Disputed Fees</u>.   Customer shall pay all amounts set forth in this Agreement, in a Product Order and in a Work Order in the manner specified, or if no schedule is provided, on a monthly basis as invoiced by CSC. All amounts are stated and payable in United States dollars. Customer shall pay a late charge on any amount which remains unpaid thirty (30) days after its due date. The late charge shall be compounded and computed daily at the lesser of (i) 1.5% per month, or (ii) the highest rate permitted by law. Customer may withhold payment of any invoice or portion thereof that Customer disputes in good faith; provided, however, that (x) Customer must give written notice, which may be delivered a method prescribed by Section 11.1, to CSC within thirty (30) days after receipt of CSC's invoice of such disputed amount, accompanied with a detailed explanation for the basis of withholding any such amount to enable CSC to thoroughly evaluate the dispute, and (y) in the event a particular invoice includes both disputed and undisputed charges, Customer pays all undisputed items in accordance with this Agreement. Customer and CSC shall diligently pursue an expedited resolution of such dispute. If the dispute is not resolved within ninety days of CSC's receipt of Customer's notice of dispute or the amount exceeds five hundred and thousand dollars ($500,000.00), then either party may commence arbitration proceedings. Neither CSC's acceptance of partial payment as set forth above nor anything else in this paragraph shall be deemed a waiver of CSC's right to declare Customer to be in breach of this Agreement and/or the applicable Product Order or Work Order or otherwise require CSC to continue to provide any services hereunder after an uncured breach by Customer. In the event that the disputed portion or any part thereof is ultimately determined to have been properly charged, Customer shall pay interest on such amount as set out above plus any attorney's fees as provided in Section 9.

5.2     <u>License Charges</u>.   Customer recognizes that the License Charges do not include the hardware or the third

RESTRICTED INFORMATION –

018
KMPR-0108893

party software products (including open source software) which may be required to be licensed by Customer for Customer to utilize the various capabilities of the Licensed Program and that Customer is responsible for the costs and licenses to obtain such hardware or third party software. Included within CSC's Documentation is a list of the required third party software as well as a listing of all hardware types needed to operate the Licensed Programs based upon the best information available to CSC at the time. The parties acknowledge and agree the necessary hardware to utilize a Licensed Program is based to some extent on many factors not generally known to CSC including the nature and organization of Customer's and the Authorized Companies data center(s), Customer's existing equipment, communication mechanisms, volume of use, number of users for various systems, anticipated uses of such software and, therefore, Customer is responsible for determining and selecting all necessary hardware.

5.3     Expenses and Additional Fees.  Customer shall pay CSC for all reasonable expenses incurred by CSC in the performance of Services which are reimbursable in accordance with Exhibit B. No other expenses may be reimbursed except as specifically set forth in the applicable Work Order. In addition to the above, Customer agrees to pay CSC all CSC standard communication line charges, telephone usage charges, and data center charges incurred by CSC in providing Services provided CSC has obtained Customer's approval in advance or included such costs in the applicable Work Order or Product Order. Depending on the applicable rules, regulations and statutes of the appropriate taxing jurisdiction, the reimbursement of expenses may be subject to sales, use or other taxes that would be payable by Customer pursuant to paragraph 5.4 below.

5.4     Taxes.  Except for income taxes levied on CSC's net income, Customer shall pay or reimburse CSC for all national, federal, provincial, state, local or other taxes and assessments of any jurisdiction, including sales or use taxes, data processing taxes, royalty taxes, property taxes, international withholding taxes (including those in lieu of income taxes), customs or other import or export taxes, value added taxes and amounts levied in lieu thereof which are legally payable by Customer for charges set, services performed or to be performed, or payments made or to be made hereunder.  Customer shall not be entitled to deduct the amount of any such taxes, duties or assessments from payments made to CSC under this Agreement.  This provision shall survive the termination of this Agreement and shall be applicable regardless of the time frame in which the requirement of the payment of such taxes or assessments is asserted (e.g. a deficiency assessment by a taxing authority as a result of an audit after the termination of this Agreement.) If it becomes necessary for tax purposes, upon Customer's request, CSC shall identify any taxes to be assessed in connection with product support as opposed to product maintenance, and shall provide Customer with reasonably available, non-confidential documentation that validates any such assessment.

Provided, however, CSC will cooperate with Customer to attempt to minimize the amount of taxes and assessments payable by the Customer in accordance with applicable statutes, rules and regulations.

In the event that a taxing authority or other entity asserts that CSC is responsible for the payment of any taxes, interest or penalties for which Customer is legally responsible, Customer shall defend, indemnify and hold harmless CSC from any and all liability for the payment of such taxes, interest or penalties and any expenses and fees (including reasonable attorneys' fees) reasonably incurred by CSC as a result of such assertion. Customer shall take all reasonable steps, including the posting of a bond, to remove any lien from CSC property, which arises from such assertion.

If Customer is a tax exempt entity or if any transaction covered by this Agreement is a tax exempt transaction, Customer will provide a copy of such tax exemption certificate to CSC immediately after the execution of this Agreement. If Customer has a direct pay certificate that allows the direct payment to the proper taxing authority of Customer's obligations under this Section, Customer shall provide a copy of such direct pay certificate to CSC immediately upon the execution of this Agreement.

In the event that a Product Order, Work Order or other attachment to this Agreement specifically provides for the delivery of equipment or other property to Customer for the resale to a third party, and as a result Customer is not responsible for the payment of the taxes and assessments under this Section, Customer shall provide a copy of such resale certificate to CSC immediately upon the execution of this Agreement.

5.5     Subject to any required regulatory approval, Customer agrees that on or before June 30, 2009, another subsidiary of Unitrin, Inc. acceptable to CSC in its reasonable judgment shall either be added as a party to this Agreement or shall execute and deliver a guarantee guaranteeing the payment and performance obligations of Customer set forth in this Agreement. If Customer is unable to perform such obligation by June 30, 2009, Customer shall notify CSC of the reason for such delay and the anticipated delivery date. If CSC disputes such

Master Agreement 2008 P093-017A

CSC: Taylor

RESTRICTED  INFORMATION –            CRAWFORD

019

KMPR-0108894

reasons or revised delivery date, the parties agree to negotiate in good faith on a commercially reasonable date for delivery.

## Section 6
## Warranties

6.1    <u>Limited Warranties for Licensed Program</u>.   CSC makes the following warranties for the Licensed Program(s):

### 6.1.1    <u>Intellectual Property Rights</u>.

(a)      Subject to the exclusions and limitations set forth below, CSC hereby warrants to Customer that it has all rights necessary to grant the licenses pursuant to this Agreement and that no Licensed Program including any Custom Modifications and Updates provided by CSC or Materials will infringe the U.S. copyright, patent, trademark or other U.S. intellectual property rights of any third party.   This warranty shall run throughout the License Term, but CSC's indemnification obligations in Section 6.1.1(b) and (c) for Customer's use of the Licensed Program during the License Term shall survive the termination of this Agreement and the termination of the license of any Licensed Program hereunder.   In the event of a breach of this warranty, CSC's sole liability and Customer's sole and exclusive remedies shall be as set forth in Sections 6.1.1(b) and 6.1.1(c) below.

(b)      Customer shall give CSC prompt written notice following the receipt of any suit (including lawsuits or actions brought before an arbitration panel), action, claim or demand (collectively, a "*claim*") brought or asserted against Customer and containing allegations which, if true, would cause a breach of the warranties in Section 6.1.1(a); provided that in the event Customer or an Authorized Company is served with a lawsuit (including those for arbitration), Customer shall give CSC written notice thereof within seventy-two (72) hours following the receipt of such suit.   Notwithstanding the foregoing, the failure of Customer to give notice to CSC in a timely manner will not result in or operate to release, waive or otherwise affect CSC's obligation to indemnify Customer provided CSC is not in any way materially prejudiced by such delay. Subject to the terms of this Agreement and the exclusions and limitations herein, CSC shall thereafter defend Customer and its applicable Affiliates against such claim and shall indemnify and hold Customer and its applicable Affiliates harmless against all judgments entered by a court of competent jurisdiction (as well as those awards resulting from a claim rendered by an arbitrator) or settlements agreed to by CSC in connection with such claim, plus any litigation costs, fees and expenses incurred by Customer that could not reasonably be avoided (such as Customer employees having to travel to attend depositions noticed by CSC or the plaintiff(s)), but not including attorney's fees except as specifically provided below.   In addition, if CSC fails to timely respond to a claim, then CSC will pay for the reasonable attorneys' fees incurred by Customer prior to CSC taking control of the defense of such claim.   Except as specifically provided below, CSC shall have the sole right to control the defense and/or settlement of such claim.   Customer shall provide CSC with all reasonable cooperation in the defense and settlement of a claim.   Customer may defend or respond to any such claim only if CSC fails or refuses to timely provide a defense in breach of this Section after having received written notice from Customer of such failure to defend and having been permitted a reasonable period of time to cure such breach after the receipt of such notice (except that Customer shall be entitled to reimbursement for legal fees and expenses reasonably incurred as a result of filing deadlines occurring or approaching such cure period), in which event CSC shall be liable to indemnify Customer and its applicable Affiliates to the full extent required herein, including Customer's reasonable attorneys' fees.   Customer's right to defend such claim as provided above shall continue until such time as CSC indicates it shall assume and control the defense or settlement.   Customer must provide CSC's General Counsel with monthly status reports of the defense and settlement of such claim.   Customer may not settle any such claim without CSC's written consent, which consent will not be unreasonably withheld. Notwithstanding the preceding provisions of this Section 6.1.1, CSC shall have no obligations or liability to the extent a claim: (i) results from, any addition to, change in, correction or modification of a Licensed Program not provided by CSC or its agent as part of the Innovation Community and MESA; (ii) results from the failure to install an Update if installation of such Update would have avoided the infringement, so long as Customer was so notified in writing that such installation would have avoided the infringement; (iii) is asserted by a parent, subsidiary, Authorized Company or other Affiliate of Customer; (iv) results from Customer's use of the Licensed Program in combination with non-CSC Licensed Programs, except for third party software listed in a Product Order and provided by CSC hereunder; or (v) results directly from data, information, software, code or anything else provided to CSC by Customer or a third party on behalf of Customer which Customer or such third party did not have the right to disclose.   For purposes of clarification, Customer Code as provided in Section 6.3 or third party software incorporated into CSC's base version of a Licensed Program is not excluded by the preceding sentence or

Master Agreement 2008  P093-017A

15

CSC: Taylor

KMPR-0108895

otherwise under this section.

(c)     In the settlement of a claim, CSC shall have discretion to effectuate any of the following remedies so long as there is no additional cost or expense to Customer, other than implementing such remedy(ies):

(i)     to obtain for Customer and the Authorized Companies the continuing right to use a Licensed Program;

(ii)     to modify an infringing Licensed Program so that it no longer infringes, provided its original functionality and performance are preserved in all material respects, terminate the license for that part of the Licensed Program which was infringing, and Customer shall immediately cease use of the Licensed Program, or part thereof, which was modified and return or destroy it pursuant to Section 10.4;

(iii)     to replace an infringing Licensed Program with other, non-infringing software that has substantially identical functionality and performance, terminate the license for such Licensed Program, or part thereof, and Customer shall immediately cease use of the Licensed Program, or part thereof, which was replaced and return or destroy it pursuant to Section 10.4; or

(iv)     only if none of the foregoing is reasonably and commercially practicable, to terminate the license of the infringing Licensed Program and to refund a portion of the charges paid by such Customer for such Licensed Program, computed in accordance with Section 6.1.1(c)(v) immediately below. Customer shall return or destroy the Licensed Program pursuant to Section 10.4.

(v)     If CSC terminates the license of the Licensed Program pursuant to Section 6.1.1.(c)(iv) above or, if despite CSC's defense of an infringement claim as provided above, an injunction is entered such that Customer cannot use the Licensed Program and Customer terminates the license and Product Order for such Licensed Program due to such material breach, then, as liquidated damages and not as a penalty, CSC shall refund to Customer the following percentage of the License Charges (if any) and implementation fees for the terminated Licensed Program previously paid by Customer in connection with such Licensed Program:

| Year During Which Error or License Termination Occurs | % of License Charges and Implementation Fees Refunded to Customer |
| --- | --- |
| First year of license | 100% |
| Second year of license | 100% |
| Third year of license | 80% |
| Fourth year of license | 60% |
| Fifth year of license | 40% |
| Sixth year of license or later | 20% |

Such refunds shall be due thirty (30) days after CSC's receipt of the returned Licensed Program or Customer's certification of destruction pursuant to Section 10.4 and shall bear interest thereafter until paid at the rate set forth in Section 5.1. The parties agree that the foregoing remedies are reasonable in light of the anticipated harm caused by the specified breaches, the difficulties of proof of loss and the inconvenience of otherwise obtaining an adequate remedy for such a breach.

6.1.2   Nonconformity Correction.   Customer acknowledges that the programs of a Licensed Program may contain Nonconformities, and CSC acknowledges its related obligations hereunder. CSC warrants that it will correct, at CSC's sole cost and expense, the computer programs of the most current and immediately preceding base Release (plus any other Release made generally available to its other customers during the immediately preceding twelve (12) months) of a Licensed Program, for the parts of such Licensed Program which have not been modified or affected by a modification not provided by CSC as Innovation Community or MESA, if they fail to operate in accordance with their manuals designated as Documentation to such programs so long as Customer is entitled to MESA for the Licensed Program and a representative of Customer at the Authorized Location has provided CSC with notice of the Nonconformity, which notice may be delivered by email, telephone, fax or a method prescribed by Section

RESTRICTED INFORMATION –                    CRAWFORD

021
KMPR-0108896

11.1.

6.1.3 **Performance Warranties.** CSC hereby makes the following additional warranties to Customer, which shall run for the periods indicated:

| Warranty | Duration of Warranty |
|---|---|
| 6.1.3(a) -- CSC will use commercially available virus testing and detection software to confirm each Licensed Program will, upon delivery, be free of all viruses, Trojan horses, worms, or other software routines designed to disable, erase or otherwise harm software, hardware or data. In addition, Customer will use commercially available virus testing and detection software to confirm each Licensed Program will, prior to installation, be free of all viruses, Trojan horses, worms, or other software routines designed to disable, erase or otherwise harm software, hardware or data. Upon Customer's request, CSC will discuss with Customer such virus detection procedures to be utilized by the parties. In the event of a breach of the foregoing warranty by CSC, Customer's sole and exclusive remedy shall be: (a) for CSC to redeliver a version of the Licensed Program in compliance with this warranty; and (b) if Customer fully complied with its virus scanning obligations and the introduction of the virus was due solely to CSC's breach of its warranty and provided further that it is established that CSC's virus detection software would have detected and removed such virus had it been used, then in addition to redelivering a version of the Licensed Program in compliance with its warranty, CSC will use all commercially reasonable efforts to assist Customer minimize the effect of such virus and CSC will not charge Customer for its personnel time in connection therewith. | 60 days from date of delivery |
| 6.1.3(b) -- Upon delivery to Customer, the physical media embodying each copy of a Licensed Program will be free from defects. In the event of a breach of the foregoing warranty, Customer's sole and exclusive remedy shall be for CSC to redeliver a version of the Licensed Program in compliance with this warranty. | 60 days from date of delivery |
| 6.1.3(c) -- The Documentation for each Licensed Program will, in all material respects, be complete and accurate. In the event of a breach of the foregoing warranty, Customer's sole and exclusive remedy shall be for CSC to redeliver a corrected version of the Documentation in compliance with this warranty within a commercially reasonable period of time. | For so long as such Program is covered by MESA. |

6.1.4 The above warranties do not extend to: (i) the operation of a Licensed Program in a manner that is not in material compliance with the methods prescribed in its Documentation, or (ii) to any portion of a Licensed Program which has been modified by any person other than CSC, except for Innovation Community Modifications incorporated by CSC into the base Licensed Program.

6.2 **Limited Warranties for Services:** With respect to the Services provided pursuant to a Work Order hereunder, CSC makes the following warranties:

6.2.1 **Intellectual Property Rights.**

RESTRICTED INFORMATION --  CRAWFORD  022

KMPR-0108897

(a) Subject to the exclusions and limitations set forth below, CSC hereby warrants to Customer that it has all rights necessary to grant the licenses to the Materials and to perform the Services pursuant to this Agreement and that no Materials will infringe the U.S. copyright, patent, trademark or other U.S. intellectual property rights of any third party. This warranty shall run throughout the associated License Term for the Licensed Program for which the Materials were developed, but CSC's indemnification obligation in Section 6.2.1(b) for Customer's use of the Materials during the associated License Term shall survive the termination of this Agreement and the termination of the license of any Materials hereunder. In the event of a breach of this warranty, CSC's sole liability and Customer's sole and exclusive remedies shall be as set forth in Sections 6.2.1(b) below.

(b) In the event of the receipt of any suit, action, claim or demand (collectively, a "claim") brought or asserted against Customer and containing allegations which, if true, would cause a breach of the warranties in Section 6.2.1(a), and provided Customer give CSC written notice of such claim as provided in paragraph 6.1.1(b) above, then CSC shall defend, indemnify and hold Customer and its applicable Affiliates harmless as provided in paragraph 6.1.1(b) and (c) for such claim. Notwithstanding the preceding provisions of this Section 6.2.1, CSC shall have no obligations or liability to the extent a claim: (i) results from, any addition to, change in, correction or modification of the Services or Materials not provided by CSC or its agent; (ii) results from the failure to install an Update if installation of such Update would have avoided the infringement so long as Customer was so notified in writing that such installation would have avoided the infringement; (iii) is asserted by a parent, subsidiary, Authorized Company or other Affiliate of Customer; (iv) results from Customer's use of the Materials or Services in combination with non-CSC Licensed Programs, except for third party software listed in a Product Order and provided by CSC hereunder; or (v) results from data, information, software, code or anything else provided to CSC by Customer or a third party on behalf of Customer which Customer or such third party did not have the right to disclose. For purposes of clarification, Customer Code as provided in Section 6.3 or third party software incorporated into CSC's base version of a Licensed Program is not excluded by the preceeding sentence or otherwise under this section. In addition, in the event of a settlement of a claim, CSC shall have the discretion to effectuate any of the remedies in Section 6.1.1(c) so long as there is no additional cost or expense to Customer, other than in implementing such remedy(ies); however, with respect to claims related to the Materials or Services, all references in Section 6.1.1(c) to "Licensed Program" and "License Charge" shall refer to "Materials" and "service fees", respectively, and that the references to Implementation Fees shall not be applicable. The parties agree the above remedies are reasonable in light of the anticipated harm caused by the specified breaches, the difficulties of proof of loss and the inconvenience of otherwise obtaining an adequate remedy for such a breach and, therefore, shall be liquidated damages and not a penalty.

6.2.2   <u>Service Conformance</u>. CSC warrants to Customer that the Services, as and when delivered or rendered hereunder, will conform to the description or System External Specifications set forth in the applicable Work Order and shall be provided by properly trained personnel. CSC's sole liability under the foregoing warranty shall be to provide the services described in Section 6.2.3 hereof.

6.2.3   <u>Service Correction</u>. Customer shall notify CSC in writing within thirty (30) days after completion of the Services in question (or such longer period as may be specified in a Work Order) when any of the Services fail to conform to the description or System External Specifications set forth in the applicable Work Order. Such notification shall include the detailed information necessary for CSC to verify such nonconformity. Upon actual receipt of such notification and verification of the nonconformity, CSC shall correct the nonconformity so that the Services shall conform with the description or System External Specifications in the applicable Work Order. The passage of the thirty (30) day period after completion of the Services without the notification described herein shall constitute final acceptance of the Services.

6.3   Customer desires to participate in CSC's Innovation Community ("IC") process. As to code which Customer developed prior to the effective date of this Agreement ("Existing Customer Code"), Customer agrees to certify to CSC that Customer owns such code and that such code is the sole and exclusive property of Customer. CSC may elect to (1) incorporate such Existing Customer Code into an IC Modification as the sole and exclusive property of CSC, or (2) re-develop at CSC's cost the functionality within the Existing Customer Code to ensure that the re-developed code is originally developed by CSC

and non-infringing on any third party's rights prior to incorporating it into the IC ("Re-developed Code"). In the event CSC elects to redevelop the code as set forth above, Customer acknowledges that such redevelopment may result in delays in implementing such functionality within the IC; however, Customer retains the option of using its code outside of the base Licensed Program or IC during the interim period until CSC makes the Re-developed Code available.

As to all future developed code made available by Customer for inclusion in IC ("On-going Code"), Customer and CSC agree that all such On-going Code shall be jointly developed in accordance with CSC internal development procedures to ensure that such On-going Code is the sole and exclusive property of CSC and is non-infringing on the rights of any third party. In the event Customer provides any code to CSC as part of the Innovation Community process and CSC includes such code in any Innovation Community Modifications which are incorporated by CSC into the base version of a Licensed Program ("Customer Code"), then without further consideration, Customer hereby assigns to CSC all right, title, and interest (including all patents, copyrights, trademarks, trade secrets and moral rights) in and to all Customer Code which shall henceforth be CSC Confidential Information. Such assignments shall be effective irrevocably as of the creation of such Customer Code. Customer further agrees to perform, upon the request of CSC during or after the term of this Agreement, any further acts as may be necessary or desirable to transfer, perfect and defend CSC's ownership of such Customer Code. To the extent that Customer would obtain any rights in conflict with the foregoing assignment (whether by contract, assignment, or operation of law), Customer waives such rights in favor of CSC. Notwithstanding the foregoing, Customer shall retain rights to use Customer Code in its own operations as provided in this Agreement and related agreements. For purposes of clarification, Customer Code shall include Existing Customer Code, Re-developed Code and On-going Code as defined in this Section 6.3.

6.4    **EXCLUSIONS OF ALL OTHER WARRANTIES. THE WARRANTIES SET FORTH ABOVE AND REMEDIES FOR BREACH OF CONTRACT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS AND FITNESS FOR A PARTICULAR PURPOSE.**

### Section 7

### Limitation of Liabilities and Remedies for Breach of Contract

7.1    <u>CSC's Remedies.</u> The following states CSC's sole and exclusive remedies for breaches of this Agreement by Customer:

(a)    If Customer fails to pay when due any License Charge or taxes for a Licensed Program (except for reasons permitted in Section 5.1), CSC shall notify Customer of such failure and if payment is not received by CSC within 30 days after the receipt of such notice (as evidenced by delivery confirmation or acknowledgement of receipt by Customer), CSC may cease providing MESA, terminate the license of such Licensed Program as well as the applicable Product Order and Customer shall either destroy or return all copies of such Licensed Program in accordance with the provisions of Section 10.4 and Customer shall pay CSC all amounts due CSC and costs reasonably incurred directly resulting from such breach, plus late fees at the rates set forth in Section 5.1.

(b)    If Customer fails to pay when due any MESA Charge, taxes or other amounts due for a Licensed Program (except for reasons permitted in Section 5.1), CSC shall notify Customer of such failure and if payment is not received by CSC within 30 days after the receipt of such notice, (as evidenced by delivery confirmation or acknowledgement of receipt by Customer), CSC may cease providing MESA, terminate the license of such Licensed Program as well as the applicable Product Order and Customer shall either destroy or return all copies of such Licensed Program in accordance with the provisions of Section 10.4 and Customer shall pay CSC all amounts due CSC and damages and costs reasonably incurred directly resulting from such breach, plus late fees at the rates set forth in Section 5.1.

(c)    If Customer fails to pay when due any charges, fees, expenses, taxes or any other amounts due for any Materials, training or other Services (except for reasons permitted in Section 5.1), CSC shall notify Customer of such failure and if payment is not received by CSC within 30 days after the receipt of such notice, (as evidenced by

RESTRICTED INFORMATION –
CRAWFORD
024
KMPR-0108899

delivery confirmation or acknowledgement of receipt by Customer),CSC shall be entitled to immediately cease providing such Services, terminate the license of such Materials, as well as the applicable Work Order, and Customer shall either destroy or return all copies of such Materials in accordance with the provisions of Section 10.4 and Customer shall pay CSC all amounts due CSC and damages and costs reasonably incurred directly resulting from such breach, plus late fees at the rates set forth in Section 5.1.

(d)     If Customer commits a material breach of this Agreement (including a Product Order or Work Order) other than as specified above, or in subsection 7.1(f) below, and does not cure such breach in accordance with Section 10.2, then CSC may terminate the license of the affected Licensed Program(s) and/or Materials (as well as terminate the applicable Product Order and/or Work Order),  and such Customer shall either destroy or return all copies of such Licensed Program and/or Materials in accordance with the provisions of Section 10.4 and Customer shall pay CSC all amounts due CSC and damages reasonably incurred directly resulting from such breach, plus late fees at the rates set forth in Section 5.1.

(e)     In any claim in which CSC establishes its right to a return of a Licensed Program, CSC shall be entitled to seek an award of specific performance to enforce such right and reasonable attorney's fees as set forth in Section 10.4.

(f)     All claims for breach or other disputes arising out of Sections 2.1(b), 2.6, 4, 6.1.1, 6.1.2 or 6.3 shall be brought in a court of competent jurisdiction and CSC shall have all such remedies as may be available to it under applicable law except as excluded or limited as provided in this Agreement and/or the applicable Product Order and/or Work Order. All other claims shall be subject to the dispute resolution provisions of Section 9.

(g)     In no event shall CSC be entitled to an award of punitive, exemplary or multiplied damages for any breach of this Agreement by Customer. **CUSTOMER SHALL NEVER BE LIABLE UNDER THIS AGREEMENT TO CSC OR OTHERS FOR ANY ECONOMIC LOSS OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS OR SAVINGS) INDIRECT, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT OR TORT (INCLUDING CUSTOMER'S OWN NEGLIGENCE), LAW OR EQUITY AND REGARDLESS WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED TO CUSTOMER IN ADVANCE OR COULD HAVE BEEN REASONABLY FORESEEN OR FOR ANY CLAIM OR DAMAGE ASSERTED BY ANY THIRD PARTY.**

(h)     **THE ABOVE LIMITATIONS AND EXCLUSIONS DO NOT APPLY TO AMOUNTS OWED BY CUSTOMER PURSUANT TO THIS AGREEMENT (INCLUDING ANY PRODUCT ORDER OR WORK ORDER), LOSSES RELATED TO A BREACH OF CUSTOMER'S WARRANTIES IN PARAGRAPH 6.3 ABOVE, CUSTOMER'S, THE AUTHORIZED COMPANIES' OR ANY APPROVED THIRD PARTY'S (INCLUDING EMPLOYEES OF CUSTOMER, THE AUTHORIZED COMPANIES OR ANY APPROVED THIRD PARTIES) BREACH OF THE CONFIDENTIALITY OBLIGATIONS OR ANY CLAIMS ARISING OUT OF CUSTOMER'S INDEMNIFICATION OBLIGATIONS OR FOR ANY BREACH OF THE SCOPE OF LICENSE.**
(i)     Customer may withhold payment of any amount subject to a pending a good faith dispute between the parties in accordance with Section 5.1. The foregoing provisions of this Section 7.1 shall not apply to any disputed amounts withheld in accordance with Section 5.1.

7.2     <u>Customer's Remedies.</u>     The following states Customer's sole and exclusive remedies for breaches of this Agreement (including any Product Order or Work Order) by CSC:

7.2.1   **CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES AND CSC'S SOLE LIABILITY ON ANY CLAIM, LOSS OR LIABILITY ARISING OUT OF OR CONNECTED WITH THIS AGREEMENT (INCLUDING ANY PRODUCT ORDERS AND WORK ORDERS) SHALL IN ALL CASES BE SOLELY LIMITED TO THE REMEDIES AND LIABILITY SET FORTH IN SECTIONS 6.1.1(b), 6.1.1(c), 6.1.2, 6.1.3, 6.2.1(b), 6.2.3 AND 10.2 OF THIS AGREEMENT.  IF, NOTWITHSTANDING THE ABOVE, CUSTOMER IS ENTITLED TO RECOVER DAMAGES FROM CSC FOR ANY REASON, THEN IN THE AGGREGATE OVER THE TERM HEREOF CSC SHALL ONLY BE LIABLE FOR:**

Master Agreement 2008 P093-017A

CSC: Taylor

RESTRICTED  INFORMATION –                              CRAWFORD                              025

KMPR-0108900

**7.2.1.1** WITH RESPECT TO CLAIMS RELATED TO A PRODUCT ORDER HEREUNDER FOR A LICENSED PROGRAM, THE AMOUNT OF ANY OTHER DIRECT LOSS OR DAMAGE WHICH IS NOT IN EXCESS OF THE AMOUNTS ACTUALLY PAID BY CUSTOMER TO CSC UNDER THE APPLICABLE PRODUCT ORDER DURING THE SIX (6) MONTH PERIOD PRIOR TO CUSTOMER'S WRITTEN NOTICE TO CSC OF ITS CLAIM; AND

**7.2.1.2** WITH RESPECT TO CLAIMS RELATED TO THE SERVICES PROVIDED PURSUANT TO A WORK ORDER HEREUNDER, THE AMOUNT OF ANY OTHER DIRECT LOSS OR DAMAGE WHICH IS NOT IN EXCESS OF THE ACTUAL AMOUNT PAID BY CUSTOMER TO CSC FOR THAT PORTION OF THE SERVICES WHICH FAILED TO CONFORM.

**7.2.2** EVEN IF CUSTOMER'S EXCLUSIVE REMEDIES FAIL OF THEIR ESSENTIAL PURPOSES, CSC SHALL NEVER BE LIABLE UNDER THIS AGREEMENT TO CUSTOMER OR OTHERS FOR ANY ECONOMIC LOSS OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS OR SAVINGS) INDIRECT, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT REGARDLESS OF THE FORM OF THE ACTION, WHETHER IN CONTRACT OR TORT (INCLUDING CSC'S OWN NEGLIGENCE), LAW OR EQUITY AND REGARDLESS WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED TO CSC IN ADVANCE OR COULD HAVE BEEN REASONABLY FORESEEN BY CSC, OR FOR ANY CLAIM OR DAMAGE ASSERTED BY ANY THIRD PARTY.

**7.2.3** IN NO EVENT SHALL CUSTOMER BE ENTITLED TO AN AWARD OF PUNITIVE, EXEMPLARY OR MULTIPLIED DAMAGES FOR ANY BREACH OF THIS AGREEMENT BY CSC.

**7.2.4** THE ABOVE LIMITATIONS AND EXCLUSIONS DO NOT APPLY TO LOSSES RELATED TO CSC'S OR ANY APPROVED THIRD PARTY'S (INCLUDING THE EMPLOYEES OF CSC, CSC'S TEMPORARY CONTRACT EMPLOYEES OR CONSULTANTS, OR THE EMPLOYEES OF ANY APPROVED THIRD PARTIES) BREACH OF THE CONFIDENTIALITY OBLIGATIONS OR ANY CLAIMS ARISING OUT OF CSC'S INDEMNIFICATION OBLIGATIONS IN SECTIONS 6.1.1 OR 6.2.1.

**7.2.5** All claims for breach or other disputes arising out of Sections 2.1(b), 2.6, 4, 6.1.1, 6.2.1 or 6.3 may be brought in a court of competent jurisdiction and Customer shall have all such remedies as may be available to it under applicable law except as excluded or limited as provided in this Agreement and/or the applicable Product Order and/or Work Order. All other claims shall be subject to the dispute resolution provisions of Section 9.

### Section 8
### Force Majeure

**8.** CSC shall not be liable or deemed to be in default for any delay or failure in performance under this Agreement (including any Product Order or Work Order) or interruption of service resulting, directly or indirectly, from acts of God, civil or military authority, or causes beyond CSC's reasonable control such as shortages of suitable parts, materials, transportation, or any similar cause.

### Section 9
### Dispute Resolution

**9.1** _General_. Except with respect to disputes, breaches or claims arising under Sections 2.1(b), 2.6, 4, 6.1.1, 6.2.2 or 6.3 of this Agreement (as to which a court of competent jurisdiction shall be the appropriate forum), all disputes arising out of or relating to this Agreement, or the breach thereof, shall be settled in accordance with the following procedures, which may be commenced by either party upon written notice to the other party (the _"Notice of Dispute."_)

RESTRICTED INFORMATION –

CRAWFORD

026

KMPR-0108901

9.2    Non-Binding Mediation. A dispute shall first be subject to a non-binding mediation session of up to two consecutive days conducted in New York, New York by a single, disinterested mediator appointed by the American Arbitration Association *("AAA")* under its Commercial Mediation Procedures. Unless otherwise agreed by the parties, the mediation shall commence within fifteen (15) days of the effective date of the Notice of Dispute. Each party shall have the option to present a written summary of its position, not to exceed ten pages, and/or to make an opening statement of its position to the mediator of not more than one hour in duration. No document submitted, nor anything stated by either party, during the mediation shall be admissible or discoverable in any subsequent arbitration proceeding or other civil adjudication relating to the dispute. The parties shall bear their own costs and expenses and an equal share of the mediator's fees and the administrative fees for the mediation.

9.3    Binding Arbitration.

(a)    If the dispute is not resolved by mediation, then either party may, within ten (10) business days after the conclusion of mediation, submit the dispute to binding arbitration administered by the AAA by giving written notice to the other party and to the AAA. The arbitration proceedings shall be conducted before a single arbitrator who shall be an attorney with extensive experience with computer software contracts. Selection of the arbitrator shall be by any method that is agreeable to the parties, provided that, if the parties are unable to agree on an arbitrator within 20 days after the dispute is submitted to arbitration, then the AAA shall assign the arbitrator. No person may be selected as an arbitrator who has had any prior relationship with either of the parties, whether business, professional, social or otherwise, or who served as mediator of the same dispute.

(b)    The arbitration shall be held in New York, New York.

(c)    The arbitrator shall permit each party to take pre-hearing discovery, but shall limit the scope of such discovery so as to be consistent with the scope and complexity of the issues in dispute and so as to allow completion of the hearing within the time limit imposed by Section 9.3(d) below. Each party will submit to the hearing schedule set by the arbitrator. Each party shall be entitled: (i) to be represented by counsel at the arbitration hearing, (ii) prior to the hearing to present the arbitrator and the other party with a written summary of its position on the issues in dispute, which shall not exceed ten pages in length, (iii) at the hearing to make both an opening and closing statement of its position, neither of which shall exceed two hours in duration, (iv) to present such testimony and documentary, physical or other evidence as is relevant and material to the dispute (iv) to present witnesses and to cross examine opposing witnesses, and (v) to file post-hearing briefs with the arbitrator (with copies to the other party) of not more than ten pages in length.

(d)    Except as hereafter provided, the arbitration shall be completed within 120 days after the date the dispute was submitted to arbitration. Upon a clear showing by a party that imposition of the foregoing time limit would work an undue hardship on such party or would not be practicable due to events beyond such party's control (such as the illness of a key witness), the arbitrator may extend such time limit but shall make all reasonable efforts to see that the arbitration is completed as promptly as practicable.

(e)    The arbitrator shall render an award within twenty (20) business days after completion of the arbitration, unless such time shall be extended by mutual agreement of the parties. With respect to any matter brought before the arbitrator, the arbitrator shall make a decision having regard to the intentions of the parties, the terms of this Agreement, and custom and usage of the insurance and data processing industry. Such decisions shall be in writing and shall state the findings of fact and conclusions of law upon which the decision is based, provided that such decision may not (i) award consequential, punitive, special, incidental or exemplary damages or any amounts in excess of the limitations delineated in Section 7 of this Agreement, (ii) include a suspension of any provision hereof, or (iii) render a decision which, if reached by a trial court, would be vacated, modified or corrected in whole or in part under a clear abuse of discretion or error at law standard of review used by appellate courts reviewing a trial court decision. The decision shall be based exclusively upon the evidence presented by the parties at a hearing in which evidence shall be allowed. Such decision shall be final and binding upon all parties to the proceeding and may be entered by either party in any court having jurisdiction, and may not be appealed except on the grounds for vacating an award as specified in the applicable rules, statutes or case law governing the arbitration. Neither the AAA nor the arbitrator shall be a necessary party in any judicial proceedings relating to an arbitration hereunder. Neither the parties, the AAA nor the arbitrator may disclose the existence or results of any arbitration hereunder to any third parties without the prior written consent of both parties.

(f)    The arbitrator may grant equitable remedies consistent with the provisions of this Agreement. The arbitrator shall have the same power as a judge in a court of law or equity to hear and grant motions, including,

Master Agreement 2008 P093-017A

22

CSC: Taylor

RESTRICTED INFORMATION –        CRAWFORD

KMPR-0108902

without limitation, motions for dismissal for failure to state a claim motions for judgment on the pleadings and motions for summary judgment.

(g)     In the event that one party (the *"offeror"*) offers in writing to settle the dispute (the "Settlement Offer") during the pendency of the arbitration for a sum certain in money or other consideration and such offer is rejected by the other party (the *"offeree"*), and if:

(i) the Settlement Offer was an offer by the offeror to pay the offeree a sum certain in money or other consideration, and the offeror subsequently prevails or the offeree is awarded less than the amount of such Settlement Offer; or

(ii) the Settlement Offer represented a sum certain in money or other consideration that the offeror was willing to receive from offeree in settlement, and the offeror subsequently is awarded more than the amount of such Settlement Offer,

then in either such case, the offeror shall be entitled to recover from the offeree all the offeror's costs and expenses of arbitration incurred subsequent to such offer, including reasonable attorneys' fees and costs assessed against it by the AAA.

(h)     The arbitration rules and procedures of the AAA shall otherwise govern the arbitration to the extent such rules are consistent with these provisions.

### Section 10
### Term and Termination

10.1     Term.  The term of this Agreement commences on its effective date and will continue so long as there is a Product Order or Work Order in force as part of this Agreement.  The term of each Product Order which is made a part of this Agreement shall begin upon its effective date and shall continue until the earlier to occur of: (a) expiration or termination of the License Term; or (b) termination of the Product Order pursuant to this Agreement. The term of a Work Order shall commence on the effective date and shall continue until the earlier to occur of: (x) expiration of the Work Order; (y) completion of the Services; or (z) termination of the Work Order pursuant to this Agreement.

10.2     Termination for Breach.  Either party may terminate a Product Order or Work Order upon a material breach by the other party of any one or more of the terms and conditions of such Product Order or Work Order or this Agreement in relation to such Product Order or Work Order provided the party in breach is notified in writing by the other party of the material breach and such breach is not cured or a satisfactory resolution agreed upon in writing within thirty (30) days of such notice. CSC may immediately terminate any Work Order if Customer's license to use a Licensed Program identified in such Work Order, or Customer's right to receive MESA for such Licensed Program, is terminated.

10.3     Termination for Bankruptcy.  In the event a party makes a general assignment for the benefit of creditors or files a voluntary petition in bankruptcy or petitions for reorganization or arrangement under the bankruptcy laws, or if a petition in bankruptcy is filed against a party, or if a receiver or trustee is appointed for all or substantially all of the property and assets of a party and such petition or appointment is not dismissed within sixty (60) days, the other party may terminate any one or more of the Product Orders and/or Work Orders.

10.4     Effect of Termination.  Except as provided above or in any Purchase Order or Work Order, the expiration or termination of a Product Order or Work Order shall have no effect on any other Product Order or Work Order that may be in force and effect as part of this Agreement.  Except as otherwise provided herein or in a related agreement between the parties, Customer shall remain liable for all charges legally required under the Product Order and Work Order for services or licenses to the date of termination or otherwise due CSC and which are unpaid as of the date of termination. Upon termination or expiration of the License Term for a Product Order, Customer shall not use a Licensed Program designated therein and shall return to CSC, within thirty (30) days after such termination, the original and all copies of such Licensed Program (or certify to its destruction).  Due to the nature of such Licensed Program and the need for its protection as a trade secret and confidential proprietary information, time is of the essence in its return, and in the event of Customer's failure to do so within the time provided herein, Customer agrees that CSC shall be entitled to seek injunctive relief to require such return, reasonable attorneys fees and costs incurred in obtaining such injunctive relief and such damages as a court of competent jurisdiction shall award.  If it

Master Agreement 2008  P093-017A

CSC: Taylor

RESTRICTED  INFORMATION –

CRAWFORD

028
KMPR-0108903

is impractical to separate and return such Licensed Program, Customer shall destroy the Licensed Program and all copies thereof and within thirty (30) days of termination of this Agreement an officer of Customer shall certify to CSC in writing that the Licensed Program and all copies thereof have been destroyed.  Timely certification of destruction shall fulfill Customer's obligation to return the Licensed Program.  Failure to so certify destruction shall constitute failure to return the Licensed Program.

## Section 11
## Miscellaneous Provisions

11.1    Notices. All notices required pursuant to this Agreement shall be in writing and shall be sent by either (i) certified mail, return receipt requested, (ii) prepaid, overnight express courier, or (iii) confirmed facsimile transmission with a copy thereof sent by one of the other means.  All notices shall be deemed effective upon receipt. Notices shall be directed as follows or to such other address as a party may designated by proper notice hereunder:

If to CSC:

10301 Wilson Blvd.
Blythewood, South Carolina 29016
Attn: General Counsel
Facsimile: (803) 333-5560

If to Customer:
Unitrin Services Company
One Tower Lane
Lower Level
Oakbrook Terrace, IL 60181

Attn: Chief Information Officer
Facsimile: (630) 368-8240

With a copy to:
Unitrin Services Company
One East Wacker Drive
Chicago, IL 60601
Attn: General Counsel
Facsimile: 312-661-4941

11.2    Assignment/Delegation.    Neither party may transfer or assign this Agreement to any third party without the prior written consent of the other party.  For purposes of this Section 11.2: (i) a sale of stock possessing a majority of the party's voting power or a merger or other transaction effecting transfer of rights and obligations under this Agreement to a third party by operation of law shall be considered an assignment, and (ii) no change of corporate name or reincorporation in another state shall, in and of itself, be considered an assignment.

11.3    Entire Agreement.    This Agreement, including all Exhibits, Product Orders, Work Orders, Design Documents and other attachments hereto, constitutes a fully integrated contract and state the entire agreement of the parties hereto relating to the subject matter hereof and supersedes all prior proposals, discussions, representations, demonstrations, negotiations, correspondence, writings, understanding and other agreements relating to such subject matter and together sate the entire understanding and agreement upon which CSC and Customer rely respecting the subject matter of this Agreement.

11.4    Amendments.    Each amendment to this Agreement must be in writing and be signed by an authorized representative of both CSC and Customer.  Each amendment to a Product Order or Work Order must be in writing and be signed by an authorized representative of both CSC and Customer.

11.5    Waivers. The failure or delay by either CSC or Customer in requiring performance of any provision of this Agreement shall not constitute a waiver of the right to require performance of such provision.  To be effective, a waiver must be in writing and signed by an authorized representative of the waiving party.  Unless a written waiver

Master Agreement 2008 P093-017A

CSC: Taylor

expressly so provides, no waiver of a breach of a provision shall constitute a waiver of the provision itself or of any subsequent breach thereof. All rights and remedies hereunder shall be cumulative and may be exercised singularly or concurrently.

11.6 Counterparts. This Agreement may be executed in two or more counterparts, each of which will be considered an original and all of which together will constitute one and the same agreement.

11.7 Governing Law. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of New York, without regard to its conflict of laws rules, and shall be construed, performed and enforced in all respects in accordance with the laws of that State. Because the parties agree that this contract is not a contract for the sale of goods, this Agreement shall not be governed by any codification of Article 2 or 2A of the Uniform Commercial Code, or any codification of the Uniform Computer Information Technology Act, ("UCITA"), or any reference to the United Nations Convention on Contracts for the International Sale of Goods. Notwithstanding any acknowledgment by CSC of a purchase order submitted by Customer, any condition or provision in any such purchase order or other memorandum of Customer which is in any way inconsistent with, or which adds to the provisions of this Agreement, is null and void.

11.8 Successors. This Agreement will be binding upon and inure to the benefit each of the parties and their successors and permitted assigns permitted by this Agreement.

11.9 Divestiture of Customer Business. In the event of a divestiture of an Authorized Company or business segment of an Authorized Company ("Divested Unit") on whose behalf the Customer is then utilizing a Licensed Program under this Agreement, the Customer may, during the license term, in addition to its continuing use for its ongoing businesses, continue to use the Licensed Program on behalf of the Divested Unit for a transitional period not to exceed one year in connection with the divestiture, provided: (i) such Divested Unit (and it's parent or any affiliate of the Divested Unit) does not receive any disclosure of source code for the Licensed Program, but Customer may allow disclosure of the internet or network enabled components of a Licensed Program only to the employees of such Divested Unit required to have such access and provided that no one accesses the Licensed Products outside the U.S.; (ii) CSC, Customer and the Divested Unit must first execute a CSC non-disclosure agreement; (iii) such Divested Unit must not become an Affiliate of a competitor of CSC as defined in Section 4.3 above; (iv) Customer must continue to obligate such Divested Unit (and its employees) to a level of care sufficient to protect the License Program from unauthorized use or disclosure; (v) Customer must continue to be responsible for assuring the Divested Unit's (and it's employees') compliance with the terms of this Agreement and the non-disclosure agreement, and (vi) the Licensed Program shall be used to process the policies underwritten by the Divested Unit.

11.10 Agreement Confidential. Customer promises not to disclose the terms and conditions of this Agreement to any third party, except as required in the normal conduct of Customer's business or as agreed to by CSC.

11.11 Press Release. Customer agrees to cooperate with CSC by providing information and approval for joint news releases about the business relationship between CSC and Customer. CSC agrees that no news release will be released without Customer's prior approval.

11.12 Non-Hire. Neither CSC nor Customer will (i) attempt to induce an employee of the other to terminate his or her employment or (ii) offer employment to a former employee of the other during the six (6) month period immediately following the former employee's termination. For purposes of this paragraph, "employee" shall mean only the personnel of either party who are substantially involved in the development, marketing, servicing, distribution or use of a Licensed Program.

11.13 Heading. The descriptive headings of this Agreement are intended for reference only and shall not affect the construction or interpretation of the Agreement. References to this Agreement are inclusive of Product Orders which are specifically made applicable to this Agreement by their terms.

11.14 Unenforceability. If any provision of this Agreement or the application thereof to any party or circumstances shall, to any extent, now or hereafter be or become invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and every other provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Master Agreement 2008 P093-017A

25

CSC: Taylor

IN WITNESS WHEREOF, this Master Software License and Services Agreement has been executed as of the Effective Date.

CSC                                         CUSTOMER

COMPUTER SCIENCES CORPORATION               UNITRIN SERVICES COMPANY

By: _____                 By: _____

Print Name: Raymond A. August               Print Name: Shawn Crawford
                                                         Vice President

Title: PRESIDENT P&C INS., FSS              Title: Unitrin Services Company
       1/16/09

FAX COPY PREVIOUSLY SIGNED
ON 1/2/09

RESTRICTED INFORMATION –            CRAWFORD            031
KMPR-0108906

Exhibit A
**Sample Product Order**

## PRODUCT ORDER NO____

This Product Order ("Product Order"), deemed effective _____, 200__, is by and between **Computer Sciences Corporation ("CSC") and** ████████████████████ ("Customer"), and is hereby made a part of and incorporated into the Master Software License and Service Agreement by and between the parties hereto dated _____, _____ (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement. If any provision of this Product Order and any provision of the Agreement are inconsistent or conflicting, the inconsistent or conflicting provision of this Product Order shall be an amendment of the Agreement and shall control as to the Licensed Program(s) designated herein.

1.  **DEFINITIONS:** For purposes of this Product Order only, the following terms shall have the following meanings in this Product Order:

    Authorized Company(ies):

    _____

    Authorized Lines of Business:

    (i)Type of Insurance:_____
    (ii) Excluded Lines: _____

    Authorized Location:

    _____
    _____

    License Term: The period commencing on the effective date hereof and continuing for eighty-four (84) full calendar months.

    MESA Term: The period commencing on the effective date hereof and continuing for forty-eight (48) full calendar months and any renewals thereof. Upon the expiration of the initial forty-eight (48) month MESA Term, Customer shall have the option of renewing the MESA Term as provided in Section 4 below.

2.  **LICENSED PROGRAM COMPONENTS AND SCOPE OF LICENSE**

2.1  The Licensed Program listed below is licensed by this Product Order:

     **[APPLICABLE LICENSED PROGRAM DESCRIPTIONS TO BE INSERTED HERE]**

2.2  The Licensed Program will be provided in machine readable source code except (i) the Integrated Application Platform, Application Program Generator, Rating Processor and other Technical Enabling Mechanisms

contained in a Licensed Program, which are certain object code programs which give users the capability to create, customize or alter screens and programs, and define edits for Customer's use as part of the Licensed Program, and (ii) third party programs to which CSC has the right to incorporate in a Licensed Program but does not have the right to distribute source code.

2.3  *[NOTE: ADD CLARIFICATION AS TO WHETHER OR NOT MULTIPLE COPIES OF THE SYSTEM CAN BE RUN BY CUSTOMER.]*

3.  **LICENSE CHARGE AND MESA CHARGE**

3.1  For the Customer's authorization to use the Licensed Program during the License Term hereof, Customer promises and agrees to pay to CSC a License Charge of ___ dollars ($ .00) which shall be due and payable upon execution hereof. The License Charge shall be wired to the following account:

     CSC
     Wachovia Bank, NA
     Philadelphia, PA
     ABA# 031201467
     Credit to: Financial Services Group
     Acct. No. 2000010398409

3.2  For Customer's right to receive MESA support for the Licensed Program during the MESA Term, Customer shall pay a MESA Charge for each Licensed Program beginning the first day of the first full calendar month following the effective date of this Product Order and continuing on the first day of each succeeding month of the MESA Term hereof, except as otherwise provided herein, equal to the sum of the following amounts:

     (i)  The "Base Charge" for such Licensed Program (set forth in the Table of Charges below), plus

Master Agreement 2008 P093-017A

27

CSC: Taylor

KMPR-0108907

(ii) The "size charge" computed by multiplying sequentially the appropriate percentage factors for the Licensed Program (set forth in the Table of Charges) times the total direct written premiums ("DWP") produced by Customer and all Authorized Companies for Authorized Lines of Business during the immediately preceding calendar year. The initial total MESA Charge equals _____ dollars ($__). The size charge shall be recomputed as of January of each calendar year based upon the DWP for the immediately preceding calendar year. During the first calendar year of the term of this Product Order, or any portion thereof, Customer certifies that the DWP to be used in this calculation is $_____.

3.3 Beginning the first January 1 after the effective date of this Product Order, the Base Charge for all Licensed Programs shall be increased effective as of that January 1 and each January 1 thereafter for so long as MESA is in effect by an amount equal to the percentage increase in the Consumer Price Index for all Urban Consumers (Professional Services) ("CPI"), published by the United States Bureau of Labor Statistics, from the immediately preceding January 1 times the Base Charge in effect for the immediately preceding calendar year.

### [INSERT APPLICABLE TABLE OF CHARGES]

## 4. RENEWAL OF MESA AND LICENSE TERMS

4.1 Upon expiration of the initial MESA Term, Customer may elect either of the following options by six (6) months prior written notice to CSC:

(i) To renew the MESA Term for an additional thirty-six (36) full calendar months at the same Base Charge (as adjusted by CPI increases during the initial MESA Term) and Table of Charges as set forth above, for the initial MESA Term, except that there shall be no additional License Charge; or

(ii) To continue to use the Licensed Program on an "AS IS" right-to-use basis without MESA and without performance warranties of any kind for the remainder of the License Term subject to all other terms and conditions

of the Agreement and this Product Order, except no MESA Charge shall be payable and Customer shall return or destroy the Licensed Program and all related material pursuant to Section _____ of the Agreement at the end of the License Term provided, however, Customer must pay all third party royalties, if any.

Customer acknowledges that Paragraph 4.1(i) shall automatically apply if no notice is provided to CSC.

4.2 If Customer elects to renew MESA after the initial MESA Term pursuant to Section 4.1(i), upon expiration of the additional MESA Term of this Product Order (and any extension of MESA thereafter), Customer may elect either of the following options by six (6) months prior written notice to CSC:

(i) To renew the License Term and MESA Term for the Licensed Program at CSC's then current terms and conditions if MESA is offered by CSC at such time, except that there shall be no additional License Charge, or

(ii) To renew the License Term and retain the Licensed Program on an "AS IS" right-to-use basis without MESA and without performance warranties of any kind for a period of seventy-two (72) months upon execution of an Addendum to this Product Order and payment of a lump sum license fee equal to the final MESA Charge multiplied by seventy-two (72) with the resulting sum multiplied by forty percent (40%); provided, however, Customer must also pay all third party royalties, if any, or

(iii) To terminate the license and return or destroy the Licensed Program and all related material pursuant to Section _____ of the Agreement at the end of the License Term.

4.3 If Customer elects not to extend MESA after the initial MESA Term pursuant to Section 4.1(ii), at the end of the License Term (or at the end of any renewals of the License Term), Customer may elect either of the following options by six (6) months prior written notice to CSC:

(i) To renew the License Term and MESA Term for the Licensed Program at CSC's then current terms and conditions

Master Agreement 2008 P093-017A

28

CSC: Taylor

if MESA is offered by CSC at such time; or

(ii)  To terminate the license and return or destroy the Licensed Program and all related material pursuant to Section _____ of the Agreement.

## 5.  ADDITION OF OTHER SUBSIDIARIES

5.1  If during the MESA Term Customer forms a new, wholly-owned insurance company subsidiary, Customer may add such subsidiary as an Authorized Company under this Product Order for the processing of Authorized Lines of Business within twelve (12) months after its formation by: (i) amendment of this Product Order to include such subsidiary as an Authorized Company and (ii) adding such subsidiary's DWP for the Authorized Lines of Business to the DWP used in calculating the MESA Charge under this Product Order. There is no additional License Charge for such addition.

5.2  If during the MESA Term Customer acquires additional wholly-owned insurance company subsidiaries, Customer may add any such subsidiaries as Authorized Companies for a Licensed Program within twelve (12) months of their acquisition by: (i) amendment of this Product Order to include such subsidiaries as Authorized Companies, (ii) adding such subsidiaries' DWP for the Authorized Lines of Business to the DWP used in calculating the MESA Charge, and (iii) payment to CSC of an additional License Charge equal to the increase in the MESA Charge under this Product Order resulting from the addition of such subsidiaries times the multiplier set forth in the Table of Charges. If during the MESA Term Customer acquires books of insurance business (or parts thereof) from third parties, Customer may process such business with a Licensed Program by: (i) written notice to CSC of such acquisition, (ii) adding such business' DWP for the Authorized Lines of Business to the DWP used in calculating the MESA Charge, and (iii) payment to CSC of an additional License Charge equal to the increase in the MESA Charge under this Product Order resulting from the addition of such business times the multiplier set forth in the Table of Charges.

5.3  At any time during the MESA Term any insurance company subsidiaries not added within the time set forth above and/or other wholly-owned insurance company subsidiaries of Customer may be added as Authorized Companies by (i) amendment of this Product Order to add such subsidiaries as Authorized

Companies, payment to CSC of an additional MESA Charge based upon such subsidiaries' DWP for the Authorized Lines of Business and based upon CSC's Base Charges and percentage factors in effect for new licensees at the time the amendment becomes effective as though such subsidiaries were new licensees licensing the Licensed Programs, except there shall be a seventy-five percent (75%) discount of the applicable Base Charge, and (iii) payment to CSC of an additional License Charge equal to CSC's multiplier in effect for new licensees at the time the amendment becomes effective times the additional MESA Charge calculated as provided above.

CSC and Customer certify by their undersigned authorized representatives that they have read this Product Order and the Master License Agreement of which it forms a part and agree to be bound by its terms and conditions.

**CSC**

**Computer Sciences Corporation**

By: _____
(Authorized Signature)
(in non-black ink, please)

_____
(Name)

_____
(Title)

_____
(Execution Date)

**Customer**

_____

By: _____
(Authorized Signature)
(in non-black ink, please)

_____
(Name)

_____
(Title)

_____
(Execution Date)

Master Agreement 2008  P093-017A

29

CSC: Taylor

EXHIBIT B
TRAVEL POLICIES

## Unitrin Travel Policies for Vendors

The following are Unitrin supplied travel policies which will be honored in connection with the Agreement. Within the following policy, where receipts are to be submitted, Vendor shall supply a copy of those receipts. "Employees" or "you" as referenced below shall mean employees of Vendor and any subcontractors permitted under the Agreement.

### Reimbursable Expense Guidelines

**Airfare** – Employees will only be reimbursed for travel in coach or economy class. Reimbursement for first class is prohibited and will only be made in case of an emergency. If such an emergency occurs, a detailed explanation must be provided on page 2 of the expense report.

Whenever possible, reservations should be made early enough to assure you obtain the lowest fare possible. In obtaining the lowest available airfare, all major airlines and purchasing methods should be considered.

Copies of travel itineraries received from the travel agency and ticket receipts must be included with your expense report.

**Meals** – Meals are generally reimbursed at actual cost. Meals should be eaten at reasonably priced restaurants and should not exceed $50 per person for dinner without written explanation.

Under normal circumstances, you will not be reimbursed for breakfast costs for the morning on which you are traveling out and you will not be reimbursed for dinner costs for the evening on which you are traveling home. **Exceptions:** On the day you leave, if your flight is scheduled to leave before normal business hours you may submit a receipt for breakfast. On the day of your return, if the actual or scheduled arrival time of your flight is after normal business hours, you may submit a receipt for dinner. Normal business hours for this purpose are 8:00 am – 6:00 pm. You may also submit a receipt for a meal if you are scheduled to depart or arrive on a non-business day or company holiday.

**Parking/Ride to/from Airport** – You are expected to find the most economical transportation to and from the airport. Taxis, limousines, public transportation, and driving your own car should be compared for cost advantage.

Receipts for parking at airports, hotels, and, in some circumstances, the company office should be attached to your expense report. Employees are encouraged to use remote or long-term airport parking whenever possible. You should include a brief explanation on page 2 of your expense report when using daily or short-term airport parking lots for trips lasting 4 or more days.

RESTRICTED INFORMATION –

CRAWFORD

035
KMPR-0108910

**Rental Car and Gas** –Your reimbursement will be limited to the mid-size rate regardless of the class of car rented unless three or more employees are traveling together. A full size car will be allowed if three or more employees are traveling together. Employees are encouraged to request economy size cars if traveling alone. If two or more employees are traveling together, a reasonable attempt should be made to minimize the number of rental cars. It is permissible to rent a second car if three or more employees are traveling together in lieu of a full size car. Unlimited miles should always be requested.

Gas purchases for rental cars should be substantiated by receipts. Please refuel rental cars prior to returning them unless the rental firm(s) offers refueling at a rate comparable to the rate at local gas stations.

**Hotel Room** – You should stay in moderately priced hotels within a reasonable distance from your destination. Hotel expenses should be itemized on the expense report daily when the hotel bill provides the detail (i.e., daily room charges, phone, parking, and meals).

**Miscellaneous Expenses** – Reasonable expenses for laundry, dry cleaning, and valet are allowed for trips longer than one week. Consider using local establishments instead of the services provided in your hotel since local establishments are generally more economical.

The actual amount expended to have someone assist you with your baggage is a proper charge. Tips to parking attendants are also allowed if necessary. Small gratuities for maid service are also permitted.

RESTRICTED  INFORMATION –                    CRAWFORD                    036
                                                                        KMPR-0108911

# Exhibit A-3

| From: | AAA Rekha Rangachari, Esq. |
|---|---|
| To: | Meyer, Chris; Lee, Christopher; Kribs, Kelly Albinak; Veith, Paul E.; R-Andrew F. Newman; R-Jeremy Press; R-Lisa S. Gallerano; R-Mitchell P. Hurley |
| Subject: | Second List Results -- Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283) |
| Date: | Tuesday, January 05, 2016 10:52:04 AM |
| Attachments: | imageca0e24.PNG |

Dear Counsel,

I hope this finds you well. Happy New Year.

Based on your confidential Second Strike and Rank List submissions, we are inviting Stephen S. Strick, Esq., to serve as Arbitrator.

I'll be in touch shortly with his executed appointment documents.

Warm regards,
Rekha



**AAA Rekha Rangachari, Esq.**
**Director of ADR Services**
American Arbitration Association
150 East 42nd St, 17th Floor
New York, NY, 10017
www.adr.org
**T: 646 240 4583**
**F: 212 286 0383**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.



**AMERICAN ARBITRATION ASSOCIATION** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

150 East 42nd Street, 17th Floor
New York, NY 10017
Telephone:(212)484-4188
Fax:(212)286-0383

January 21, 2016

**<u>Via Electronic Mail Only</u>**
Paul E. Veith, Esq.
Christopher Meyer, Esq.
Kelly Albinak Kribs, Esq.
Christopher Y. Lee, Esq.
Sidley Austin LLP
1 South Dearborn
Chicago, IL 60603

Lisa S. Gallerano, Esq.
Andrew F. Newman, Esq.
Akin Gump Strauss Hauer & Field LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201

Mitch Hurley, Esq.
Akin Gump Strauss Hauer & Field LLP
One Bryant Park
New York, NY 10036

Case Number: 01-15-0005-2283

Kemper Corporate Services, Inc.
-vs-
Computer Sciences Corporation

Dear Counsel,

We herewith inform the Parties that the AAA appoints as sole Arbitrator Stephen S. Strick:

> Stephen S. Strick, Esq.
> 459 West 24th Street, First Floor
> New York, NY 10011

Enclosed please find copies of Arbitrator Strick's duly executed Notices of Appointment and Compensation Arrangements. Please refer to the Notice of Compensation Arrangements for the specific rates. Per our rules, all arbitrators are neutrals, unless otherwise agreed by the parties in the situation of party appointed arbitrators.

If either party or their counsel knows of any contact or conflict that may be relevant, they are to communicate this information to the AAA <u>within ten days</u>. Each party should be responsible for updating its disclosures as such information become available. <u>The duty to update this information continues up to and including the date of the hearing.</u>

This letter will also serve to confirm that a Preliminary Hearing will be scheduled shortly. <u>Please provide your availability for a call the weeks beginning January 25 and February 1.</u>

039



AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

150 East 42nd Street, 17th Floor
New York, NY 10017
Telephone:(212)484-4188
Fax:(212)286-0383

Compensation to Arbitrator Strick represents an independent obligation of the parties, and it is understood that the AAA has no liability, direct or indirect, for such payment. Each party shall promptly deposit in advance with the AAA such sums of money as required by the administrator to defray arbitrator invoices. Compensation incurred will be deducted from deposits on hand, if any.

Upon request, checks are to be made payable to the American Arbitration Association and submitted to the undersigned. You may also view case financial information, as well as make payments with a credit card online via AAA's WebFile.

We have attached invoices that reflect an estimated amount of eight (8) preliminary study hours. Please process the invoices and remit payment to the AAA by **close of business January 28, 2016**. Please note that you may receive duplicate invoices since invoices are also generated automatically every 30-days from our central accounting department.

There shall be no direct telephone or any other type or contact with Arbitrator Strick. Please note that any challenges or financial matters must be exclusively submitted to the case manager.

As a reminder, cases may be viewed and managed online through AAA's WebFile.

Sincerely,

*R. Rangachari*

Rekha Rangachari, Esq.
Director of ADR Services
+1 646 240 4583
RekhaRangachari@adr.org

Jeffrey T. Zaino, Esq.
Vice President
+1 212 484 3224
ZainoJ@adr.org

cc:    Stephen S. Strick, Esq. (via electronic mail only)

# Exhibit A-4

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the matter of arbitration:<br><br>*Kemper Corporate Services, Inc.*<br>("Claimant")<br>vs.<br>*Computer Sciences Corporation*<br><br>("Respondent") | **Case Number  01-15-0005-2283**<br>**Report of Preliminary Hearings and**<br>**Scheduling Order** |

## PRELIMINARY HEARINGS

Pursuant to the rules and procedures of the American Arbitration Association (the "AAA"), a first preliminary hearing was held starting at 11:00 A.M. on February 9, 2016 (the "February Preliminary Hearing") and a second preliminary hearing was held starting at 11:00 A.M. on March 1, 2016 (the "March Preliminary Hearing"). Both preliminary hearings were held before Stephen S. Strick (the "Arbitrator"). Counsel attending the February Preliminary Hearing were Paul E. Veith, Esq., and Christopher Y. Lee, Esq., of Sidley Austin LLP, and Fran Robertson, Esq., Claimant's Chief Litigation Counsel, all of whom appeared on behalf of Claimant, Kemper Corporate Services, Inc. ("Kemper"); and Steve Sumner, Esq., David H. Pace, Esq., and Gayle A. Boone, Esq. of Sumner, Schick, and Pace, LLP appearing for Respondent, Computer Sciences Corporation ("CSC"). At the March Preliminary Hearing, Mr. Veith, Ms. Robertson appeared for Claimant and Messrs. Sumner and Pace appeared for Respondent.

ROPHSO030316

041

By agreement of the parties and **Order of the Arbitrator**, the following is in effect, (unless otherwise indicated, all times are *__Eastern__* and each deadline is *__6 PM Eastern__* of the day specified).

## JURISDICTION

Personal and subject matter jurisdiction in this proceeding is conferred upon this Tribunal pursuant to the terms of *Section 9* of the *Master Software License and Service Agreement* between the parties,[1] (the "MSLSA").   In addition, counsel for each party appearing in this proceeding confirmed at the February Preliminary Hearing that neither had any objection, and thereby consented to (i) the jurisdiction and the administration of this arbitral proceeding by the AAA,[2] (ii) the appointment of the undersigned Arbitrator, Stephen S. Strick, Esq. to act as sole arbitrator in this proceeding, (iii) the application of the AAA Commercial Rules and its Procedures for Large and Complex Cases, and (iv) the application of New York State internal law and the Federal Arbitration Act *(U.S. Code, Title 9)*.

The parties through their counsel have also agreed that the time limitations relating to (i) completion of the arbitration set forth in Section 9.3(d) of the MSLSA, and (ii) rendering an award as set forth in Section 9.3(e) are, by the mutual consent of the parties, amended, modified and superseded by the agreed upon deadlines and approved time periods set forth in Schedule 1.

---

[1] The Master Software License and Service Agreement is dated 1/2/09 and 1/16/09 and is signed by CSC and Unitrin Services Company n/k/a Kemper Corporate Services, Inc. (*See*, Respondent's Answer, Exhibit No. 1.)

[2] At the February Preliminary Hearing, Respondent noted its jurisdictional objection to any claims asserted in this proceeding that are contractually excluded by the parties from arbitration or reserved for resolution in other arbitral or judicial forums. Counsel agreed to meet and confer and attempt to consolidate and streamline procedures in this and related proceedings in an attempt to achieve arbitral/judicial economies.

ROPHSO030316

## RELEVANT PROCEDURAL HISTORY/PLEADINGS

On October 19, 2015, Counsel for Claimant filed Kemper's **Demand for Arbitration** with the AAA initiating this arbitral proceeding.

On November 16, 2015 Counsel for Respondent filed **CSC's Answering Statement and Counterclaim Request**.

On January 6, 2015, Counsel for Claimant filed **Kemper's Answer** to Respondent's Counterclaims.

On February 18, 2016 Counsel for Respondent filed CSC's First Amended Answering Statement and Counterclaim along with exhibits.

## APPROVED PRE-HEARING SCHEDULE

Pursuant to agreement of the parties and direction and approval of the Arbitrator, the parties have agreed to adhere to the dates and deadlines contained in Schedule 1. The dates set forth in Schedule 1, may be changed only by written approval of the Arbitrator upon application, and for good cause shown.

## DOCUMENT EXCHANGE

### Document Production Schedule:

Counsel shall continue to cooperate and confer with one another with respect to the most efficient means of exchanging documents (including electronically stored documents) that are relevant and necessary to prove their claims and counterclaims in this proceeding. Each side shall serve upon the other, its request for the production of documents, which documents shall be produced and delivered to the office of opposing counsel in accordance with Schedule 1.

3

Any objection to the opposing party's request shall be communicated promptly to opposing counsel in writing, but in no event shall such objection be made later than the date agreed in Schedule 1. Counsel will meet and confer promptly following any such objection and attempt to resolve any issues with respect to document production. If there are any disagreements with respect to such documents, after a good faith attempt to resolve the issues between them, counsel will promptly refer such issue(s), if any, to the Arbitrator for resolution.

### Document Production/Privilege Issues:

Any documents withheld from production on the stated grounds of attorney-client privilege or work-product immunity must be scheduled on a privilege log. The deadline for serving the log is the date by which the withheld documents would otherwise have been produced. The log must indicate for each withheld document: (i) its nature (e.g., email, letter, attorney notes), date, and, if applicable, title/reference line, (ii) the names of all creators/senders and recipients (including cc and bcc recipients), (iii) an indication of which of its creators/senders and recipients, if any, was as of its date an attorney for the withholding party, and an indication of which of its creators/senders and recipients, if any, was as of its date neither an attorney for, nor a party or employee of, the withholding party, (iv) a general description of the document (e.g., "advice from counsel"), and (v) the basis for the privilege or immunity claim if not readily apparent from the other information provided (e.g., "next-to-last email in chain contains advice from counsel to business person and last email in chain forwards and summarizes advice from counsel"). Without a showing of good cause, documents that are not so scheduled on a log that has been served by the deadline will not be excused from production on grounds of privilege or immunity. The parties shall promptly confer and attempt to resolve any dispute regarding a claim of privilege or immunity, and any remaining disputes shall promptly be brought to the Arbitrator's attention. The Arbitrator may conduct an *in camera* review of documents to settle such disputes.

4

ROPHSO030316

044

**Discovery Documents Not To Be Filed With The Tribunal:**

Discovery request documents (e.g., requests for production of documents) and documents (including privilege logs) produced in response to discovery requests shall *not* be sent to the Arbitrator or the AAA unless a particular discovery request or produced document is the subject of a dispute that requires adjudication by the Arbitrator or unless otherwise ordered.

**Discovery Disputes:**

The parties shall endeavor, in good faith, to continue to cooperate in connection with discovery procedures and requests and attempt to themselves resolve any disagreements regarding the exchange of documents. Any unresolved discovery disputes shall be promptly brought to the Arbitrator's attention in writing, with each side stating their position in writing of not more than two pages per issue unless otherwise permitted by the Arbitrator upon application to issue a longer position statement.

**Additional Discovery:**

Any party seeking additional discovery beyond that agreed and approved by the Arbitrator must **promptly** make application (in a letter not more than three (3) pages in length) to the Arbitrator requesting such additional discovery. The letter shall include a showing of good cause and an indication of whether or not the other party consents.

## MOTIONS

Any party seeking to make any further motion(s) in this proceeding, dispositive or otherwise, shall first seek permission to do so from the Arbitrator (in a letter not more than two (2) pages per motion requested), explaining the reasons for same.[3] The Arbitrator may seek

---

[3] Unless otherwise approved by the Arbitrator, all briefs, motions and petitions filed in this proceeding by counsel for the parties shall be in 12 point type, spaced at 1.5 lines and appear on standard 8.5 x 11 inch sized paper.

ROPHSO030316

responses to such requests from the opposing side.

## FINAL WITNESS LISTS---SCHEDULING OF TESTIMONY

On the date set out in Schedule 1, each party shall identify each person whom the party plans to call to offer **expert testimony** and provide opposing counsel any written reports issued by such expert, or if none are in existence, a short summary of the expert's anticipated testimony and the bases therefor together with each such expert's c.v.

On the date set out in Schedule 1, each side shall identify each person the party plans to call to testify as rebuttal experts and each rebuttal expert's rebuttal report if written, or the bases for the expert's anticipated rebuttal testimony and his or her curriculum vitae.

On the date set out in Schedule 1, each side shall identify each non-expert person the party plans to call to testify, including witnesses on rebuttal (other than rebuttal experts).

Each such identification of a potential witness shall include his or her full name, address, and a short summary of his or her anticipated testimony. Except upon a showing of good cause, a party may be barred from calling a witness who is not so identified by that party.

The parties shall make arrangements to schedule the attendance of witnesses so that the Hearings can proceed expeditiously and without any unnecessary delay.

A party intending to present witnesses during the Hearing shall notify the other party and the Arbitrator, by 10:00 AM three (3) business days in advance of the anticipated date of testimony, of the names of the witnesses who will be called to testify on the day so anticipated and of the order in which those witnesses will be called.

## EXCHANGE OF EXHIBITS---EXHIBIT LISTS

On the date set out in Schedule 1, each party shall exchange (a) copies of all exhibits it anticipates offering in evidence at the Hearings and (b) a list of those exhibits,

6

indicating on the list the number and name/description of each such exhibit. The parties may agree to serve those copies and lists electronically. Copies of the exhibits and the lists shall *not* be sent to the Arbitrator or the AAA Case Manager. Except upon a showing of good cause, parties may be barred from introducing exhibits that are not so exchanged and listed by either party.

Each exchanged-and-listed exhibit shall automatically be deemed to be admissible at the Hearings for all purposes unless a written objection is served no later than *five (5) days following* receipt thereof. Objections shall *not* be sent to the Arbitrator or the AAA. Counsel shall promptly confer to try to resolve any objections. Either party may request a telephonic conference with the Arbitrator to discuss any unresolved objections and any other matters of concern.

## PRE-HEARING BRIEFS

On the date set out in Schedule 1, the parties shall exchange and submit to the Arbitrator an **opening pre-hearing brief** or position paper on all significant disputed legal issues involved in this proceeding, setting forth succinctly that side's legal position and supporting arguments, with copies (preferably in WORD format or, if necessary, in PDF format) of the cited *key* authorities and the cited *key* exhibits. Each brief/position paper should include (i) a discussion, with specificity and with citation to appropriate authority, regarding what the burden of proof is for each claim and each defense and (ii) an itemized listing of the relief requested and a discussion of the alleged basis for entitlement to each item of relief, including specific citation to the agreements between the parties.

## STATUS CONFERENCES

Either side or the Arbitrator may, from time to time, request additional status conference(s). During these conferences, the parties are free to raise any matter of concern relating to the present proceeding.

ROPHSO030316

## MISCELLANEOUS PRELIMINARY MATTERS

Any additional, preliminary and/or administrative matters not specifically addressed herein shall be raised in writing by the parties as promptly as possible, but in no later than *ten (10) calendar days before the Hearings*.

## HEARING SCHEDULE AND LOCATION

The Hearing Dates shall be held at a location to be agreed upon by the parties and approved by the Arbitrator, commencing on January 17, 2017 through and including January 31, 2017. Each hearing day shall commence promptly at *10:00 AM* and end at approximately *5:00 PM*, unless other arrangements are made and approved by the Arbitrator.

## EXHIBIT BOOKS FOR HEARING

At the commencement of the Hearings, the parties will provide the Arbitrator with **one (1) set of jointly prepared** loose-leaf exhibit binders containing copies of all exhibits to be used at the Hearings. Each exhibit shall be separately pre-marked, uniquely numbered, and identified by a numbered side-tab divider in its loose-leaf binder. Thus, there will be only one "Exhibit 1," one "Exhibit 2," etc. and not a "Claimant's Exhibit 1" and a "Respondent's Exhibit 1," a "Claimant's Exhibit 2" and a "Respondent's Exhibit 2," etc. The parties shall also provide one or more exhibit books for use by witnesses at the Hearings.

## OPENING AND CLOSING STATEMENTS

At the Hearing, each side may, at its option, make an opening statement. Each opening statement is limited to one (1) hour. Additional time may be granted at the discretion of the Arbitrator. The Arbitrator, in consultation with the parties, will decide towards the end of the Hearings whether there will be any closing statements.

8

## CHANGE OF DEADLINES

The parties may, by mutual agreement and written approval of the Arbitrator, change any pre-hearing deadline, provided such change does **_not_** result in postponing the Hearing. The parties shall promptly inform the Arbitrator and the Case Manager of any change the parties wish to make in any pre-hearing deadline and **shall jointly represent to the Arbitrator that the change will not result in postponing the Hearings**.

Any party seeking to change the pre-hearing or Hearings schedule must make application to the Arbitrator (in a letter not more than three (3) pages in length) requesting the change. The letter shall include a showing of good cause and an indication of whether or not the other party consents. The other party may promptly respond in a letter, not more than three (3) pages in length, but there will be **_no_** further submissions by either side unless requested by the Arbitrator.

## CONFIDENTIALITY OF PROCEEDINGS

Pursuant to the direction of the Arbitrator, counsel for the parties shall promptly meet and confer and attempt to reach agreement regarding the nature and degree of confidentiality that shall be maintained by the parties and their agents, attorneys and employees with respect to this proceeding including the Arbitrator's rulings, findings, and awards as well as the transcripts and any filings made in connection with this arbitral proceeding. The parties may enter into a non-disclosure agreement to protect trade secrets and confidential documents on terms acceptable to both sides and subject to the approval of this Arbitrator. Counsel shall jointly report as to the status of such agreement, as soon as practicable, but not later than December 1, 2015.

9

ROPHSO030316

049

## COMMUNICATIONS WITH THE ARBITRATOR

The parties have elected to avail themselves of the Accelerated Direct Exchange of Information with the Arbitrator. Therefore, party communications may be sent to the Arbitrator directly, provided that opposing counsel is copied on all such communications. The parties may utilize electronic exchange of documents between them in connection with this proceeding. (The parties are also free, if they so agree to electronically exchange documents with each other that are not also being sent to the Arbitrator.) Thus, *all* documents and other writings to be sent to the Arbitrator shall be sent by email, simultaneously to the other party and the AAA Director of ADR Services, Rekha Rangachari, Esq. (RekhaRangachari@adr.org). The parties consent to email, with attachments, as the means for such submission, filing, and service. Such attachments shall preferably be in WORD document format to the extent possible (or, if necessary, in PDF format).

If for logistical or other reasons (including volume of material being sent) email transmission cannot reasonably be used, hard copies of the documents and other writings (two-sided copies) as well as one or more discs or thumb drives containing same, shall be sent by courier for same-day or next-business-day delivery, provided the discs are received by the applicable deadline. Submissions exceeding thirty (30) pages (including attachments) should be sent by courier as well as by email. The parties consent to that alternative method for such submission, filing, and service in those instances where email transmission cannot be used. Documents sent by courier or email, as the case may be, shall be addressed to the Arbitrator as follows:

Stephen S. Strick, ADR
Arbitration & Mediation Services
459 West 24th Street
First Floor
New York, NY 10011
Tel: (212) 227-2844
email: sstrick@arbitratemediate.com

10

ROPHSO030316

050

There are to be no *ex parte* communications (regardless of form) between any of the parties or their counsel or any of their witnesses, on the one hand, and the Arbitrator, on the other.  Furthermore, there are to be no communications (regardless of form) between any of the parties and their counsel, on the one hand, and the Arbitrator, on the other, concerning the Arbitrator' compensation, fees, and expenses or concerning Arbitrator' disclosures and/or challenges, locale disputes, or settlement negotiations.  Any issues that the parties may have relating to arbitrator deposits or compensation shall be discussed with the AAA Director of ADR Services and not with the Arbitrator.

## REASONED FORM OF AWARD

The parties have agreed that the Arbitrator shall provide a form of final award in which the basis for the Arbitrator's decisions contain an explaination of his reasoning in reaching his conclusions (i.e., a Reasoned Form of Final Award).

## DOCUMENTATION OF HEARING; COST OF TRANSCRIPTS AND REPORTER

The parties will provide an official record of the Hearing, which will be made by a court reporter or recording device. A transcript copy of the official record shall be provided to each of the Arbitrator and the cost of the court reporter shall (in the first instance) be shared equally by the parties (unless otherwise agreed by them).

## STRICT ENFORCEMENT OF PROCEDURES/DEADLINES

All procedures/deadlines set forth herein will be strictly followed/enforced.

## EFFECT OF ORDER

This Order shall continue in effect unless and until amended/superseded by any subsequent order of the Arbitrator.

11

ROPHSO030316

051

* * *

Counsel are thanked for the cooperative attitude and courtesy they showed to each other and to the Arbitrator during the preliminary hearing.

Order Entered as of: March 3, 2016

_____

Stephen S. Strick, Arbitrator

12

ROPHSO030316

052

## *SCHEDULE 1*

**Kemper/CSC Arbitration – Approved Scheduling Order (as of March 1, 2016)**

| Event | Tribunal Approved Dates as of |
|---|---|
| Discussion with arbitrator (continued preliminary conference); parties to submit agreed schedule (or competing proposals) | 3/1/2016 |
| Parties to submit proposed protective order (or competing proposals) | 3/4/2016 |
| Parties to submit joint discovery plan, E-Discovery protocol (or competing proposals) | 3/4/2016 |
| Kemper to file reply to answer and counterclaim | 3/9/2016 |
| First day for parties to propound written discovery requests and commence deposition discovery | 3/21/2016 |
| Kemper provides read-only on line access to the project documents on the Sharepoint Server, or will produce those documents in an electronic format that mirrors the directory structure on which those documents are located on the Sharepoint Server. | 4/15/2016 |
| Deadline to produce all documents (rolling production contemplated) | 6/17/2016 |
| Final deadline for filing any motions to compel discovery | 6/29/2016 |
| Begin fact deposition period | 7/8/2016 |
| **Deadline to disclose all witnesses to be called at hearing (AAA ¶4)** | 8/28/2016 |
| **Deadline to amend pleadings without leave (AAA ¶2)** | 8/28/2016 |
| Completion of all non-expert discovery | 9/16/2016 |
| Submission of initial expert reports | 9/30/2016 |

| | |
|---|---|
| Submission of rebuttal expert reports | 10/28/2016 |
| Completion of expert witness depositions | 11/22/2016 |
| **Deadline to submit joint stip. of uncontested facts (AAA ¶3)** | 12/16/2016 |
| **Deadline to file pre-hearing briefs (AAA ¶8)** | 12/23/2016 |
| **Deadline to exchange exhibits and demonstratives (AAA ¶5)** | 12/23/2016 |
| Final Pre-Hearing Conference with Arbitrator | 1/6/2017 |
| **Arbitration Hearing (11 days of hearing time) (AAA ¶6)** | 1/17/2017-1/31/2017 |
| Deadline to file post-hearing briefs | 2/28/2017 |
| Arbitrator Decision | 3/24/2017 |

# Exhibit A-5

| From: | Stephen Strick |
|---|---|
| To: | Veith, Paul E.; David H. Pace |
| Cc: | AAA Rekha Rangachari Esq.; Meyer, Chris; Lee, Christopher; CL-Francesca Robertson; R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner; R-Steve Sumner |
| Subject: | Re: Schedule in Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283) |
| Date: | Wednesday, June 29, 2016 12:22:13 PM |
| Attachments: | Joint Proposed Amended Arbitration Schedule (6 29 16).docx |

Thank you both. The joint proposed amended schedule attached to today's email and dated June 29, 2016, is approved.

I look forward to receiving counsels' thoughts regarding the hearing's venue.

Kind regards,


Stephen Strick, Arbitrator




Stephen S. Strick, ADR
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200



This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone. Please then delete the e-mail and any copies of it. Thank you.


On Jun 29, 2016, at 6:53 AM, Veith, Paul E. <pveith@sidley.com> wrote:

Mr. Strick –

Mr. Pace and I have conferred and we jointly propose the attached schedule. This is

different than the schedule submitted yesterday as follows: (1) the deadline for initial post-hearing briefs was adjusted to account for the fact that the date in the prior schedule fell on the Sunday of Memorial Day weekend – we pushed it to the end of that week; (2) we added a date for responsive post-hearing briefs; and (3) we allowed 60 days for the arbitrator's decision, as you requested.

Mr. Pace and I will be conferring with our clients and one another in the coming days to attempt to reach a recommendation on the venue for the arbitration, and will be back to you on that subject as soon as possible.

Paul

**PAUL E. VEITH**

**SIDLEY AUSTIN LLP**
+1 312 853 4718
pveith@sidley.com

---

**From:** Stephen Strick [mailto:sstrick@arbitratemediate.com]
**Sent:** Tuesday, June 28, 2016 12:05 PM
**To:** Veith, Paul E.; David H. Pace
**Cc:** AAA Rekha Rangachari Esq.; Meyer, Chris; Lee, Christopher; CL-Francesca Robertson; R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner; R-Steve Sumner
**Subject:** Re: Schedule in Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283)

### _KINDLY ACKNOWLEDGE RECEIPT_

Gentlemen:

Further to my email below, please advise if you have discussed the most convenient venue for hearings. If it is decided that New York City remains the agreed seat and you wish to reserve facilities at the AAA, I would suggest that you contact Ms. Rangachari regarding hearing room facilities at your earliest convenience.

S——

Stephen S. Strick, ADR
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is
intended only for the individual (or individuals) or
entities named above and others who have been
specifically authorized to receive it. If you are not the
intended recipient, please do not read, copy, or use or
disclose the contents of this communication to others.
Please notify the sender that you received this e-mail in
error by replying to the e-mail or by telephone.  Please
then delete the e-mail and any copies of it. Thank you.

On Jun 28, 2016, at 8:12 AM, Veith, Paul E.
<pveith@sidley.com> wrote:

Dear Mr. Strick:

With the approval of CSC's counsel, David Pace, we
are providing a Joint Proposed Amended Arbitration
Schedule.

You will note that the principal change is to add
about 60 days to the schedule for all pre-hearing
activities, up to and including the final pre-
hearing conference.  Given the unexpectedly large
volume of documents produced by the parties, the
parties believe that the addition of time to this
schedule is essential to completing the remaining
discovery in an expeditious, fair and efficient
manner.

While this schedule generally adds approximately 60
days to most previously set dates, we have
suggested re-setting the hearing itself for
approximately 90 days later than it had been
originally scheduled.  The parties believe setting
a hearing at this date will provide insurance
against the need to make any future adjustment,
being mindful of your stated desire to have
certainty as to when the arbitration will take
place.  With an extra 30 days built in to the end
of this schedule, we are most comfortable.

057

We are, of course, amenable to any suggestions and
realize that this proposal is subject to your
availability, and may require modification.

Please advise if this new schedule is acceptable
and/or whether we need to re-set the postponed
telephonic conference.

Thank you.

Paul


**PAUL E. VEITH**


**SIDLEY AUSTIN LLP**
+1 312 853 4718
pveith@sidley.com

---

**From:** Stephen Strick
[mailto:sstrick@arbitratemediate.com]
**Sent:** Monday, June 27, 2016 4:45 PM
**To:** Veith, Paul E.; David H. Pace; AAA Rekha Rangachari
Esq.
**Cc:** Meyer, Chris; Lee, Christopher; CL-Francesca Robertson;
R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner;
R-Steve Sumner
**Subject:** Re: Schedule in Kemper Corporate Services, Inc. v.
Computer Sciences Corporation (AAA Case No. 01-15-0005-
2283)

Thank you.  I look forward to your submission(s).

Rekha, please note that tomorrow's call is off
calendar.


S——


Stephen S. Strick, ADR
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022

059

# Kemper Corporate Services/Computer Sciences Corp.
## Joint Proposed Amended Arbitration Schedule (submitted June 29, 2016)

| Event | Arbitrator Approved Dates | Kemper Proposal |
|---|---|---|
| Final deadline for filing any motions to compel discovery | 6/29/16 | 7/27/16 |
| Begin fact deposition period | 7/8/16 | 8/25/16 |
| Deadline to disclose all witnesses to be called at hearing (AAA ¶4) | 8/28/16 | 10/28/16 |
| Deadline to amend pleadings without leave (AAA ¶2) | 8/28/16 | 10/28/16 |
| Completion of all non-expert discovery | 9/16/16 | 11/11/16 |
| Submission of initial expert reports | 9/30/16 | 12/9/16 |
| Submission of rebuttal expert reports | 10/28/16 | 1/20/17 |
| Completion of expert witness depositions | 11/22/16 | 2/10/17 |
| Deadline to submit joint stip. of uncontested facts (AAA ¶3) | 12/16/16 | 2/24/17 |
| Deadline to file pre-hearing briefs (AAA ¶8) | 12/23/16 | 3/3/17 |
| Deadline to exchange exhibits and demonstratives (AAA ¶5) | 12/23/16 | 3/3/17 |
| Final Pre-Hearing Conference with Arbitrator | 1/6/17 | 3/13/17 |
| Arbitration Hearing (10 days of hearing time) (AAA ¶6) | 1/17/17-1/31/17 | 4/13/17-4/26/17 |
| Deadline to file initial post-hearing briefs | 2/28/17 | 6/2/17 |
| Deadline to file responses to post-hearing briefs | - | 6/16/2017 |
| Arbitrator Decision | 3/24/17 | 8/15/17 |

# Exhibit A-6

| From: | Stephen Strick |
|---|---|
| To: | Lee, Christopher |
| Cc: | David Pace; Steve Sumner; Justin Sumner; Gayle Boone; dschick@sumnerschick.com; Jack Lilley; Veith, Paul E.; Meyer, Chris; Jones, Simone; Carroll, Jeff; AAA Rekha Rangachari Esq. |
| Subject: | Re: Kemper v. CSC, Case No. 01-15-0005-2283: Amended Arbitration Schedule |
| Date: | Thursday, October 20, 2016 6:32:17 PM |

### *KINDLY ACKNOWLEDGE RECEIPT*

Thank you Mr. Lee/Counsel:

The parties' request for entry of the Joint Proposed Amended Arbitration Schedule, submitted to this Tribunal today, October 20, 2016 is hereby APPROVED.

Entered this 20th day of October, 2016.

Stephen Strick, Arbitrator

Stephen S. Strick, ADR
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone.  Please then delete the e-mail and any copies of it. Thank you.

On Oct 20, 2016, at 11:11 AM, Lee, Christopher <chris.lee@sidley.com> wrote:

jointly request the entry of the attached Joint Proposed Amended Arbitration Schedule (submitted October 20, 2016).

062

## Kemper Corporate Services/Computer Sciences Corp.
## Joint Proposed Amended Arbitration Schedule (submitted October 20, 2016)

| Event | Deadline |
|---|---|
| Deadline to amend pleadings without leave (AAA ¶2) | 10/28/16 |
| Completion of all non-expert discovery | 11/11/16 |
| Deadline to disclose all witnesses to be called at hearing (AAA ¶4) | 7 days after the completion of all non-expert discovery |
| Submission of initial expert reports | 12/9/16 |
| Submission of rebuttal expert reports | 1/20/17 |
| Completion of expert witness depositions | 2/10/17 |
| Deadline to submit joint stip. of uncontested facts (AAA ¶3) | 2/24/17 |
| Deadline to file pre-hearing briefs (AAA ¶8) | 3/3/17 |
| Deadline to exchange exhibits and demonstratives (AAA ¶5) | 3/3/17 |
| Final Pre-Hearing Conference with Arbitrator | 3/13/17 |
| Arbitration Hearing (10 days of hearing time) (AAA ¶6) | 4/13/17-4/26/17 |
| Deadline to file initial post-hearing briefs | 6/2/17 |
| Deadline to file responses to post-hearing briefs | 6/16/2017 |
| Arbitrator Decision | 8/15/17 |

# Exhibit A-7

| From: | Stephen Strick |
|---|---|
| To: | Veith, Paul E. |
| Cc: | David Pace; AAA Rekha Rangachari, Esq.; dschick@sumnerschick.com; Lee, Christopher; Steve Sumner (ssumner@sumnerschick.com) |
| Subject: | Re: Kemper Corporate Services v. Computer Sciences Corp.; AAA Case No. 01-15-0005-2283 |
| Date: | Wednesday, November 16, 2016 9:18:09 AM |

Thank you Counsel.

Your progress and exceptional cooperation is noted and appreciated.

The parties' proposed revised schedule is APPROVED.

 Stephen Strick, Arbitrator

Sent from my iPhone

On Nov 16, 2016, at 7:06 AM, Veith, Paul E. <pveith@sidley.com> wrote:

> Dear Arbitrator Strick,
>
> Pursuant to the Report of Preliminary Hearings and Scheduling Order dated March 3, 2016, the parties hereby jointly request the entry of the attached Joint Proposed Amended Arbitration Schedule.  This schedule amends the current schedule, which was last amended and entered October 20, 2016, by changing the deadlines indicated below.  You will note from the attachment that we are NOT proposing any extension to the Arbitration Hearing itself:

| Event | Existing Deadline | Proposed Deadline |
|---|---|---|
| Completion of all non-expert discovery | 11/11/16 | 12/2/16 (three-week extension) |
| Submission of initial expert reports | 12/9/16 | 12/23/16 (two-week extension) |
| Submission of rebuttal expert reports | 1/20/17 | 2/3/17 (two-week extension) |
| Completion of expert witness depositions | 2/10/17 | 2/17/17 (one-week extension) |
| **Deadline to file pre-hearing briefs (AAA ¶8)** | 3/3/17 | 3/10/17 (one-week extension) |
| **Deadline to exchange exhibits and demonstratives (AAA ¶5)** | 3/3/17 | 3/10/17 (one-week extension) |
| Final Pre-Hearing Conference with Arbitrator | 3/13/17 | 3/20/17 (one-week extension) |

> By way of background, the parties have completed approximately 80% of the requested depositions – the majority of which involved securing the attendance of witnesses no longer affiliated with either party without the need to issue subpoenas. The amount of cooperation between the parties to get to this point has been exceptional.  In short, significant progress has been made toward completing non-expert discovery, but additional time is needed -- primarily to accommodate the availability of a handful of remaining non-party witnesses.
>
> Please advise if this adjustment is acceptable.
>
>
>
> PAUL E. VEITH
>
>
> SIDLEY AUSTIN LLP
> One South Dearborn
> Chicago, IL 60603
> +1 312 853 4718
> pveith@sidley.com
> www.sidley.com
> SIDLEY
> 

*************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<2016-11-16 Revised Joint Amended Arbitration Schedule.docx>

065

## Kemper Corporate Services/Computer Sciences Corp.
## Joint Proposed Amended Arbitration Schedule (submitted November 14, 2016)

| Event | Deadline in 10/20/16 Amended Schedule | Proposed Deadline |
|---|---|---|
| Completion of all non-expert discovery | 11/11/16 | 12/2/16 |
| Deadline to disclose all witnesses to be called at hearing (AAA ¶4) | 7 days after the completion of all non-expert discovery | 7 days after the completion of all non-expert discovery |
| Submission of initial expert reports | 12/9/16 | 12/23/16 |
| Submission of rebuttal expert reports | 1/20/17 | 2/3/17 |
| Completion of expert witness depositions | 2/10/17 | 2/17/17 |
| Deadline to submit joint stip. of uncontested facts (AAA ¶3) | 2/24/17 | 2/24/17 |
| Deadline to file pre-hearing briefs (AAA ¶8) | 3/3/17 | 3/10/17 |
| Deadline to exchange exhibits and demonstratives (AAA ¶5) | 3/3/17 | 3/10/17 |
| Final Pre-Hearing Conference with Arbitrator | 3/13/17 | 3/20/17 |
| Arbitration Hearing (10 days of hearing time) (AAA ¶6) | 4/13/17-4/26/17 | 4/13/17-4/26/17 |
| Deadline to file initial post-hearing briefs | 6/2/17 | 6/2/17 |
| Deadline to file responses to post-hearing briefs | 6/16/2017 | 6/16/2017 |
| Arbitrator Decision | 8/15/17 | 8/15/17 |

# Exhibit A-8

| From: | Stephen Strick |
|---|---|
| To: | Lee, Christopher |
| Cc: | dpace@sumnerschick.com; Steve Sumner; jsumner@sumnerschick.com; Gayle Boone; David Schick; Jack Lilley; Veith, Paul E.; Meyer, Chris; Jones, Simone; Carroll, Jeff; AAA Rekha Rangachari Esq. |
| Subject: | Re: Kemper v. CSC, Case No. 01-15-0005-2283: Pre-hearing questions |
| Date: | Tuesday, February 14, 2017 5:43:07 PM |
| Attachments: | 2017-02-14 Joint Proposed Amended Arbitration Schedule.pdf |

### *KINDLY CONFIRM RECEIPT*

Thank you Mr. Lee.

I am pleased to hear that the parties are cooperating well in connection with pre-hearing matters and preparation for our April hearings in Dallas.

Please see my responses (in black and caps below) to counsels' request for input on the issues raised.

Kind regards,


Stephen Strick, Arbitrator



Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200


This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone.  Please then delete the e-mail and any copies of it. Thank you.

On Feb 14, 2017, at 2:42 PM, Lee, Christopher <chris.lee@sidley.com> wrote:

Dear Arbitrator Strick,

The parties are cooperating well to prepare for the hearing, and have conferred and reached agreement on a number of items.  At this time, the parties request your input on the following:

(1) <u>Amendments to the Arbitration Schedule (Note:  NO changes to the hearing dates)</u>:
- <u>One-week extension of the deadline to file pre-hearing briefs</u>:  The parties request a one-week extension to file pre-hearing briefs (*i.e.*, extending the deadline from 3/10 to 3/17).  This will allow the parties to finalize an exhibit list (due to be finalized on 3/10) prior to filing pre-hearing briefs, which will enable the parties to cite exhibit numbers from the finalized exhibit list in the pre-hearing briefs.

  APPROVED.

- <u>Striking the deadline to exchange demonstratives</u>:  The parties request striking the 3/10 deadline to exchange demonstratives.  The parties will still exchange exhibit lists by 3/10, but the parties propose exchanging demonstratives at least 48 hours prior to their use at the hearing.  A proposed Amended Arbitration Schedule reflecting these two changes is attached.

  APPROVED.

(2) <u>Binder of exhibits</u>:  Pursuant to you Report of Preliminary Hearings and Scheduling Order, the parties will provide you with one set of jointly prepared loose-leaf exhibit binders containing copies of all exhibits to be used at the hearing at the commencement of the hearing.  As discussed above, if the one-week extension to file pre-hearing briefs is granted, the parties will be able to cite to a finalized exhibit list in the pre-hearing briefs.  If that is the case, would you prefer to receive a set of loose-leaf exhibit binders on 3/17 with the pre-hearing briefs?  Or would you still prefer to receive the exhibit binders at the commencement of the hearing?

  ON MARCH 17, PLEASE PROVIDE ONLY THOSE EXHIBITS CITED IN PRE-HEARING BRIEFS.

(3) <u>Pre-hearing conference</u>:  Would you prefer to conduct the 3/20 pre-hearing conference in person or telephonically?  The parties are willing to participate telephonically, but will attend an in-person hearing if you would prefer that.

PLEASE MEET AND CONFER AND ADVISE ME OF COUNSELS' PROPOSED AGENDA OF ITEMS FOR DISCUSSION DURING OUR MARCH 20TH PRE-HEARING CONFERENCE. DEPENDING ON THE (I) THE NUMBER OF ITEMS TO BE CONSIDERED, (II) THE RELATIVE COMPLEXITY OF THE  ISSUES TO BE DISCUSSED, AND (III) THE PARTIES' PREFERENCES,  IT MIGHT MAKE GOOD SENSE TO GET TOGETHER IN PERSON.  IF THAT PROVES TO BE THE CASE,  I CAN BE AVAILABLE IN CHICAGO OR DALLAS (OR NEW YORK), ALTHOUGH IT MIGHT BE MOST PRACTICAL AND ECONOMICAL TO MEET IN CHICAGO.  I LOOK FORWARD TO COUNSELS' THOUGHTS ON THESE ISSUES.

AFTER I REVIEW THE AGENDA AND CONSIDER THE PARTIES' PREFERENCE, WE CAN DISCUSS THE WISDOM OF AN IN PERSON MEETING OR WHETHER THE PROCESS CAN BE ACCOMPLISHED ON THE PHONE.  I AM AVAILABLE FOR  A CONFERENCE CALL TO DISCUSS, AFTER REVIEWING THE FOREGOING,  THIS OR NEXT WEEK.

SEE RESPONSE AFTER LAST SENTENCE BELOW.

(4) <u>Deposition designation</u>:  The parties anticipate that they will play video of excerpts of designated deposition testimony (or have it read into the record) at the hearing.   To conserve time at the hearing, the parties are agreeable to submitting the balance of the deposition designations in transcript form.  Is this acceptable, or will you require any deposition testimony to be played or read at the hearing in order to be considered part of the record?

THE PARTIES' PROPOSAL IS ACCEPTABLE.  PLEASE PROVIDE ME WITH A JOINT STIPULATION REGARDING THE PARTIES' AGREEMENT ON THIS ISSUE.

(5) <u>Expert summaries</u>:  To use the hearing time as efficiently as possible, the parties propose submitting 1-page or less summaries of the qualifications of experts who will testify live at the hearing.  Please advise if this is acceptable.

ACCEPTABLE.

Please let us know if you would like to schedule a status call to discuss these and any

other preliminary issues.


LET'S SPEAK ON FRIDAY OR TUESDAY NEXT WEEK TO DISCUSS AGENDA ITEMS REFERRED TO IN (3) ABOVE, AFTER YOUR MEET AND CONFER.  PLEASE COORDINATE THE CALL WITH MS. RANGACHARI.

Thank you,


**CHRISTOPHER Y. LEE**
Associate

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 6095
chris.lee@sidley.com
www.sidley.com

**SIDLEY**


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

070

## Kemper Corporate Services/Computer Sciences Corp.
## Joint Proposed Amended Arbitration Schedule (submitted February 14, 2017)

| Event | Deadline in 11/16/16 Amended Schedule | Proposed Deadline |
|---|---|---|
| Completion of expert witness depositions | 2/17/17 | 2/17/17 |
| Deadline to submit joint stip. of uncontested facts (AAA ¶3) | 2/24/17 | 2/24/17 |
| Deadline to exchange exhibits (AAA ¶5) | 3/10/17 | 3/10/17 |
| Deadline to file pre-hearing briefs (AAA ¶8) | 3/10/17 | 3/17/17 |
| Final Pre-Hearing Conference with Arbitrator | 3/20/17 | 3/20/17 |
| Arbitration Hearing (10 days of hearing time) (AAA ¶6) | 4/13/17-4/26/17 | 4/13/17-4/26/17 |
| Deadline to file initial post-hearing briefs | 6/2/17 | 6/2/17 |
| Deadline to file responses to post-hearing briefs | 6/16/2017 | 6/16/2017 |
| Arbitrator Decision | 8/15/17 | 8/15/17 |

# Exhibit A-9

| | |
|---|---|
| **From:** | Stephen Strick |
| **To:** | David H. Pace; Veith, Paul E. |
| **Cc:** | David Pace; David Schick; Meyer, Chris; Lee, Christopher |
| **Subject:** | Re: Post-Hearing Schedule |
| **Date:** | Tuesday, April 25, 2017 9:30:38 PM |

Thanks Gentlemen:

Let's discuss and lock down the dates tomorrow at our usual 9:15 meeting.


sss——

Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200


This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone.  Please then delete the e-mail and any copies of it. Thank you.


On Apr 25, 2017, at 4:08 PM, David H. Pace <david.pace77@gmail.com> wrote:

CSC agrees to the schedule Mr. Veith has proposed, subject to the arbitrator's agreement to the viability of the initial award date.

David H. Pace
Sumner, Schick & Pace
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219

(972) 567-3936

On Apr 25, 2017, at 3:53 PM, Veith, Paul E. <pveith@sidley.com> wrote:

Mr. Strick:

As you requested, here is the proposed scheduled for post-hearing activities we discussed yesterday:

June 9, 2017:          Simultaneous submission of initial post-hearing briefs
June 30, 2017:         Simultaneous responses to initial post-hearing briefs
August 28, 2017:       Final argument (Sidley/Chicago)
September 18, 2017:    Parties to submit drafts of Proposed Reasoned Award
October 2, 2017:       Arbitrator's interim award

As we have previously discussed, if the preliminary award entitles either party to make a claim for attorneys' fees and expenses pursuant to contract, such a claim would be made subsequent to the issuance of the interim award and prior to the issuance of a final award, as directed by the Arbitrator.

We should discuss page limits on the post-hearing briefs, and we'll be prepared to do so at 9:15 a.m. tomorrow.

Thanks.

Paul

**PAUL E. VEITH**

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 4718
pveith@sidley.com
www.sidley.com
**<image001.png>**

*************************************************************************************************
*****

072

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*******************************************************************************************
*****

# Exhibit A-10

| From: | Stephen Strick |
|---|---|
| To: | Veith, Paul E.; David H. Pace |
| Cc: | AAA Rekha Rangachari Esq.; Meyer, Chris; Lee, Christopher; CL-Francesca Robertson; R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner; R-Steve Sumner |
| Subject: | Re: Schedule in Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283) |
| Date: | Monday, July 18, 2016 2:18:44 PM |

## *KINDLY CONFIRM RECEIPT*

Thank you Mr. Veith.

I have read your email sent today. Based on the parties' mutual selection, and their joint determination of its convenience as a location, Dallas, Texas is approved as the site of merits hearings in the captioned case.

I note the parties' request to hold the hearings at a neutral site. I would suggest that you and Mr. Pace advise Ms. Rangachari of the specific requirements that the parties and counsel require in terms of hearing room dates, size, breakout facilities and other logistical needs.

Please let me know if I may be of help in facilitating any issues.


Kind regards,


Stephen Strick, Arbitrator

Stephen S. Strick, ADR
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient,

please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone.  Please then delete the e-mail and any copies of it. Thank you.

On Jul 18, 2016, at 12:58 PM, Veith, Paul E. <pveith@sidley.com> wrote:

Mr. Strick:

Having conferred concerning the location of the April 2017 arbitration hearing, the parties jointly propose conducting the arbitration in Dallas.  Among the possible locations, Dallas is more convenient than the other options for counsel and the witnesses.  While both my firm and Mr. Pace's firm have office locations in Dallas, we would like to coordinate with the AAA in selecting a neutral site for the arbitration hearing itself. Assuming Dallas is an acceptable location for you, please advise as to how we should proceed in securing the necessary facilities for a hearing.

Thank you.


**PAUL E. VEITH**


**SIDLEY AUSTIN LLP**
+1 312 853 4718
pveith@sidley.com

---

**From:** Stephen Strick [mailto:sstrick@arbitratemediate.com]
**Sent:** Wednesday, June 29, 2016 12:22 PM
**To:** Veith, Paul E.; David H. Pace
**Cc:** AAA Rekha Rangachari Esq.; Meyer, Chris; Lee, Christopher; CL-Francesca Robertson; R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner; R-Steve Sumner
**Subject:** Re: Schedule in Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283)

Thank you both.  The joint proposed amended schedule attached to today's email and dated June 29, 2016, is approved.

I look forward to receiving  counsels'  thoughts regarding the hearing's venue.

Kind regards,


Stephen Strick, Arbitrator


Stephen S. Strick, ADR

075

Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is
intended only for the individual (or individuals) or
entities named above and others who have been
specifically authorized to receive it. If you are not the
intended recipient, please do not read, copy, or use or
disclose the contents of this communication to others.
Please notify the sender that you received this e-mail in
error by replying to the e-mail or by telephone.  Please
then delete the e-mail and any copies of it. Thank you.

On Jun 29, 2016, at 6:53 AM, Veith, Paul E.
<pveith@sidley.com> wrote:

Mr. Strick –

Mr. Pace and I have conferred and we jointly propose the
attached schedule.  This is different than the schedule submitted
yesterday as follows:  (1) the deadline for initial post-hearing
briefs was adjusted to account for the fact that the date in the
prior schedule fell on the Sunday of Memorial Day weekend – we
pushed it to the end of that week; (2) we added a date for
responsive post-hearing briefs; and (3) we allowed 60 days for the
arbitrator's decision, as you requested.

Mr. Pace and I will be conferring with our clients and one another
in the coming days to attempt to reach a recommendation on the
venue for the arbitration, and will be back to you on that subject
as soon as possible.

Paul

**PAUL E. VEITH**

076

**SIDLEY AUSTIN LLP**
+1 312 853 4718
pveith@sidley.com

**From:** Stephen Strick [mailto:sstrick@arbitratemediate.com]

**Sent:** Tuesday, June 28, 2016 12:05 PM
**To:** Veith, Paul E.; David H. Pace
**Cc:** AAA Rekha Rangachari Esq.; Meyer, Chris; Lee, Christopher; CL-Francesca Robertson; R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner; R-Steve Sumner
**Subject:** Re: Schedule in Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283)

### *KINDLY ACKNOWLEDGE RECEIPT*

Gentlemen:

Further to my email below, please advise if you have discussed the most convenient venue for hearings. If it is decided that New York City remains the agreed seat and you wish to reserve facilities at the AAA, I would suggest that you contact Ms. Rangachari regarding hearing room facilities at your earliest convenience.

S——

Stephen S. Strick, ADR
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is intended only

077

for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone. Please then delete the e-mail and any copies of it. Thank you.

On Jun 28, 2016, at 8:12 AM, Veith, Paul E. <pveith@sidley.com> wrote:

Dear Mr. Strick:

With the approval of CSC's counsel, David Pace, we are providing a Joint Proposed Amended Arbitration Schedule.

You will note that the principal change is to add about 60 days to the schedule for all pre-hearing activities, up to and including the final pre-hearing conference. Given the unexpectedly large volume of documents produced by the parties, the parties believe that the addition of time to this schedule is essential to completing the remaining discovery in an expeditious, fair and efficient manner.

While this schedule generally adds approximately 60 days to most previously set dates, we have suggested re-setting the hearing itself for approximately 90 days later than it had been originally scheduled. The parties believe setting a hearing at this date will provide insurance against the need to make any future adjustment, being mindful of your stated desire to have certainty as to when the

078

arbitration will take place. With an extra 30 days built in to the end of this schedule, we are most comfortable.

We are, of course, amenable to any suggestions and realize that this proposal is subject to your availability, and may require modification.

Please advise if this new schedule is acceptable and/or whether we need to re-set the postponed telephonic conference.

Thank you.

Paul


**PAUL E. VEITH**


**SIDLEY AUSTIN LLP**
+1 312 853 4718
pveith@sidley.com

---

**From:** Stephen Strick
[mailto:sstrick@arbitratemediate.com]

**Sent:** Monday, June 27, 2016 4:45 PM
**To:** Veith, Paul E.; David H. Pace; AAA Rekha Rangachari Esq.
**Cc:** Meyer, Chris; Lee, Christopher; CL-Francesca Robertson; R-David Pace; R-Gayle Boon; R-Jack Lilley; R-Justin Sumner; R-Steve Sumner
**Subject:** Re: Schedule in Kemper Corporate Services, Inc. v. Computer Sciences Corporation (AAA Case No. 01-15-0005-2283)

Thank you. I look forward to your submission(s).

Rekha, please note that tomorrow's call is off calendar.


S——

# Exhibit A-11

| From: | David H. Pace |
|---|---|
| To: | "Stephen Strick"; Veith, Paul E. |
| Cc: | "David Pace"; "David Schick"; "AAA Rekha Rangachari, Esq."; Lee, Christopher; Meyer, Chris |
| Subject: | RE: Rules of Evidence AAA R-34 |
| Date: | Wednesday, April 05, 2017 10:35:13 AM |
| Attachments: | Joint Witness Summary.DOCX |

Mr. Strick, attached is a joint witness summary as you requested.  Also, on April 2, 2017, my client CSC combined with the former HP Services business to form a new company named DXC.  I have spoken with Mr. Veith about this, and we were planning to use the name CSC during the hearing for my client, since that is how the witnesses referred to CSC in their depositions, and the documents refer to CSC.  My thinking is that switching the name to DXC at this late stage might only result in confusion.

David H. Pace

Sumner, Schick & Pace

3811 Turtle Creek Blvd.

Suite 600

Dallas, Texas 75219

(972) 567-3936

---

**From:** Stephen Strick [mailto:sstrick@arbitratemediate.com]
**Sent:** Tuesday, April 4, 2017 8:48 PM
**To:** Paul E. Veith <pveith@sidley.com>; David H. Pace <david.pace77@gmail.com>
**Cc:** David Pace <dpace@sumnerschick.com>; David Schick <dschick@sumnerschick.com>; AAA Rekha Rangachari, Esq. <RekhaRangachari@adr.org>; Christopher Lee <chris.lee@sidley.com>; Chris Meyer <cmeyer@sidley.com>
**Subject:** Re: Rules of Evidence AAA R-34

**_RESPONSE REQUESTED_**

Counsel:

In reviewing your pre-hearing briefs I note references to the application of New York law pertaining to evidentiary rules and contract construction.

I also note that AAA Rules and Procedures for Large Complex Cases apply in this proceeding, including Rule-34 which states:

> **R-34. Evidence**
> (a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

May I have your position(s) on the application of the second sentence in (a) above?  In other words, do you agree that the parties are bound or are not bound by legal (i.e. New York) rules of evidence and the bases for your views?

I look forward to your thoughts.

Stephen Strick, Arbitrator

Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone.  Please then delete the e-mail and any copies of it. Thank you.

On Apr 4, 2017, at 8:18 PM, Veith, Paul E. <pveith@sidley.com> wrote:

For the record – receipt is acknowledged and we will work with Mr. Pace to present you with a single document providing this information for all witnesses.

**PAUL E. VEITH**

**SIDLEY AUSTIN LLP**
+1 312 853 4718
pveith@sidley.com

**From:** Stephen Strick [mailto:sstrick@arbitratemediate.com]
**Sent:** Tuesday, April 4, 2017 8:07 AM
**To:** David H. Pace <david.pace77@gmail.com>
**Cc:** Veith, Paul E. <pveith@sidley.com>; David Pace
<dpace@sumnerschick.com>; David Schick <dschick@sumnerschick.com>; AAA
Rekha Rangachari, Esq. <RekhaRangachari@adr.org>; Lee, Christopher
<chris.lee@sidley.com>; Meyer, Chris <cmeyer@sidley.com>
**Subject:** Re: Witness Information ROPHSO 3316 page 6 Attached

That's fine, but I just want to know, simply, if the witnesses and potential
witnesses are employees past or current, their title, and their respective
role(s) at or for the company for which they are testifying.

Kind regards,

Stephen Strick, Arbitrator

Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is
intended only for the individual (or individuals) or
entities named above and others who have been
specifically authorized to receive it. If you are not the
intended recipient, please do not read, copy, or use or
disclose the contents of this communication to others.
Please notify the sender that you received this e-mail in
error by replying to the e-mail or by telephone.  Please

then delete the e-mail and any copies of it. Thank you.

On Apr 4, 2017, at 8:02 PM, David H. Pace
<david.pace77@gmail.com> wrote:

Receipt acknowledged, Mr. Strick. I have spoken with Mr.
Veith this morning and we propose to submit a joint summary
of the witnesses broken down into CSC witnesses, Kemper
witnesses and third party witnesses. Mr. Veith will prepare
the short summaries for the Kemper witnesses, and I will
provide the short summaries for the CSC and third party
witnesses. As we understand your request, you are looking
for a quick reference document that will indicate the
affiliation, roles and duration on the project of the various
witnesses. We propose that we will provide you with that
joint summary tomorrow if that is acceptable to you.

David H. Pace
Sumner, Schick & Pace
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219
(972) 567-3936

On Apr 3, 2017, at 10:21 PM, Stephen Strick
<sstrick@arbitratemediate.com> wrote:

### *KINDLY ACKNOWLEDGE RECEIPT*


Counsel:

Thank you for the Witness Disclosure
Information. Reading your briefs, I have a sense
of the identity of the individuals referred to in
your disclosures, but for the sake of good order, it
would be helpful for me to have a very short
description of their relationship(s) to the parties,
past and current. A sentence or two will suffice.


Stephen Strick, Arbitrator

Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com

083

www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication
is confidential and is
intended only for the
individual (or individuals) or
entities named above and
others who have been
specifically authorized to
receive it. If you are not the
intended recipient, please
do not read, copy, or use or
disclose the contents of this
communication to others.
Please notify the sender
that you received this e-
mail in error by replying to
the e-mail or by telephone.
Please then delete the e-
mail and any copies of it.
Thank you.

On Apr 3, 2017, at 8:23 PM, David
H. Pace <david.pace77@gmail.com>
wrote:

<CSC's Disclosure of Witnesses Who May Be
Called at Trial.pdf>

**************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

**************************************************************************************

084

# Exhibit A-12

| From: | Stephen Strick |
|---|---|
| To: | Veith, Paul E.; David Pace"s GMail |
| Cc: | David Schick; Steve Sumner; Justin Sumner; abridson@sumnerschick.com; Meyer, Chris; Lee, Christopher; Jamie Wilson; RekhaRangachari@adr.org |
| Subject: | Re: Kemper v. CSC: CSC"s Interim Award and Brief on Subject Matter Jurisdiction |
| Date: | Tuesday, September 19, 2017 5:33:10 PM |
| Attachments: | image001.png |
| | CSC"s Interim Award - Final.docx |

## *KINDLY ACKNOWLEDGE RECEIPT*

Dear Counsel:

Thank you for your submissions yesterday, which I am actively reviewing.

As agreed, I will be issuing an award on a partial interim basis on or before October 2, 2017; the tribunal thus retains jurisdiction to decide all issues relating to this proceeding pending the issuance of a Final Award. Consequently hearings will remain open until evidence with respect to a possible award of prejudgement interest and possible award of costs and expenses is presented on the record and the hearings are officially closed by the tribunal pursuant to AAA R-39.

Stephen S. Strick, Arbitrator

Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone. Please then delete the e-mail and any copies of it. Thank you.

On Sep 18, 2017, at 3:54 PM, Stephen Strick <sstrick@arbitratemediate.com> wrote:

Thank you Counsel; receipt of the subject documents is acknowledged.

Stephen S. Strick, FCIArb
Arbitrate | Mediate
mobile: (213) 278-2200
fax: (213) 559-8600
sstrick@arbitratemediate.com
www.arbitratemediate.com

501 Madison Avenue
Fourteenth Floor
New York, NY 10022
T: (212) 227-2844

1801 Century Park East
Suite 1820
Los Angeles, CA 90067
T: (213) 278-2200

This e-mail communication is confidential and is intended only for the individual (or individuals) or entities named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, or use or disclose the contents of this communication to others. Please notify the sender that you received this e-mail in error by replying to the e-mail or by telephone. Please then delete the e-mail and any copies of it. Thank you.

On Sep 18, 2017, at 12:06 PM, Jamie Wilson <jwilson@sumnerschick.com> wrote:

Mr. Strick,

I am also providing you with a Word version of CSC's Proposed Interim Award.

Thank you,

**Jamie R. Wilson** | Attorney at Law

Sumner, Schick & Pace, LLP

3811 Turtle Creek Blvd., Suite 600

Dallas, Texas 75219

214-965-9229



This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  It may contain information that is confidential and prohibited from disclosure due to attorney-client privilege or the attorney work product doctrine. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this message or any attachment is strictly prohibited. If you have received this e-mail in error, please notify the original sender at (214) 965-9229 and destroy this e-mail, along with any attachments. Thank you.

**From:** Jamie Wilson
**Sent:** Monday, September 18, 2017 2:07 PM
**To:** 'sstrick@arbitratemediate.com'
**Cc:** David Pace's GMail; David Schick; Steve Sumner; Justin Sumner; Amanda Bridson; 'Veith, Paul E.'; 'cmeyer@sidley.com'; 'Lee, Christopher'; 'RekhaRangachari@adr.org'
**Subject:** Kemper v. CSC: CSC's Interim Award and Brief on Subject Matter Jurisdiction

Mr. Strick,

Attached is CSC's Proposed Interim Award and CSC's Brief on Subject Matter Jurisdiction over the Master Outsourcing Services Agreement. If you have any issues opening the files, please let me know.

Thank you,

**Jamie R. Wilson** | Attorney at Law

Sumner, Schick & Pace, LLP

3811 Turtle Creek Blvd., Suite 600

Dallas, Texas 75219

214-965-9229

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  It may contain information that is confidential and prohibited from disclosure due to attorney-client privilege or the attorney work product doctrine. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this message or any attachment is strictly prohibited. If you have received this e-mail in error, please notify the original sender at (214) 965-9229 and destroy this e-mail, along with any attachments. Thank you.

# Exhibit A-13

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

Case No.
01-15-0005-2283

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Kemper Corporate Services, Inc.,**

Claimant,

– vs. —

**Computer Sciences Corporation,**

Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PARTIAL FINAL AWARD

The Tribunal

*Stephen S. Strick, Sole Arbitrator*

# AMERICAN ARBITRATION ASSOCIATION

## Commercial Arbitration Tribunal

| | |
|---|---|
| In the matter of arbitration:<br><br>*Kemper Corporate Services, Inc.*<br>("Claimant")<br><br>-vs-<br><br>*Computer Sciences Corporation*<br>("Respondent") | **Case Number 01-15-0005-2283**<br>*PARTIAL FINAL AWARD* |

## PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, STEPHEN S. STRICK (the "Arbitrator" or "Tribunal"), having been duly designated in accordance with the arbitration clause contained in Section 9.3 of the Master Software License and Service Agreement ("MSLSA") entered into between the Claimant and Respondent dated January 2, 2009, and having been duly sworn, and having duly heard and considered the allegations and proofs of the Parties, do hereby issue the following Partial Final Award.

2

1.     The Parties:

   A.     Claimant

   Claimant in this proceeding is Kemper Corporate Services, Inc. ("Claimant" or "Kemper"), formerly known as Unitrin Services Company. Kemper is an Illinois corporation and wholly owned subsidiary of Kemper Corporation, an insurance holding company incorporated in Delaware and headquartered in Chicago, Illinois.

   B.     Respondent

   Respondent in this proceeding is Computer Sciences Corporation ("Respondent" or "CSC"). At the time this arbitration was initiated, CSC was an information technology and software developer incorporated in Nevada and headquartered in Falls Church, Virginia.[1] CSC is a provider of technology services and solutions. Among other products, CSC develops and licenses software solutions serving the insurance industry.

   C.     Kemper and CSC are sometimes referred to herein individually as the "Party" and together as the "Parties."

2.     Relevant Procedural History

   A.     Initiation of Arbitration/Pleadings

   Counsel for Claimant initiated this arbitration before the American Arbitration Association ("AAA") on October 19, 2015, by filing Kemper Corporate Services, Inc.'s Demand for Arbitration. On November 16, 2015, counsel for Respondent filed CSC's Answering Statement and Counterclaim. On January 6, 2016, counsel for Kemper filed its Answer to Respondent's Counterclaim. On February 18, 2016, counsel for Respondent filed CSC's First

---

[1] As reported by CSC's counsel and reflected in a news release dated April 3, 2017, on April 1, 2017, CSC and the Enterprise Services Division of Hewlett Packard Enterprise merged to form DXC Technology Company. *See* http://www.dxc.technology/newsroom/press_releases/140580-csc_and_hpe_enterprise_services_division_complete_merger_to_form_dxc_technology.

3

Amended Answering Statement and Counterclaim.  On March 9, 2016, counsel for Kemper filed its Answer to Respondent Computer Sciences Corporation's First Amended Answering Statement and Counterclaim.

B.   Appointment of Arbitrator/Pre-hearing Matters/Hearings

The undersigned was appointed as the sole Arbitrator to hear the Parties' claims, defenses, and counterclaim.  Following service of a *Notice of Preliminary Hearing* by the AAA, counsel for each of the Parties appeared before the Arbitrator for telephonic Preliminary Hearings on February 9, 2016, and March 1, 2016.  On March 3, 2016, the Arbitrator issued a *Report of Preliminary Hearings and Scheduling Order* (the "ROPHSO"), which set forth a schedule and certain other procedural particulars governing, *inter alia*, discovery and other pre-hearing matters.  The Parties conducted extensive document discovery and depositions of both lay and expert witnesses.  The schedule set in the ROPHSO was later amended at the request of the Parties.

By agreement between the Parties, an arbitration hearing was conducted in Dallas, Texas[2] before the Arbitrator over a period of ten (10) consecutive business days beginning April 13, 2017, and ending April 26, 2017.  At the hearing, the Parties presented the testimony of 27 witnesses (either live or by designated deposition testimony).  The Arbitrator also received in evidence in excess of 620 exhibits that were stipulated and received by the Tribunal as admissible.  A transcript of the hearing was prepared and has been extensively reviewed by the Tribunal.

---

[2] Although paragraph 9.3(b) of the MSLSA (Exh. 1) provides that hearings be held in New York, New York, the Parties mutually agreed to a hearing venue in Dallas and closing arguments in Chicago, IL.

C.     Briefs/Oral Arguments/Briefs on Jurisdictional Issue

The Parties submitted pre-hearing briefs on March 20, 2017, initial post-hearing briefs on June 9, 2017, and responsive post-hearing briefs on June 30, 2017. In total, the pre-hearing and post-hearing briefs filed by the Parties covered approximately 288 pages.

On August 28, 2017, the Arbitrator presided over closing arguments in Chicago, Illinois, at which the Parties submitted copies of slide presentations used during the hearing. By agreement of the Parties, Kemper submitted a supplemental brief to respond to certain new material and authorities raised by CSC in its slide presentation, and both Parties submitted short supplemental letter briefs on a jurisdictional issue, which is discussed and considered below.

3.     Jurisdiction

Personal and subject matter jurisdiction is conferred upon this Tribunal pursuant to the terms of Section 9.3 of the MSLSA. In addition, counsel for each of the Parties confirmed at the February Preliminary Hearing that neither Party had any objection, and thereby consented to (i) the jurisdiction and the administration of this arbitral proceeding by the AAA,[3] (ii) the appointment of the undersigned to act as sole Arbitrator in this proceeding, (iii) the application of the AAA Commercial Rules and its Procedures for Large and Complex Cases ("Rules"), and (iv) the application of New York State internal law and the Federal Arbitration Act (U.S. Code Title 9).[4] At the Preliminary Hearing, the Parties, through counsel, agreed that the time limitations set

---

[3] At the February Preliminary Hearing, Respondent noted its jurisdictional objection to any claims asserted in this proceeding that are contractually excluded by the Parties from arbitration or reserved for resolution in other arbitral or judicial forums. Respondent's objection is further discussed and considered *infra*.

[4] Section 11.7 of the MSLSA contains a New York choice-of-law provision.

forth in the MSLSA for conducting the arbitration hearing and rendering an award would be amended, modified, and superseded as set forth in the ROPHSO.

### 4.   Form of Award/Decision Provisions

As reflected in the ROPHSO, the Parties mutually agreed that the Arbitrator is to provide a form of final award in which the basis for the Arbitrator's decisions contains an explanation of his reasoning in reaching his conclusion (*i.e.*, a Reasoned Form of Final Award).[5]

### 5.   Factual Background[6]

#### A.   The Parties' Exceed Agreement

This matter arises out of a written agreement whose ultimate purpose was the transformation of CSC's Exceed software from the COBOL language to a Java version of Exceed ("Exceed J") and implementation of several components of Exceed J for use by Kemper in connection with the latter's Property and Casualty ("P&C") businesses. The Parties' agreement comprises several documents, including the MSLSA (Exh. 1); Product Order No. 1 (Exh. 2); Work Order No. 1 – General Consulting Services (Exh. 3); Work Order No. 2 (Java Transition Services) (Exh. 4); and Addendum No. 1 to Master Software License and Service Agreement, Product Order No. 1, and Work Orders Nos. 1 and 2 ("Addendum No. 1") (Exh. 5). These five

---

[5] I note that under the terms of paragraph 9.3(e) of the MSLSA, the Parties have agreed that the Arbitrator is to "make a decision having regard to the intentions of the parties, the terms of this Agreement, and custom and usage of the insurance and data processing industry." In reaching the findings set forth herein, I have carefully reviewed the evidence and argument of the Parties concerning their intentions with regard to the Exceed Agreement and the remedies intended, the language of agreement itself, as well as the custom and usage of the insurance and data processing industries to the extent evidence of such custom and usage was presented during the course of this proceeding.

[6] The facts recited in this section are either not disputed by the Parties or supported by a preponderance of the evidence received, and can be ascertained from the pleadings, the pre-hearing and post-hearing briefs, exhibits and testimony admitted at the hearing, and/or the Joint Stipulation of Uncontested Facts submitted February 24, 2017.

093

documents were entered into on January 2, 2009, and the Parties subsequently signed several other documents that defined additional work or further amended the terms of their agreement. Collectively, the documents containing the terms under which the Parties undertook the Exceed project are referred to herein as the "Exceed Agreement."

B.     Kemper P&C Business Segments

At the time the Parties entered into the Exceed Agreement, Kemper's P&C business was divided into three segments, which came to be known as Kemper Specialty, Kemper Preferred, and Kemper Direct. These three segments of Kemper's P&C business sold insurance to different customers through different channels of distribution. In 2008, at the time Kemper was considering a new, modern P&C software solution for its businesses, each of these three segments used different legacy software systems that operated on separate hardware platforms and were supported by separate information technology ("IT") departments.

Starting prior to 2008, Kemper began to consider updating and consolidating its IT infrastructure for its three P&C business segments onto a single software and hardware platform. To that end, Kemper began looking for replacement software to handle certain core functions of its P&C businesses. As part of its consolidation, Kemper wanted to cease using mainframe computers for the P&C businesses and move to using a more economical, server-based system, that would run on a Java platform. By implementing a new software system to support all three P&C business segments, Kemper also sought, among other things, to reduce its cost of duplicative staff supporting the different legacy software systems and receive the benefits of a robust, modern Java based platform. Evidence from both Parties demonstrated that the perceived benefits of implementing a Java version of the software included access to a large and growing labor pool of Java trained programmers, ease of maintenance and enhancement, and the

7

availability of a community of common software users who would share maintenance and enhancement costs. (Exhs. 1004 and 1006). From among the software candidates Kemper considered, it ultimately chose CSC's Exceed, which was a product designed to handle core functions for a P&C business such as policy administration, rating, and billing.

### C.   The COBOL To Java Transformation

At the time that Kemper was evaluating the Exceed software, the Exceed software was written in the COBOL computer programming language. During the time that the Parties were negotiating the terms of the Exceed Agreement, CSC advised Kemper it was planning to transform Exceed from COBOL to Java, in part by using a third party, known as Blue Phoenix, to translate the Exceed COBOL code to Java code using a software conversion tool. CSC had previously worked with Blue Phoenix to transform another CSC software product, known as Point-In, from COBOL to Java. Kemper was told that Blue Phoenix would use software to conduct an automated "machine translation" of Exceed from COBOL to Java, and that CSC would then have to perform additional hand coding work on the machine-translated code before it could operate as a Java version of Exceed and serve as the base for implementation at Kemper. Kemper was aware that a COBOL – Java transformation that involved machine-translated Java, even after hand coding, sometimes resulted in an undesirable, difficult to maintain and enhance product, referred to in a derogatory manner as "JOBOL."

Nevertheless, while both Parties were aware of the risks, evidence adduced during the proceeding indicates that CSC expressed confidence in its abilities to successfully transform COBOL software to maintainable Java. (Ex. 252)[7].

---

[7] CSC's Exceed Architect, James Hurley ("Mr. Hurley"), presented Respondent's positive views regarding its COBOL to Java transformation at Sun Microsystem's "big techie conference." The Presentation Abstract for the

To address Kemper's concerns, the Parties negotiated specific terms in the Exceed Agreement to protect Kemper against the risk that the transformation of the software from COBOL to Java might not succeed. In this regard, the Parties negotiated paragraph 3 of the Addendum No. 1 to the MSLSA. (*See* Exh. 5). Kemper thus ultimately selected the Exceed software to replace its legacy policy administration, rating and billing systems with contractual remedies contained in the Exceed Agreement to address the possibility that the project might not succeed in the kind of software the Parties sought to put into production.

D.    Two Phase Project - Transformation and Implementation

The project documented in Exceed Agreement, was to be accomplished in two phases: a first transformation phase and a second implementation phase. The goal of the transformation phase was for CSC to make a "Java version" of Exceed "generally available" to its licensees, including Kemper. I note that the Parties' interpretation of the meaning of the terms, "Java version" and "generally available" differ markedly and are of key significance to this dispute, as discussed below.

The goal of the second implementation phase was to effectuate the Exceed software at Kemper, for all of its P&C business segments in all states in which they did business.[8] Additionally, the implementation of the software in Kemper's businesses was to be performed in phases, over several years. Initially, the Parties worked to implement Exceed in Kemper's Specialty business segment for policyholders in the State of Illinois – an implementation that would cover a small percentage of Kemper's P&C businesses, approximately 7000 policies. The

---

conference notes, "You can transform your COBOL application into maintainable Java, not JOBOL." ( *See* Exh. 252 at 8.)

[8] During the project, Kemper decided to discontinue selling insurance through Kemper Direct, and thereby that segment was excluded from the scope of the project, leaving the Kemper Specialty and Kemper Preferred segments to implement Exceed.

9

Specialty/Illinois release was intended as a pilot program, and thus was an implementation of limited magnitude scaled to minimize risk if the project encountered problems. The Parties intended that implementation in other states, and for Kemper's other business segments, would follow after the implementation of the version referred to in E, below.

### E.   Release 1/Kemper Specialty in Illinois

In June 2012, a version of the Exceed software – written in the Java language – was implemented for Specialty/Illinois. This release was referred to by the Parties as "Release 1." Release 1 included functionality for policy administration, rating, and billing. Kemper continued to use the Exceed Jsoftware for its Specialty/Illinois business until late 2015, although substantial evidence was introduced that the implementation and operation of Exceed J in Illinois was plagued by intractable software problems that required constant work and fixes that the Parties seemed unable to resolve. (*See infra* including Exh. 188).

### F.   "Extended Envisioning"

Several months after Release 1 was put into production, beginning toward the end of 2012 through February or March 2013, the Parties conducted an "Extended Envisioning" exercise as part of the Exceed J implementation in Illinois. The purpose of the exercise was to understand what the Parties forecast to be the full effort necessary to complete the implementation of Exceed J across all the P&C business segments at Kemper in all states in which it operated. The result of the process was that the Parties estimated it would take a minimum of 1,200,000 hours of work to complete the implementation – an "all-in" estimate that included additional development work by CSC, interfaces to the software that were to be prepared by Kemper, program management, and further testing. After this exercise, the Parties discussed their options and agreed to implement Exceed Billing software first (across both

segments) and then Exceed Policy Administration and Rating software. They began to pursue that course in mid-2013.

By 2013, with ongoing software problems with the Specialty/Illinois production, the Parties formed an Executive Steering Committee to track and monitor progress on the Exceed project. Although the Parties' implementation efforts after the Extended Envisioning exercise were focused on the Billing software, from time to time Kemper asked CSC to elaborate on its plans for continued development of the Policy Administration software component and its progress and plan for marketing that component to other carriers. When software problems continued, the Steering Committee ordered a "root cause" analysis to determine the reasons for the continuing issues. (*See infra* at 12; Exhs. 75, 76, and 188).

G.    September 11, 2014 Meeting to Discuss Status of Exceed J Policy Administration

On September 11, 2014, CSC and Kemper personnel met at CSC's offices in Blythewood, S.C., to discuss the Policy Administration component of Exceed J. At that meeting, CSC delivered a presentation that discussed its product strategy for Exceed J Policy Administration and addressed certain questions Kemper had raised months earlier. (*See* Exhs. 310 and 1063). The Parties dispute the substance and import of the conversations and the message delivered by CSC to Kemper regarding the future of Exceed J at the September 11th Meeting. However, the Parties agree that CSC felt that there was no longer a market for Exceed J, and proposed combining it with a "future state" software solution aimed at a broader market. (Tr. 4:40).

H.    Kemper Writes Down Exceed J Assets

At hearings, Kemper presented evidence that as a result of the content of CSC's presentation at the September 11 meeting, Kemper made a determination that led it to record a

11

pre-tax accounting charge of US $54.6 million dollars to write off a portion of the capitalized Exceed software asset, publicly announcing the same on September 30, 2014.  Kemper later advised CSC in writing that it was going to seek another Policy Administration solution.

After the September 2014 accounting charge, the Parties continued to work toward completing the implementation of the Exceed J Billing component.  On June 30, 2015, after experiencing numerous problems with the software, Kemper advised CSC that it had decided to discontinue work on the Exceed J Billing implementation, and followed up with written notice to that effect on July 1, 2015, more than 6.5 (six-and-one-half) years after the initial documents making up the Exceed Agreement were executed.  In July 2015, Kemper publicly announced it had recorded a pre-tax accounting charge of US $11.2 million dollars to write off the remaining capitalized portion of the Exceed software asset.

6.     <u>Kemper's Claims</u>

A.     <u>Kemper's Views of Reasons for Project Failure</u>

Kemper claims that the Exceed project ultimately failed for two primary reasons.  First, Kemper asserts that the transformed Exceed J code, which it views as the foundation for the implementation of Exceed at Kemper and with other licensees, was so poorly constructed that it was described internally at CSC as "malformed," "ugly," "barely readable," and "JOBOL" – a derogatory reference to undesirable, unmaintainable code.[9]  Kemper claims that the condition of the transformed code – even after substantial hand coding work following the machine

---

[9] In an internal email date February 3, 2011, CSC's Exceed Architect, Steve Bierenbaum ("Mr. Bierenbaum"), stated, "As we know, Exceed J is JOBOL and will remain so.  There is no strategy that will take us away from procedural Java without rewriting the business logic of Exceed." (Exh. 74).  *See also* Exh. 89; Tr. 4:62-76.

transformation by Blue Phoenix – proved to be an insurmountable obstacle to implementing Exceed J at Kemper as intended.

### B.      The Root Cause Analysis and Report

Also, as noted above, the Parties' Joint Steering Committee ordered a Root Cause Analysis for the Exceed J Billing Project, which issued a report on May 1, 2015, spelling out the Parties' views of the fundamental causes for the "software quality challenges, both defect volume and resolution time." (Exh. 188 at 2; also see, Exh. 75).

### C.      Failure to Adequately Market Exceed J

Second, despite having entered into a business relationship with Kemper on the premise that Kemper would be one of several members of an Exceed J user community (who would share enhancement and maintenance costs) and that Exceed J would be CSC's flagship P&C solution, CSC did little to market Exceed J after signing up Kemper, and ultimately abandoned all efforts to market the Exceed J Policy in favor of a "future state solution." In short, Kemper claimed CSC's commitment to the Exceed J Policy evaporated, making it impossible for the Parties to achieve the project's goals. (*See* Exh. 156).

### D.      Kemper's Demand

Kemper's Demand contains two counts: one for breach of contract and a second, in the alternative, for rescission of the Exceed Agreement. As noted above, New York law governs this case. (Exh. 1 § 11.7).

#### 1.      Kemper's Breach of Contract Claims

Under New York law, the elements of breach of contract are: (1) the existence of a contract, (2) performance by the Claimant, (3) non-performance by the Respondent, and (4) damages attributable to the breach. *Canzona v. Atanasio*, 118 A.D.3d 837, 838 (2014). Kemper

has the burden of proving the elements of a breach of contract claim. Kemper claims CSC materially breached the Exceed Agreement in several ways. Kemper claims CSC breached Section 3.4 of Addendum 1, which reads as follows:

> Notwithstanding the foregoing, if for reasons not caused by Customer, CSC fails to make the Java version of the Licensed Program generally available to its licensees within twenty-four (24) months ..., Customer may declare CSC in breach of the Agreements and will be entitled to all remedies set forth in this Addendum (including, without limitation, all payments made by Customer pursuant to the Agreements but without any limitations based upon when such payments were made) and to seek all additional proven direct damages resulting from such breach.

Kemper claims that CSC failed to discharge its obligations under Section 3.4 in three different ways, and it contends any of the three is sufficient to establish that a breach occurred:

*First*, Kemper claims that (a) CSC failed to create a "Java version" of Exceed; (b) that CSC failed to meet the criteria set forth in Exhibit A to Addendum 1, which expressly defined requirements for meeting the "generally available" standard; and (c) that to the extent it claims to have released a "Java version" of Exceed that met the "generally available" criteria, CSC failed to do so by January 2, 2011, as contractually required. Kemper also claims that neither CSC's failure to ever create a "Java version," nor CSC's failure to meet the "generally available" criteria of Exhibit A of Addendum 1, nor CSC's failure to meet the January 2, 2011 deadline, were "for reasons ... caused by Kemper."

*Second*, Kemper claims that, CSC's failure to (i) make a "Java version" of Exceed "generally available" constitutes a breach of the specific obligation set forth in Section 3.4 of Addendum 1, and that failure, along with (ii) CSC's abandonment of any efforts to promote and market the Exceed J Policy component independently, constituted a breach of contract because

14

101

CSC's actions resulted in frustration of the essential and fundamental purpose of the contract. (*See* Exh. 156).

**_Third_**, Kemper claims that CSC breached the covenant of good faith and fair dealing that is implied in all contracts under New York law. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995); *ABN AMRO Bank, N.V. v. MBIA, Inc.*, 17 N.Y.3d 208, 228 (2011). According to Kemper, CSC had a duty to use good faith when exercising its discretion in administering the tests and approving the criteria for determining whether the Exceed J software satisfied the contractual definition of "generally available," and CSC failed to do so. Likewise, Kemper alleges that CSC's failure to market the Exceed J Policy to other customers[10] and its decision to simply abandon development of that product in favor of a "future state solution" prevented Kemper from realizing the benefits of the Exceed Agreement. (Tr. 4:39-43).

### 2. Kemper's Alternative Claim for Rescission

In the alternative, Kemper seeks rescission of the Exceed Agreement. Under New York law, rescission is "an alternative remedy to an action for damages where there has been a material breach of a contract." Glen Banks, *New York Contract Law*, Vol. 28 § 12:2 (herein "Banks"). A rescission claim is equitable in nature, available only in the absence of a complete and adequate remedy at law. *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972). Technically, "[a] rescission amounts to the unmaking or undoing of a contract from the beginning and is not merely a termination of the agreement. The effect of rescission is to declare the contract void from its inception and to restore the parties to the *status quo*." Banks § 12:2. A contract may be rescinded if there was (1) fraud in the inducement of the contract, (2) a failure of consideration, (3) an inability to perform the contract after it was made, or (4) a breach in the

---

[10] *See* Exh. 156.

contract which substantially defeats the purpose thereof. *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000).

Kemper asserts that Section 3.4 of Addendum 1 provides it with a complete and adequate remedy at law, but alternatively Kemper claims the Exceed Agreement may be rescinded because CSC's breach substantially defeated its purpose and because CSC's promised consideration failed. Kemper claims that the well-understood primary objective of the Exceed Agreement was for CSC to supply Kemper with a Java version of CSC's Exceed software products for Kemper's P&C businesses to replace Kemper's legacy systems. Kemper alleges that by failing to develop a Java version of that software suitable for Kemper's objectives, CSC substantially and fundamentally defeated the purpose of the Exceed Agreement, and the Exceed Agreement may be rescinded as an alternative remedy should this Tribunal not find that CSC breached the Exceed Agreement. Kemper also asserts that rescission is warranted because CSC's consideration failed in that CSC never provided Kemper with a Java version of the Exceed software that Kemper bargained for, forcing Kemper, after 6.5 (six-and-one-half) years, to go back into the marketplace and seek precisely the type of software platform CSC promised but failed to deliver from another vendor.

7.   CSC's Defenses and Counterclaim

CSC claims the Exceed project ended prematurely because Kemper failed to adequately perform its own responsibilities on the project, which led to delays and cost overruns. CSC claims, among other things, that Kemper never had the support of its senior management for the project, failed to adequately manage the project, failed to properly identify business requirements for the software, failed to restrain its P&C businesses from continually changing the scope of the

16

103

project, and could still be using the Exceed J system if it had not made a business decision to end the project.

CSC asserts several specific defenses.

*First*, CSC contends that Kemper's claim under Section 3.4 of Addendum 1 is barred by Work Order No. 6 (Exh. 33), which the Parties entered into in December 2011. CSC asserts that Work Order No. 6 retroactively amended the Exceed Agreement to remove any mandatory completion deadlines and any remedies associated with a failure to meet such deadlines.

*Second*, CSC contends that Kemper's claims under Section 3.4 of Addendum 1 are barred because the delays in completing the project were for reasons caused by Kemper, and therefore the remedies specified in that section are unavailable to Kemper.

*Third*, CSC contends that CSC *did* make the "Licensed Programs" (a term defined in the Exceed Agreement) "generally available" within the time period required, when that period is adjusted for delays caused by Kemper. Specifically, CSC has pointed to Exceed version J.1 (released in September 2012) as being a "Java version" that met the "generally available" criteria.[11] As part of this contention, CSC claims that the version of Exceed that it released in September 2012 provided Kemper what it bargained for.

*Fourth*, CSC contends that Kemper's claims under Section 3.4, including any claim for a refund of amounts paid to CSC, are barred because Kemper's delay in asserting its remedies precludes it from asserting those remedies now, or otherwise limits its recovery.

*Fifth*, CSC contends that Kemper's claim under Section 3.4 is barred by the doctrine of election of remedies. More specifically, CSC contends that assuming the occurrence of a breach

---

[11] CSC takes the position that because Work Order No. 6 removed any deadline to release the software, it was delivered as "generally available" on a timely basis.

of Section 3.4 in January 2011, Kemper had to choose between (a) immediately, or at least within a "reasonable time" terminating the agreement and attempting to seek a return of fees paid to that date, or (b) demanding performance from CSC and relying on remedies other than termination. CSC contends Kemper chose the latter course, and thereby waived its right to seek to invoke the remedy of Section 3.4.

**Sixth**, CSC contends that Kemper's claims for breach of contract and rescission fail to state a claim upon which relief can be granted, citing the assertions that Work Order No. 6 excused CSC from attempting to complete the project by any specific deadline, and that CSC's obligations were either performed or excused by Kemper's own failure to perform.

**Seventh**, CSC contends that even if Kemper could establish a breach of contract, it is not entitled to the full monetary award it seeks. On this point, CSC asserts that even if a breach occurred on January 2, 2011, and Kemper is entitled to a recovery of amounts paid to CSC, such recovery would be limited to amounts paid until January 2, 2011, but not beyond. CSC also contends that certain elements of the recovery Kemper seeks constitute requests for consequential damages, which are not permitted under the Exceed Agreement.

A.    So-Called "Day 2" Requirements

In its Amended Answer, CSC asserts a number of affirmative defenses, some of which have been developed in subsequent briefing and argument. During this proceeding the Tribunal heard CSC's so-called "Day 2" argument that the Parties expected Exceed J to contain JOBOL until the Day 2 requirements had been implemented by CSC, who was given up to four years to complete same. *See* Schedule 1 to Exh. B to Addendum 1 to the MSLSA and Product Order No. 1 and Work Orders Nos. 1 and 2. I note that the Day 2 requirements were subsequently stripped

18

from the Exceed Agreement and made non-binding or mandatory.  Given the foregoing, I found CSC's Day 2 argument of limited relevance or persuasive force.

B.      Subject Matter Jurisdiction Defense

In its Amended Answer, CSC also claimed that Kemper's claims for breach of contract and rescission "are barred due to lack of jurisdiction of this Tribunal to hear claims arising from the Master Outsourcing Services Agreement between the Parties, which was entered into June 29, 2012 (the "Outsourcing Agreement").  CSC claims that the Outsourcing Agreement contains a separate arbitration provision and dispute resolution process, and therefore any claims relating to work performed under the Outsourcing Agreement are not properly before this Tribunal.

C.      CSC's Claim for Breach of Contract/Kemper's Response

CSC also asserts a counterclaim for breach of contract, alleging that Kemper's failure to pay certain consulting service charges, support charges, and for certain software in production, constitutes a breach under Section 7.1 of the MSLSA, and/or Section 3.5 of Product Order No. 1. At the hearing, CSC claimed that Kemper owed CSC over US $6 (six) million dollars in unpaid charges. CSC also seeks fees and costs should it prevail in this proceeding.

Kemper responded to CSC's counterclaim by contending:  (a) CSC's claim for breach of contract relating to maintenance charges (known as "MESA") post-dating the end of the Parties' relationship fails because (i) Kemper paid MESA until it stopped using the Exceed J software in the Specialty/Illinois pilot, and any subsequent performance was excused on account of CSC's breaches; and (ii) after Kemper stopped using the Exceed J software in the Specialty/Illinois pilot, Kemper received no consideration in the form of the ongoing maintenance and enhancement services for which the MESA payments were to be made; (b) CSC's claim for breach generally is barred on account of CSC's prior breach; (c) CSC's claim for breach is

barred by the doctrines of frustration of purpose and accord and satisfaction; and (d) CSC's claims for breach are subject to setoff – that is, any sums CSC is allegedly owed must be factored into a determination of Kemper's claimed damages.

8.   Issues

The above summary of the Parties' claims and defenses outlines the issues this Tribunal addresses in reaching its conclusions as stated herein. I have carefully reviewed and considered the pleadings, briefs, and the full evidentiary record, including testimony, documents, emails, correspondence, statutes, case law, and academic commentary. In my judgment the issues listed in this section are those necessary and appropriate to arrive at a reasoned Partial Final Award.

I note that in light of my findings and the determination of the issues presented, not all of the questions argued in the pleadings were necessarily reached and required decisions or findings in order to arrive at the Tribunal's conclusions supporting this Partial Final Award granted by the Tribunal herein. I did, however, for the sake of completeness, carefully consider *all* of the claims and defenses asserted in the pleadings and any evidence submitted regarding those claims and defenses was examined, considered and weighed, even if they are not the subject of specific commentary below.

The core issue in reaching my Partial Final Award in this matter is whether, for reasons not caused by Kemper, CSC failed to make a "Java version" of CSC's Exceed software "generally available" by January 2, 2011, or, as is asserted by Claimant, ever did so.

In the interest of full examination and completeness of process, I will address and make findings below on the following issues:

20

107

A.   What is the proper interpretation of the term "Java version," as used in Section 3.4 of Addendum 1?

B.   Did CSC – at any time during the project, release a "Java version" of Exceed? If not, was its failure to do so "for reasons caused by Kemper"?

C.   In its attempt to transform Exceed and release a "Java version," did CSC meet the "generally available" criteria listed on Exhibit A of Addendum 1? If not, was CSC's failure to do so "for reasons caused by Kemper"?

D.   Did CSC make a "Java version" of Exceed "generally available" within the time frame specified in Section 3.4 of Addendum 1 of the Exceed Agreement? If not, was CSC's failure to do so "for reasons caused by Kemper"?

E.   Did Work Order No. 6 eliminate any obligation on CSC's part to make a "Java version" of Exceed "generally available" by any particular date?

F.   If Kemper proved that CSC breached Section 3.4 of Addendum 1 of the Exceed Agreement, to what remedy or remdies is it entitled?

G.   If Kemper proved that CSC breached Section 3.4 of Addendum 1 of the Exceed Agreement, is Kemper's remedy or recovery limited by reason of the timing of its assertion of its claim of breach?

H.   Does this Tribunal have jurisdiction over any portion of CSC's claim that arises out of the Outsourcing Agreement? Does any portion of Kemper's claim here arise out of the Outsourcing Agreement?

I.   Has CSC carried the burden of proof on its counterclaim?

9.   <u>Findings</u>

Based on a careful consideration of the evidence presented by the Parties, it is my reasoned determination and finding that Kemper has met its burden of proving the elements of a breach of contract claim. The following discussion of each of the issues listed above provides the reasoning for my decision.[12]

---

[12] As noted above, the elements of breach of contract under New York law are: (1) the existence of a contract, (2) performance by the Claimant, (3) non-performance by the Respondent, and (4) damages attributable to the breach. *Canzona*, 118 A.D. 3d at 838. I note that the Parties do not dispute the validity of the Exceed Agreements.

21

**A.** *What is the proper interpretation of the term "Java version," as used in Section 3.4 of Addendum 1?*

Though it is used several times, the term "Java version" is not specifically defined in the Exceed Agreement.[13]

### 1. What is a Java version?

While, as CSC's own expert witness concluded,[14] the purpose of the Exceed Agreement is apparent from the face of the contract documents, that being the transformation of the Exceed software from COBOL to Java and the licensing and implementation of that software by Kemper and other licensees,[15] the Parties nevertheless dispute what the term "Java version" means.

#### a. Kemper's View

Kemper claims that a "Java version" of a software program that is being transformed (as was the case here, with Exceed being transformed from COBOL to Java) must be one that embodies the core principles of Java, and enables the software's user to realize the benefits of running Java, including ease and economy of use, enhancement and maintenance, as well as

---

[13] In matters of interpretation, a tribunal should first try to give effect to a contract's plain meaning based on the face of the agreement. *See* Banks § 9:1. The tribunal should focus on discerning the Parties' intent at the time they entered the contract, as evidenced by the apparent purpose of the contract, as evidenced by the contract's plain text. *Id.* §§ 9:2, 9:5. If the purpose of the contract can be determined, the tribunal should interpret the contract in a manner that promotes that purpose. *Id.* The tribunal should also try to construe the contracts in a manner that produces a "practical interpretation that will realize the parties' reasonable expectations" at the time they entered the contract, and in doing so should not look at particular provisions in isolation, but rather should try to effectuate the contract as a whole and consider the context in which a contract was written. *Id.* §§ 9:6, 9:12. The tribunal can consider parol evidence if it determines the contract is ambiguous. *Id.* § 9:13.

[14] *See* Exh. 500 at 1, 10-16.

[15] *See* Exh. 2 (Product Order 1) §§ 2, 3.1 (licensing the Exceed software and stating that "[a]s a condition precedent of this Product Order being effective, Customer must execute Work Order No. 2," which called for and governed the transformation of Exceed from COBOL to Java); Exh. 3 (Work Order 1) § 1.1 (setting forth the "general consulting services" CSC provided to Kemper for the "implementation of one or more of CSC's Exceed Licensed Products"); Exh. 5 (Addendum 1) at 1 (noting the Parties entered into Work Order 2 for "[Kemper] to participate in the acceleration of CSC's development of a Java version of the Cobol base version" of the licensed Exceed software). That the transformation of Exceed and its implementation at Kemper was the Parties' primary purpose and intention in entering the Exceed agreements is not in dispute, and was corroborated by many witnesses from both Parties.

22

Kemper Corporate Services, Inc. v. Computer Sciences Corporation
(AAA Case No. 01-15-0005-2283)

simplicity of form and access to a large and growing pool of Java-trained programmers.

### b.   CSC's Point of View

CSC, on the other hand, contends that any software that compiles in Java is a Java version. (*See* Exh. 500 at 7-9).

### c.   Analysis and Finding

Because the Exceed Agreement fails to define the term "Java version" and because the term is subject to different interpretations, I find its meaning in the context of this proceeding is ambiguous.[16]  I have therefore looked outside the four corners of the Exceed Agreement to parol evidence to find the intent of the Parties regarding the nature of the Java version that the Parties sought at the time of contracting.

In this case, in my judgment, the language of the contract – read in light of the purpose and text of the entire agreement together with the benefit of parol evidence proffered during this proceeding – clearly supports Kemper's interpretation of what the Parties intended at the time of contracting when they referred to the transformation and implementation of a "Java version" of CSC's Exceed software.

---

[16] The first step in interpreting a particular provision is determining whether it is ambiguous. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). A provision is ambiguous if it is reasonably susceptible to more than one interpretation. *Id.* In deciding whether a provision is ambiguous, the tribunal should use well-established holistic principles of interpretation and canons of construction. Contract provisions are not to be interpreted in isolation, but rather in a manner to effectuate the contract as a whole, considering the context in which a contract was written. Banks §§ 9:6, 9:12. Similarly, the tribunal should not construe a particular provision in a way that produces an absurd result, but rather should construe the provision in a commercially reasonable manner. *Id.* Likewise, "[a]n interpretation that gives a reasonable and effective meaning to all the terms of the contract is preferable to one that leaves a part unreasonable or of no effect," and "[i]n assessing whether ambiguity exists, [the tribunal should] consider the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous." *Id.* §§ 9:6, 9:19. The canons of construction mandate that specific terms be given greater weight than general language (*id.* § 10:10), and that the same words used in different parts of a writing be given the same meaning. *See Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 362 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 802 (2d Cir. 2015); *U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*, 2017 WL 436508, at *10 (S.D.N.Y. Jan. 27, 2017). If the tribunal determines that a provision is *not* ambiguous, then it need only look to the text of the contract to determine the parties' intent. Banks § 9:1. If the tribunal determines that a provision *is* ambiguous, then parol evidence can help to determine the intent of the parties. *Id.* § 9:13.

23

110

Kemper Corporate Services, Inc. v. Computer Sciences Corporation
(AAA Case No. 01-15-0005-2283)

I find that the term "Java version" should be interpreted as a version of Exceed that embodies the core principles of Java and enables the software's users (such as Kemper and other potential licensees of the software in the user community) to realize the benefits of running Java[17] including platform independence, ease and economy of use, maintenance and enhancement, stability and access to a large and growing labor pool of Java programmers.

There was considerable evidence in the record that the Parties intended the term "Java version" to describe the output of the transformation phase of the Exceed project (after machine transformation and subsequent hand coding by CSC so that version could serve as the Java base for further enhancement and implementation), and that evidence was entirely consistent with the purpose and language of the Exceed Agreement.

I find that the clear weight of the evidence and common sense dictates that both Parties wanted to achieve the substantial benefits that a Java version of the Exceed software would provide.

Nevertheless evidence presented during the proceeding strongly convinces this Tribunal that the Parties did not achieve the benefits they sought at any time before the Exceed Agreement was terminated. Instead, the evidence adduced during this proceeding clearly indicates that the Parties received a malformed, unreadable software that was anything but easy to enhance and maintain, or sell to (or share costs with) other Exceed J licensees in a potential user community. (*See infra* Exhs. 55, 75, 76, 89, 156, 188, 310, 1058, 1075, and 1078).

**B.    *Did CSC – at any time during the project – release a "Java version" of Exceed? If not, was its failure to do so "for reasons caused by Kemper"?***

---

[17] There was considerable evidence presented at the hearing identifying the benefits of running Java, one of which was testimony from witnesses on both sides to the effect that Java programs – which feature a modern, object-oriented language understood by a large and growing pool of computer programmers – are typically far easier and far more economical to maintain and enhance than programs written in more dated, legacy languages such as COBOL. Some of the core principles and benefits of a Java version of software are discussed in Kemper's Expert Report of Jeff Parmet ("Mr. Parmet"). (*See* Exh. 400).

1.  Was a Java version of the software ever made "generally available"?

Having interpreted "Java version" to contain the principles and provide the benefits described above, the question arises whether CSC released a "Java version" at any time during the Exceed project by making it "generally available" as that term was defined by the Parties at the time they entered into the Exceed Agreement.

Having fully and carefully considered the evidence presented by the Parties, I find that the evidence produced during this proceeding establishes that CSC did not release a "Java version" of Exceed during the project as intended by the Parties. CSC points to its release of Exceed version J.1, in September 2012, as having been a release that discharged its obligation to release a Java version pursuant to Section 3.4 of Addendum 1, claiming that such release was timely because Work Order No. 6 removed any deadline to deliver the software.

There is ample evidence in the record, however, that neither version J.1 nor any other version of Exceed about which testimony was received was a "Java version" as that term has been interpreted. There is abundant evidence in the record that the state or condition of the Exceed J software even as late as May 2015 was such that no one could reasonably conclude that CSC had fulfilled its obligation to release a "Java version."

In the latter regard, I was persuaded by the content of CSC Exceed Architect Mr. Bierenbaum's internal email of April 16, 2015, (Exh. 89) stating that:

> the actual converted code was ugly. Barely readable by new Java developers. Initially the code was only discernible by COBOL developers intimately familiar with Exceed who had been given Java syntax education . . . CSC committed to Kemper that we would insure that the resulting system would be a native Java application. Phil Ehlen (Product Owner) with James Hurley (Exceed Architect) made that commitment in writing to them . . .
>
> The net on JUnit in my opinion is that our code is so malformed (5 million issue by automated analysis) that JUnit would not test what needs testing.

I was also persuaded that the version of Java that CSC claimed to be "generally available" was subject to constant problems and required a war room manned by CSC programmers to fix and provide constant work-arounds while it was deployed on a limited basis in Illinois. (*See* Tr. 4 Testimony of Harry Yee, and Exhs. 75 and 76). I find that the condition and quality of the software described and existing throughout the term of the project could not have been what the Parties sought to implement or otherwise intended to produce, use, and license to others.

2. Was the reason for the failure to make a Java version generally available caused by Kemper?

Having fully and carefully considered the evidence presented by the Parties, I find that CSC's failure to release and make "generally available" a "Java version" of Exceed during the Exceed project was not for reasons caused by Kemper. In arriving at this conclusion, I observe that the Exceed Agreement between the Parties provides that the role of transforming Exceed from COBOL to Java was CSC's obligation. Kemper was responsible for identifying custom modifications to be made to the COBOL version of Exceed *before* it was transformed – *if* Kemper wanted the modifications to be made to both the COBOL *and* Java versions of the software. However, I find that the number of modules resulting from (and the timing of) requested modifications by Kemper do not lead to a conclusion that such modification requests resulted in CSC's failure to make a Java version "generally available" during the project. The work of creating a Java version of Exceed fell entirely to CSC. And, as noted, CSC was not obligated to make changes to the COBOL version that exceeded those it had been contracted to provide. Consequently, I find that the unmaintainable condition of the software following the transformation, as described by CSC's Mr. Bierenbaum and other witnesses, including Harry Yee, was entirely the responsibility of CSC.

**C.**  *In its attempt to transform Exceed and release a "Java version," did CSC meet the "generally available" criteria listed on Exhibit A of Addendum 1?  If not, was its failure to do so "for reasons caused by Kemper"?*

The term "generally available" was used to define the process CSC agreed to follow internally before releasing the "Java version" of Exceed.  Unlike the term "Java version," the term "generally available" *was* specifically defined by the Parties, and that definition appears as Exhibit A of Addendum 1 to the Exceed Agreement.  During the pre-contract period, CSC suggested the language for the definition of "generally available" that was ultimately adopted by the Parties.  The definition starts:  "For Exceed components to be considered 'generally available', the code must meet the following criteria and/or successful completion of the following steps . . ." (Exh. 5 at Exhibit A).  The aforementioned criteria and steps are spelled out in bullet points and additional text.  For CSC to have met the "generally available" criteria before releasing the software, it had to successfully complete certain forms of unit testing, performance testing, quality control testing, and earn the release sign-off of various CSC personnel.

The evidence presented at the hearing as to whether CSC met the so-called "generally available" criteria focused on Exceed versions J.0 and J.1.  CSC admitted that it failed to meet the "generally available" criteria before releasing version J.0, but claims it met the criteria before releasing J.1 in September 2012.

Kemper, for its part, claimed that CSC did not meet the "generally available" criteria for J.1 or any other version of Exceed.  There was evidence presented that Exceed J.1 was released with numerous "exceptions."  The presence of a documented "exception" in the record of a release means that CSC decided to go forward and release software despite the fact that the software did not meet a particular release criteria.  The concept of an "exception" is not

mentioned in the Exceed Agreement, and there is no evidence that Kemper agreed to waive application of any of the "generally available" criteria, as defined in the Exceed Agreement, or agreed to accept or allow a release with "exceptions." Moreover, Kemper's expert, Mr. Parmet, reviewed version J.1 and the surrounding documentation and testified to the effect that he did not see evidence that required testing had been performed successfully, or even performed at all. Mr. Parmet evaluated J.0, J.1, and the last version of Exceed released to Kemper, following which he testified that in his opinion none of them met the "generally available" criteria set forth in the contract. (*See also* Bierenbaum Exh. 89, "our code is so malformed . . . that JUnit would not test what needed testing").

Having considered the evidence presented by the Parties, I find that CSC failed to meet the "generally available" criteria when it released Exceed version J.1 and that CSC's failure to meet the "generally available" criteria at the time of releasing J.1 was not for reasons caused by Kemper. The evidence indicated that the steps and criteria that CSC followed were entirely internal to CSC, and it was CSC's role to determine whether the various testing steps were adequate or had been met. There was nothing in the Exceed Agreement that required any sign-off or participation by Kemper in ensuring the "generally available" criteria were met.

I also find that there was no credible evidence in the record to prove that CSC's unilaterally granting itself numerous exceptions to the "generally available" criteria is consistent with the custom and usage in the data process industry. To the contrary, I find that the parties agreed that the "generally available" criterion was necessary to fulfill CSC's obligations under the Exceed Agreement.

By reason of my findings (a) that CSC did not meet the GA criteria before releasing Exceed version J.1, and (b) that its failure to do so was not "for reasons caused by Kemper," and

(c) that such failure was not excused as custom and usage in the data process industry, I find that Kemper has established that CSC breached its obligation under Section 3.4 of Addendum 1 and that Kemper is therefore entitled to the remedy set forth in that Section.

## CONCLUSION

By reason of my findings that CSC failed to (a) make a "Java version" of Exceed at any time during the Exceed project, (b) "generally available" (c) for reasons that were not caused by Kemper, I find that Kemper has met its burden of proof and established that CSC breached its obligations under Section 3.4 of Addendum 1 and that, consequently, Kemper is entitled to the remedy set forth in that Section.

\*\*\*\*\*

While not essential to my findings and conclusions in rendering this Partial Final Award, I address the other issues listed above for the sake of completeness.

**D.      *Did CSC make a "Java version" of Exceed "generally available" within the time frame specified in Section 3.4 of Addendum 1 of the Exceed Agreement? If not, was its failure to do so "for reasons caused by Kemper"?***

Even if CSC had, at some point, satisfied its obligation to make a "Java version" of Exceed "generally available" (and, as noted above, I found that CSC failed to do so), the question of whether it rendered Exceed J "generally available" before the deadline set forth in Section 3.4 of Addendum 1 would remain.

Section 3.4 of Addendum 1 set forth a deadline of 24 months after the Exceed Agreement was initially entered into, that is, by January 2, 2011. CSC has conceded that version

29

116

J.0 did not meet the contractual "generally available" criteria, and therefore the question remains whether CSC's release of J.1 in September 2012 was timely.   Given the January 2, 2011, deadline, at issue is whether CSC's deadline to release a "Java version" was (a) extended to or beyond September 14, 2012; or (b) eliminated altogether.   Based on the language of the contract and the evidence presented and for the reasons discussed below, I find that the January 2, 2011, deadline was not extended, and was not eliminated by either operation of law or agreement of the Parties.   (*See infra* at 29).

I find, therefore, that CSC breached Section 3.4 not only because it failed to make a "Java version" of Exceed "generally available," but also because it failed to do so by January 2, 2011.

1. <u>Change to Exceed Agreement Requires Signed Writing</u>

There was evidence presented that, in 2010, representatives of the Parties exchanged emails and may have discussed the extension of certain deadlines and remedies under paragraph 3 of Addendum 1.

However, Section 11.4 of the MSLSA unambiguously requires that any amendment to the Exceed Agreement be "in writing and be signed by an authorized representative" of both Parties.   (Exh. 1, § 11.4).   This provision applied to deadline changes, and indeed the record reflects that the Parties *did* change the so-called "Completion Date" by executing a written amendment to Addendum 1.   (*See* Exh. 17, § 1).   There was however, never any writing that changed the date in Section 3.4 beyond January 2, 2011.   Moreover, none of the communications between the Parties referenced any date as late as September 2012, let alone reflected an agreement on such a date.

Based on the evidence presented, I therefore find (a) that the Parties did not agree to extend CSC's deadline for making a "Java version" of Exceed "generally available" to or beyond

30

117

September 14, 2012, and (b) that CSC failed to make a "Java version" of Exceed "generally available" at any time before the January 2, 2011, deadline.

2.    Work Order 2, Section 2 "Custom Modification" Arguments

Given the language of Section 3.4, the next issue is whether CSC's failure to meet the deadline was "for reasons caused by Kemper." CSC claims that Kemper was to blame for any failure to meet the January 2, 2011, deadline.[18] CSC's argument focuses in part on Section 2 of Work Order 2, which was the Work Order that set the terms for delivery of the "Java Transition Services." By its plain terms, Section 2 of Work Order 2 sets the starting point for the code that was to be transformed from COBOL to Java. CSC's arguments relate to two separate provisions of Section 2 of Work Order 2: one related to a January 4, 2010, deadline, and the other related to

Custom Modifications. Those provisions read as follows:

> The parties agree that, at Customer's option, additional **Custom Modifications** to be incorporated into the Java Version of the Licensed Programs (as well as in Cobol form) **may be identified on or before January 4, 2010**; however, **if the Custom Modifications to be provided in both Cobol and Java represent an increase of two (2) percent or more of the total module count** for all modules listed by CSC as in scope for the Java Transition Project as of November 3, 2008, such Custom Modifications **may result in a delay in the Completion Date.** Furthermore, any **Custom Modifications identified after January 4, 2010,** must be mutually agreed upon as part of a project change control process and **may result in a delay in the Completion Date** unless such Custom Modifications are to be only in the Java version in which case there will be no delay in the

---

[18] Again, this argument only takes on significance if CSC did, in fact, make a "Java version" of Exceed "generally available" *at any time.* As noted I have previously found CSC failed to do so, and therefore this discussion is not necessary, but is nonetheless included for the sake of completeness.

Completion Date. (Exh. 4, § 2 (emphases added)).

     3.    The January 4, 2010, Deadline to Request Custom Modifications to Both COBOL and Java versions

By the plain terms of Work Order 2, Section 2, Kemper had the right to request Custom Modifications that would be made to *both* the to-be-transformed COBOL *and* post-transformation Java versions of Exceed, but Kemper had to exercise that right by January 4, 2010. That deadline was intended to give CSC time to change the COBOL version and allow its vendor time to do the work it needed to meet the deadline for transformation.

CSC claims that Kemper requested modifications to the COBOL version well beyond/past January 4, 2010. There is a dispute as to whether Kemper insisted that post-January 4 requests for Custom Modifications be made to the COBOL version as well as to post-transformation Java versions.

The evidence is clear, however, that Kemper was not prohibited *from making* Custom Modification requests after January 4, 2010 – the contract only provides that Kemper no longer had the *right to require* that the modifications be addressed in *both* the COBOL *and* Java versions if requests for Custom Modifications were received after that date. Indeed, the evidence established that the Parties fully expected that Kemper would make Custom Modification requests to the Java version for many years, given the phased and ongoing nature of the larger Exceed Project.

Even assuming that Kemper requested changes to the COBOL version after January 4, 2010, does not lead this Tribunal to a finding that Kemper caused CSC to fail to meet its contractual deadline for making a "Java version" of Exceed "generally available," nor does it lead to a finding that impacts Kemper's remedy under Section 3.4 of Addendum 1.

If Kemper made requests to the COBOL version after January 4, 2010, CSC had two options: *First*, (a) it could decline to address the Custom Modifications in COBOL prior to the initial transformation of Exceed, deferring the modification to a later Java-only version; or *Second*, (b) it could agree to make the changes to the COBOL version prior to transformation, but condition its agreement to do so on Kemper agreeing to execute an amendment to the Exceed Agreement changing CSC's deadline. Based on the evidence presented at the hearing, CSC did not avail itself of either option. Moreover, it is worth noting that the even if CSC had, as it claims, agreed to make changes to the COBOL version based on post-January 4, 2010, requests, the contract merely says that such an agreement *may* result in an extension of the "Completion Date". As this Tribunal noted previously, Section 11.4 of the MSLSA required any amendment or extension to the Exceed Agreement to be in a writing *signed* by both Parties. There is no such writing in evidence.[19]

### 4.   *The 2% Total New Module Count Limit*

CSC also contends that that the Custom Modifications Kemper requested led to changes that exceeded the 2% total new module count provision in Work Order 2, Section 2. I considered (a) whether the 2% total new module count limitation was exceeded, and (b) if so, that module increase had any impact on Kemper's claim of breach.

Having fully and carefully considered extensive evidence on these questions and the plain language of the Exceed Agreement, I find and conclude that even assuming Kemper's Custom

---

[19] CSC has also cited language in Section 1 of Addendum No. 1 (Exh. 5), which states: "Customer acknowledges and agrees that in the event of any delay caused primarily by Customer's action or inaction (including delays caused by Customer's changes to the scope of the Java Transition Project), the Completion Date ... will be extended by the number of days equal to the number of days Customer delays CSC." Again, the reference here is to "Completion Date,"a defined term that is not applicable to Section 3.4 of Addendum 1. Moreover, there is no evidence supporting an argument by CSC that the any deadline was extended by some particular number of days, and no evidence – as indicated previously – that any relevant deadline was extended beyond January 2, 2011. Thus, Section 1 of Addendum 1 provides no basis for a finding that Kemper caused CSC's failure to make a "Java version" of Exceed "generally available" by that date.

Modification requests resulted in more than a 2% increase in the total number of new modules in the Exceed COBOL software, that fact would not defeat Kemper's claim that Section 3.4 was breached.[20] During the transformation process, CSC had complete control over the creation of new modules of code; Kemper did not write code and had no visibility into the number of new modules being created. Under the plain language of the contract, just as CSC had no obligation to make changes to the COBOL version of Exceed that were requested after January 4, 2010, it had no obligation to make changes that resulted in the 2% new module count limit being exceeded. When the 2% mark was reached, CSC had the right to defer the creation of any new modules until after the transformation to Java was completed.

Finally, I agree with Kemper that the January 4 deadline and 2% total new module count did not operate as conditions on Kemper's right to assert a claim for breach under Section 3.4. If either of these limitations was exceeded, the contract says such an occurrence "*may* result in a delay in the Completion Date."

I find nothing in Section 2 of Work Order 2 (or in Section 1 of Addendum 1) that supports an argument that any action or inaction by Kemper would eliminate or extend the Section 3.4's deadline. Those two sections support, at best, an argument that the "Completion Date" *might* be extended under certain circumstances, but the evidence conclusively proves it was not extended as such an agreement would have required an amendment to the Exceed Agreement signed by the Parties.

---

[20] On the first question, CSC presented evidence of emails in which its personnel claimed that the 2% limit had been exceeded. However, the reliability of the numbers presented in the email was called into question at the Hearing, and CSC never presented evidence of underlying facts or data (through expert testimony or otherwise) linking Kemper modification requests to the creation of new modules. In any case, because I assume for purposes of my analysis that the 2% limit was exceeded, there is no need for me to make a finding on that question.

In sum, having fully and carefully considered all of the evidence, I find that CSC's failure to meet the January 2, 2011, deadline to make a "Java version" of Exceed "generally available" was not "for reasons … caused by Kemper."

### E. Did Work Order No. 6 eliminate any obligation on CSC's part to make a "Java version" of Exceed "generally available" by any particular date?

CSC argues that the Parties entered Work Order No. 6 for the purpose of eliminating any deadlines for making a "Java version" of Exceed "generally available." Specifically, CSC argues that Section 1.5 of Work Order 6 effectively eliminated the remedy Kemper seeks to invoke. Section 1.5 reads: "[a]ny projected costs and completion dates related to the Services to be performed herein are good faith estimates only and shall not be deemed to bind CSC to complete such Services for said amount or by such completion date." (Exh. 33 at § 1.5). CSC also argues that Work Order 6 was expressly made retroactive by the inclusion of § 3.3. (*Id.* § 3.3).

Kemper disputes CSC's interpretation, and presented rebuttal evidence to explain why the Parties entered Work Order 6. In summary, Kemper argues that Work Order 6 refers to the "general consulting services" as described in Work Order 6, which are readily distinguished from the "Java Transition Services" that are at the core of Work Order 2. In other words, Kemper contends that Work Order 6, and Section 1.5 within it, have nothing to do with CSC's basic transformation obligation – to make a "Java version" of Exceed "generally available." Kemper pointed out that where the Parties elsewhere changed or proposed to change deadlines, they did so using clear language that referenced the specific contractual provisions being amended, but did not do so in Work Order 6. In addition, Kemper provided an alternative reasonable interpretation of Section 1.5 and extensive evidence as to the Parties' intent.

Having carefully and fully considered the language of Work Order 6 in the context of the entire Exceed Agreement, the weight of the evidence presented by the Parties leads me to find that Work Order 6 did not operate to eliminate the deadline by which CSC was to meet its obligation to make a "Java version" of Exceed "generally available." If the Parties had intended to eliminate an important right by removing a key deadline, they could have said so in writing directly and unambiguously. I find, persuasive, the statement of CSC's Phil Ehlen who wrote in an email concerning the purpose of Work Order No. 6: "This work order *merely provides a new rate structure* that will allow Kemper to do more consulting and staff augmentation work with us leveraging lower cost labor offshore" [emphasis added]. (Exh. 286 at -457).

\* \* \*

In summary, based on the extensive evidence presented by the Parties, I find that CSC breached that section "for reasons not caused by Kemper": (a) by failing to make a "Java version" of Exceed available *at any time* during the project; (b) by failing to meet the "generally available" criteria set forth in Exhibit A to Addendum 1; and (c) by failing to meet the contractual deadline for making a "Java version" of Exceed "generally available."

### F.    *If Kemper proved that CSC breached Section 3.4 of Addendum 1 of the Exceed Agreement, to what remedy or remedies is it entitled?*

As noted above, Section 3.4 provides that if Kemper declared CSC in breach for failing to meet its obligation to make a "Java version" of Exceed "generally available," Kemper "will be entitled to ... all payments made by Customer pursuant to the Agreements but without any limitations based upon when such payments were made ..." and to seek "all additional proven direct damages resulting from such breach."

36

Kemper has requested compensatory damages totaling $84,362,892, which sum is broken down as follows: (a) payments made to CSC totaling $58,598,963; and (b) "additional direct damages resulting from" the breach made up of certain internal costs totaling $25,763,929, which includes Kemper's investment in the form of internal salaries it paid and tracked for work on the Exceed J project. Additionally, Kemper is seeking an award of pre-judgment interest under New York law and, potentially, an award of costs and expenses pursuant to the Exceed Agreement. The Tribunal's findings with respect to each component of Kemper's damages claim is set out below.

> 1. Damages

Kemper presented evidence verifying the payments it made to CSC and the amount it invested internally on the Exceed project, and CSC did not take issue with the calculations made by Kemper's expert, Andrew D. Richmond ("Dr. Richmond"). Instead, CSC takes the position that if Kemper prevails, the language of Section 3.4 limits it to recovery of payments made to CSC from the commencement of the Exceed Agreement through January 2, 2011.

Kemper argues that, as a matter of law, there is nothing in Section 3.4 or anywhere in the Exceed Agreement that supports the argument that Kemper's recovery is so limited, and furthermore, that the express terms of Section 3.4 allow for the recovery of "all payments made by Customer pursuant to the Agreements" ... "*without any limitations based upon when such payments were made*" [emphasis added]. (Exh. 5, § 3.4).

Kemper further argues that the language eliminating any limitation on the timing of "when such payments were made" stands in contrast to the language of Section 3.1 of Addendum 1, which sets forth a separate remedy that included, *inter alia*, Kemper's right to recover payments made for the 12-month-calendar period preceding termination of the Exceed

Agreement. I note that a plain reading of Section 3.4, as written, neither limits Kemper's recovery to any particular period of time nor to payments made *before* the January 2, 2011, deadline.

CSC also has argued that Section 3.4 operates to effect a forfeiture not permitted by law. Having reviewed the relevant provisions of the Exceed Agreement and the authorities cited, I conclude that an award of damages pursuant to Section 3.4 does not operate to effect a disfavored forfeiture. By specifying that Kemper could recover all payments made to CSC, the Parties were articulating in very clear terms one element of Kemper's direct damages – the money Kemper paid CSC as part of its investment in a Project under which it reasonably expected CSC would make a "Java version" of Exceed "generally available."

### a.. *Payments made to CSC*

Based on the evidence presented, I find Kemper is entitled to recover its payments to CSC ($58,598,963), less $66,311, which latter sum reflects the value of certain royalties Kemper was paid under the Exceed Agreement that were not paid as invoice credits and therefore were not accounted for previously in Mr. Richmond's analysis.[21] Taking this reduction into account, I find Kemper is entitled to recover, as damages, $58,532,652 of the payments it made to CSC pursuant to the Exceed Agreement, and said amount will be included in my Partial Final Award.

---

[21] On July 25, 2017 (and again at the August 28, 2017 closing argument), I asked the Parties to address the issue of the payment of any royalties by CSC to Kemper under the Exceed Agreement. Kemper submitted an accounting of such royalties on September 18, 2017, which was consistent with the testimony at the arbitration hearing. Based on that submission, I find it appropriate to deduct $66,311 from the recovery Kemper seeks to account for royalty payments made by CSC that were not delivered as invoice credits.

b.     *Additional direct damages resulting from breach*

Based on the evidence presented, I find Kemper has met its burden and has proven that it is entitled to recover the following internal expenses as part of a damages award:    (a) $22,228,998 in Kemper internal salaries; (b) $97,942 for hardware related to the Exceed project; and (c) $3,436,989 in other expenses Kemper incurred.[22]  There was no substantial dispute in the record regarding the accuracy of Kemper's calculation of these expenses, as presented by Dr. Richmond.  Instead, CSC disputes whether internal expenses are recoverable as direct damages, arguing that they constitute unrecoverable consequential damages.

Kemper contends that New York law permits the recovery of amounts it invested in the Exceed project because CSC's breach of its obligation to make a "Java version" of Exceed "generally available" caused the loss of that investment.  Kemper asserts that New York law permits the recovery of reasonable overhead expenses – such as the salaries and the internal expenses claimed – that are allocated to specific projects in accordance with standard cost accounting practices.

Having reviewed the evidence and the legal authority cited by both Parties in their pre- and post-hearing briefs, I find that the internal expenses claimed are properly recoverable as direct damages in that they were the natural and probable cause of CSC's breach of Section 3.4. As a result, the amounts claimed for internal expenses (as detailed above and totaling $25,763,929) will be included in the Partial Final Award.

2.     Pre-judgment interest

Kemper contends New York law provides that where a plaintiff is awarded damages for breach of contract, pre-judgment interest at a statutory rate of 9% per annum is mandatory, and

---

[22] The nature of the expenses and their amount was detailed in Dr. Richmond's reports.  (*See* Exhs. 450 and 451).

that interest shall be computed from the "earliest ascertainable date the cause of action existed(.)" *See* NYCPLR §§ 5001(a), 5001(b), 5004. The New York authorities cited by Kemper are in accord. Having found that CSC breached Section 3.4 of Addendum 1, and insofar as the deadline for CSC's compliance with its obligation thereunder was January 2, 2011, I find that the "earliest ascertainable date the cause of action existed" was January 3, 2011. Having reviewed the statute, the authorities cited by both Parties, and the evidence, I find that Kemper is entitled to statutory pre-judgment interest on the award of damages made in this Partial Final Award. I also find that Dr. Richmond's model for calculating pre-judgment interest appropriately did not begin the calculation of pre-judgment interest until the first day of the month *after* the interest accrued. In other words, because the award of damages includes money paid to CSC or incurred by Kemper for internal expenses *after* the first ascertainable date the cause of action existed, Dr. Richmond appropriately did *not* begin the calculation of pre-judgment interest on the total amount of the award on that date. In this Partial Final Award, I hereby direct Kemper to submit a proposed calculation of pre-judgment interest for inclusion in my Final Award, and I direct that Dr. Richmond's pre-judgment interest model be utilized for that purpose. For purposes of that calculation, I previously found that the "earliest ascertainable date the cause of action existed" was January 3, 2011, and Dr. Richmond should use that date.

I conclude that Kemper is entitled to pre-judgment interest at a rate of 9% per annum until the award is paid or until it is confirmed and reduced to a judgment by a court of competent jurisdiction.[23] I therefore request that Kemper submit a table that includes a month-by-month

---

[23] Under New York law, pre-judgment interest includes interest between the date of any award and the date the award is either fully paid or reduced to a judgment by a court of competent jurisdiction. *See Yeroush Corp. v. Nhaissi*, 164 A.D.2d 891, 891 (App. Div. 1990) ("Once there was an award, ... [pre-judgment] interest began to accrue as of that date until the entry of judgment thereon."); *PremiereTrade Forex, LLC v. FXDirectDealer*, LLC, 2013 WL 2111286, *8-9 (S.D.N.Y. May 16, 2013) (allowing post-award interest at the statutory pre-judgment 9% rate for the period of time between the award and entry of judgment). The availability of interest on a confirmed

calculation of the Final Award for the 18 consecutive months beginning October 1, 2017, setting forth the following columns: (a) the amount of my award in this Partial Final Award; (b) the calculation of pre-judgment interest at the statutory rate, using Mr. Richmond's methodology and as directed herein; and (c) the sum of columns (a) and (b). Depending on when the award is paid or reduced to judgment by a court of competent jurisdiction, the Final Award shall be the sum of Column (c) plus any award of costs and expenses pursuant to Section 9.3(g), as discussed below.

### 3.      Costs and expenses

Section 9.3(g) of the MSLSA provides that Kemper may be "entitled to recover from [CSC] all [Kemper's] costs and expenses of arbitration incurred subsequent to [a qualifying settlement offer], including reasonable attorneys' fees and costs assessed against it by the AAA". If the conditions spelled out in Section 9.3(g) exist, Kemper may file a petition to add an award of costs and expenses to the Final Award, as directed in the Partial Final Award, below.

### G.      *If Kemper proved that CSC breached Section 3.4 of Addendum 1 of the Exceed Agreement, is Kemper's remedy or recovery limited by reason of the timing of its assertion of its claim of breach?*

CSC argues that Kemper's remedy or recovery here should be limited because Kemper did not terminate the contract at the time the deadline passed for CSC to make a "Java version" of Exceed "generally available." Specifically, CSC contends that to recover under Section 3.4, Kemper was required to terminate the MSLSA and related agreements, as required by Section 3.1 and 3.2, and further argues that Section 3.4 was not an independent remedy provision, but merely provided an additional point in time for Kemper to exercise the remedies set forth in Sections 3.1 and 3.2. CSC also argues that the "election of remedies" doctrine bars or limits Kemper's claim.

---

judgment is beyond the scope of my jurisdiction, and is a matter to be left for any court that enters judgment on the Partial Final or Final Awards.

Having fully considered the evidence and the authorities cited by the Parties, I find that the weight of the arguments put forward by the Parties favors Claimant's view. Based on the evidence, and particularly the plain language of Addendum 1, I find that (a) Section 3.4's remedy is independent of other remedies in Section 3, (b) that there is no language in Addendum 1 (or elsewhere) that required Kemper to terminate the Exceed Agreement to invoke the remedy of Section 3.4, and (c) that Kemper was under no obligation to declare a breach at any particular time in order to pursue its remedy under Section 3.4. Moreover, having reviewed the evidence and authorities submitted with respect to the "election of remedies" doctrine, I conclude that the doctrine does not operate to prevent or limit Kemper's remedy here.[24] I note that the relevant facts in the case law cited by CSC are distinguishable from those in the present proceeding and therefore lack persuasive force.

### H.   Does this tribunal have jurisdiction over any portion of CSC's claim that arises out of the Outsourcing Agreement?  Does any portion of Kemper's claim here arise out of the Outsourcing Agreement?

In its Amended Answer and again in a letter seeking permission to file a motion to dismiss in January 2017, CSC objected to the Tribunal's jurisdiction to adjudicate claims "arising out of" the Outsourcing Agreement. After reviewing Kemper's response to the letter, I denied CSC permission to file its motion at that late stage. When the issue was again raised at the closing argument held on August 28, 2017, I directed the Parties to file briefs stating their final positions on the issue, which I have received and considered.

CSC takes the position that this Tribunal does not have jurisdiction to adjudicate whether Kemper is entitled to damages that relate to expense incurred with respect to Statements of Work

---

[24] In this last regard, I note that given evidence of Exceed J's poor quality requiring constant attention to keep it in production, Kemper did not receive a quantifiable benefit from the use of the software that it attempts to retain while also and in addition requesting damages in the form of repayment from CSC.

3, 5, and 6 of the Outsourcing Agreement, because the Outsourcing Agreement contains its own, unique dispute resolution procedures.

Kemper contends that the premise of CSC's jurisdictional objection is false, because Kemper's claim for breach does not "arise under" the Outsourcing Agreement. Kemper's breach of contract claim arises under Section 3.4 of Addendum 1, and the basis for the arbitration is Section 9 of the MSLSA, which provides that "all disputes arising from *or relating to* this Agreement, or the breach thereof, shall be settled in accordance with" the MSLSA's dispute resolution procedures.

Kemper contends that it should be allowed to recover payments made under Statements of Work 3, 5, and 6 as having been "related to" the Exceed Agreement. Kemper also claims that while Section 3.4 of Addendum 1 expressly calls for the recovery of payments made under the Exceed Agreement (that is, the MSLSA and its associated Product Order, Work Orders, addenda, and amendments) payments made under Statements of Work 3, 5, and 6 of the Outsourcing Agreement would likewise constitute "additional direct damages" recoverable under Section 3.4, because they were incurred (like Kemper's internal expenses) as part of Kemper's investment on the Exceed project.

I note that the jurisdictional issue raised by CSC potentially impacts only the amount of the damages awarded by this Tribunal that relate to sums paid by Kemper relating to Exceed J in connection with the Outsourcing Agreement. Under CSC's view, Kemper should be left to pursue the money it paid CSC under the Outsourcing Agreement by invoking the dispute resolution provisions of that Agreement. Having considered the evidence, including the language of both the MSLSA and Outsourcing Agreement, I conclude that this Tribunal's jurisdiction is sufficiently broad to permit Kemper to include claims in which it seeks to recover

43

money paid to CSC for work related to the Exceed project that was performed under the Outsourcing Agreement Statements of Work.

I reach this conclusion because I find that Kemper's claim here arises entirely out of the MSLSA and associated agreements, and *not* the Outsourcing Agreement. I also find that amounts paid under the Outsourcing Agreement Statements of Work at issue constitute direct damages recoverable under Section 3.4 of Addendum 1.

In the event a reviewing court finds that I erred in deciding the jurisdictional issue, the Final Award can be partially adjusted to eliminate the effect of any error. To do so, a reviewing court need only exclude from my Final Award the amounts paid under the Outsourcing Agreement Statements of Work. Exhibit 451 reflects Dr. Richmond's calculation of Kemper's "Alternative Claimed Costs," which was prepared specifically to quantify the amounts attributed to expenses incurred (either paid to CSC or internally) by Kemper that fell under the Outsourcing Agreement. Dr. Richmond's analysis indicates that $9,218,319 of costs included in his initial calculation were associated with Statement of Work No. 3, and $1,452,712 of costs were associated with Statement of Work No. 6.[25] As such, if CSC's jurisdictional objection is sustained by a reviewing court, reducing the damages award here awarded by $10,671,031 would fully remove the effect of any error (together with an appropriate reduction in any pre-judgment interest award).

Because I am requesting Kemper to calculate an award of pre-judgment interest based on my findings in this Partial Final Award, I likewise request that Kemper provide the Tribunal an alternative calculation of damages (including pre-judgment interest) that removes the costs incurred under the Outsourcing Agreement. I will include the alternative calculations in my

---

[25] Dr. Richmond determined that he had not included any costs from the third Outsourcing Agreement Statement of Work (No. 5) in his original calculation of costs.

Final Award, and I expressly make a finding that the alternative calculation is appropriate in the event a reviewing court determines this Tribunal lacked jurisdiction to award amounts paid pursuant to the Outsourcing Agreement as damages for CSC's breach of contract.

### I.    Has CSC carried the burden of proof on its counterclaim?

CSC claims that Kemper owes CSC in excess of US $6 (six) million dollars for various fees Kemper did not pay after the Exceed project was discontinued in July 2015, including US $2.5 million dollars in "outstanding invoices for services rendered", US $0.9 million dollars in "accrued but unbilled services", and US $3 million dollars in "MESA support charges."

Kemper contends CSC is not entitled to any of these amounts because it materially breached the Exceed Agreement, thereby excusing Kemper's performance. Kemper continued to pay MESA until it stopped using the Specialty/Illinois pilot, and thereafter stopped paying MESA.

Given my prior findings, and based on the evidence and authorities cited, I conclude that CSC is not entitled to recovery on its counterclaim. I note that as a practical matter, even assuming the amounts paid to CSC were due and owing, Kemper was entitled to recover payments made to CSC and therefore would have been within its right to include those payments in its damages request. Respondent's counterclaim is **DENIED**.

### 10.    Arguments and Evidence Not Specifically Referenced

As noted by the Parties, this case is complex, and the record is extensive. The findings made by the Tribunal here are the findings necessary to support this Partial Final Award. Any failure to address a specific argument or cite some particular evidence or authority that has been cited by either Party should not be taken as an indication that the evidence and authority was not

considered. In fact, this Tribunal's review of the record has been extensive and comprehensive, and all claims and defenses were given careful and full consideration in arriving at this Partial Final Award.

11.   Partial Final Award

For the reasons stated above, I make the following PARTIAL FINAL AWARD:

A.   Kemper's claim that CSC breached the Exceed Agreement is **GRANTED**.

B.   Having found Kemper's remedy at law to be adequate, Kemper's claim for rescission is **DENIED** as moot.

C.   CSC's counterclaim and its affirmative defenses are **DENIED**.

D.   Kemper is awarded **direct damages** against CSC in the amount of **$84,296,581**.

E.   Within 14 days of the issuance of this Partial Final Award, Kemper may submit a petition to supplement the Partial Final Award, including in its submission: (a) alternative calculations of pre-judgment interest consistent with my findings above, and (b) an application for an award of costs and expenses pursuant to Section 9.3(g) of the MSLSA, including an itemized claim with reasonable support. CSC may thereafter file a response to the petition to supplement within 14 days of its receipt of Kemper's petition.

I **reserve the right and retain jurisdiction** to consider any petition to supplement or correct this Partial Final Award as outlined above, and then render my Final Award. Jurisdiction on outstanding issues is reserved accordingly.

F.   This PARTIAL FINAL AWARD shall remain in full force and effect until such time as a FINAL AWARD is entered.

133

Kemper Corporate Services, Inc. v. Computer Sciences Corporation
(AAA Case No. 01-15-0005-2283)

I hereby certify that, for purposes of Article 1 of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York on this 2nd day of October, 2017.

_____

Stephen S. Strick, Arbitrator

47

I, Stephen S. Strick, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award.

_____

Stephen S. Strick

State of California
County of Los Angeles

On this 2nd day of October, 2017, before me personally came and appeared Stephen S. Strick, to me known to be the individual described and who executed the foregoing instrument and he acknowledged to me that he executed the same.

SEE ATTACHED
_____
Notary public

48

135

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    **CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of LOS ANGELES )

On 10.02.17 before me, JASON MIRZA NOTARY PUBLIC
_____Date_____                              _Here Insert Name and Title of the Officer_

personally appeared STEPHEN SAMUEL STRICK
                              _Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> JASON MIRZA
> Notary Public · California
> Los Angeles County
> Commission # 2149783
> My Comm. Expires Apr 21, 2020

Signature_____
                              _Signature of Notary Public_

_Place Notary Seal Above_

───────────── **OPTIONAL** ─────────────
_Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document._

**Description of Attached Document**
Title or Type of Document: MPTM FINAL REWARD Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association · www.NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)   Item #5907

# Exhibit B

8-K 1 d371672d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): March 31, 2017**



# COMPUTER SCIENCES CORPORATION
### (Exact name of Registrant as specified in its charter)

| **Nevada** | **1-4850** | **95-2043126** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1775 Tysons Boulevard
Tysons, Virginia**
(Address of Principal Executive Offices)

**22102**
(Zip Code)

**Registrant's telephone number, including area code (703) 245-9675**

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## Item 1.01 Entry Into a Material Definitive Agreement.

*Separation-Related Agreements*

On March 31, 2017, Computer Sciences Corporation ("**CSC**") entered into several agreements with Hewlett Packard Enterprise Company ("**HPE**") and DXC Technology Company, formerly known as Everett SpinCo, Inc. ("**DXC**") that set forth the principal actions taken or to be taken in connection with HPE's spin-off of DXC (the "**Spin-Off**") and that govern the relationship of the parties following the Spin-Off, including the following:

- an Employee Matters Agreement; and

- a Tax Matters Agreement

(collectively, the "**Separation Agreements**").

A summary of the material terms and conditions of each of the Separation Agreements can be found in the section titled "Additional Agreements Related to the Separation, the Distribution and the Merger" of the Proxy Statement filed as Exhibit 99.1 to this Current Report on Form 8-K (the "**Proxy Statement**"), which summaries are incorporated herein by reference. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of the agreements, each of which is attached as Exhibits 2.1 and 2.2, respectively, and is incorporated herein by reference.

*Debt Arrangements*

In connection with entering into the Merger Agreement (as defined below), CSC entered into debt financing commitment letters with certain financial institutions (the "**Conditional Lenders**"), pursuant to which the Conditional Lenders committed to provide CSC with $815 million of incremental commitments under that certain Amended and Restated Credit Agreement dated as of October 11, 2013 (the "**Revolving Credit Agreement**") by and among CSC, as borrower, the lenders from time to time party thereto (the "**Revolving Lenders**"), Citibank, N.A., as administrative agent (the "**Revolving Agent**"), Citicorp International Limited as tranche B sub-agent, and Citibank International PLC, London Branch as swing line sub-agent.

As previously announced, on February 17, 2017, CSC entered into that certain Waiver and Amendment No. 3 to the Amended and Restated Credit Agreement ("**Amendment No. 3 (RCF)**") with the Revolving Agent and each of the Revolving Lenders party to the Revolving Credit Agreement as of such date which among other things, (i) waives the event of default that would, in the absence of such waiver, arise under the Revolving Credit Agreement as a result of the Merger (as defined below), (ii) replaces CSC with DXC as the "Company" (i.e., as the principal borrower and as the guarantor of borrowings by designated subsidiary borrowers) thereunder and (iii) designates CSC as a subsidiary borrower under the Revolving Credit Agreement, in the case of clauses (ii) and (iii), subject to certain conditions, including the consummation of the Merger and the delivery of customary closing documentation. On April 3, 2017, pursuant to the terms of Amendment No. 3 (RCF), CSC was replaced with DXC as the "Company" under the Revolving Credit Agreement and CSC was designated as a subsidiary borrower thereunder.

On April 3, 2017, DXC and the Conditional Lenders providing such incremental commitments exercised an option under the Revolving Credit Agreement to incur incremental commitments thereunder in an aggregate amount of $740 million (the "**Incremental Revolving Commitments**"). The incurrence of the Incremental Revolving Commitments resulted in an increase in the aggregate outstanding size of the unsecured revolving credit facility under the Revolving Credit Agreement from $2.95 billion to $3.69 billion, consisting of $3.12 billion under the Tranche A Facility (as defined in the Revolving Credit Agreement), which is available to be drawn in US dollars, Euro and Sterling, and $570 million under the Tranche B Facility (as defined in the Revolving Credit Agreement), which is available to be drawn in US dollars, Euro, Sterling, Yen, Singapore Dollars and Australian Dollars. Of the $3.69 billion of commitments under the Revolving Credit Agreement, $3.62 billion will mature on January 15, 2022 and $70 million will mature on January 15, 2021.

138

Terms and conditions of the Revolving Credit Agreement remain as previously described in CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on October 17, 2013, June 21, 2016, September 29, 2016 and February 23, 2017.

As previously announced, on February 17, 2017, CSC entered into that certain Waiver and Amendment No. 2 to the Credit Agreement ("**Amendment No. 2 (UK)**") with the UK Borrower, the UK Agent and each of the UK Lenders party to the UK Term Loan Credit Agreement as of such date (as each of such terms is defined below), which amends that certain Credit Agreement dated as of December 16, 2015 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**UK Term Loan Credit Agreement**") among CSC Computer Sciences UK Holdings Limited (company number 07073338), a company incorporated in England (the "**UK Borrower**"), CSC, the lenders from time to time party hereto (the "**UK Lenders**") and Lloyds Bank plc, as administrative agent (the "**UK Agent**"). Amendment No. 2 (UK), among other things, (i) waives the event of default that would, in the absence of such waiver, arise under the U.K. Term Loan Credit Agreement as a result of the Merger and (ii) replaces the guaranty by CSC thereunder with a guaranty by DXC, in the case of clause (ii), subject to certain conditions, including the consummation of the Merger and the delivery of customary closing documentation. On April 3, 2017, pursuant to the terms of Amendment No. 2 (UK), the guaranty by CSC under the UK Term Loan Credit Agreement was replaced with a guaranty by DXC.

Terms and conditions of the UK Term Loan Credit Agreement remain as previously described in CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on December 22, 2015 and February 23, 2017.

As previously announced, on February 17, 2017, CSC entered into that certain Waiver and Amendment No. 1 to the Term Loan Credit Agreement ("**Amendment No. 1 (US)**") with the US Agent and each of the US Lenders party to the US Term Loan Credit Agreement as of such date (as each of such terms is defined below), which amends that certain Term Loan Credit Agreement dated as of March 21, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**US Term Loan Credit Agreement**") among CSC, as borrower, the lenders from time to time party thereto (the "**US Lenders**") and Bank of America, N.A., as administrative agent (the "**US Agent**"). Amendment No. 1 (US), among other things, (i) waives the event of default that would, in the absence of such waiver, arise under the US Term Loan Credit Agreement as a result of the Merger and (ii) replaces CSC with DXC as the "Company" (i.e., as borrower) thereunder, in the case of clause (ii), subject to certain conditions, including the consummation of the Merger and the delivery of customary closing documentation. On April 3, 2017, pursuant to the terms of Amendment No. 1 (US), CSC was replaced with DXC as the "Company" under the US Term Loan Credit Agreement.

Terms and conditions of the US Term Loan Credit Agreement remain as previously described in CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on March 22, 2016 and February 23, 2017.

As previously announced, on February 17, 2017, CSC entered into that certain Waiver and Amendment No. 2 to the Syndicated Facility Agreement ("**Amendment No. 2 (AUD)**") with the AUD Borrowers, the AUD Agent and each of the AUD Lenders party to the Syndicated Facility Agreement as of such date (as each of such terms is defined below), which amends that certain Syndicated Facility Agreement dated as of July 25, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from

139

time to time, the "**Syndicated Facility Agreement**") among CSC Australia Pty. Limited and UXC Limited (the "**AUD Borrowers**"), CSC, as guarantor, the lenders from time to time party thereto (the "**AUD Lenders**") and Commonwealth Bank of Australia, as agent (in such capacity, the "**AUD Agent**") and as mandated lead arranger and bookrunner. Amendment No. 2 (AUD), among other things, (i) waives the event of default that would, in the absence of such waiver, arise under the Syndicated Facility Agreement as a result of the Merger and (ii) replaces the guaranty by CSC thereunder with a guaranty by DXC, in the case of clause (ii), subject to certain conditions, including the consummation of the Merger and the delivery of customary closing documentation. On April 3, 2017, pursuant to the terms of Amendment No. 2 (AUD), the guaranty by CSC under the Syndicated Facility Agreement was replaced with a guaranty by DXC.

Terms and conditions of the Syndicated Facility Agreement remain as previously described in CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on July 28, 2016 and February 23, 2017.

As previously announced, on February 17, 2017, CSC entered into that certain Second Amendment to Amended and Restated Master Loan and Security Agreement Number: 27108-7000 (the "**Equipment Facility Amendment**") with the Equipment Facility Borrower, the Equipment Agent, the Equipment Lender and each of the Assignee Lenders party to the Equipment Facility as of such date (as each of such terms is defined below), which amends that certain Amended and Restated Master Loan and Security Agreement (Number: 27108-70000) dated as of April 4, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Equipment Facility**") among CSC Asset Funding I LLC, as borrower (the "**Equipment Facility Borrower**"), CSC, as guarantor, Banc of America Leasing & Capital, LLC, as lender (in such capacity, the "**Equipment Lender**"), and as an assignee lender (in such capacity, the "**Banc of America Assignee Lender**"), The Bank of Tokyo-Mitsubishi UFJ, Ltd., as an assignee lender (together with Banc of America Assignee Lender, the "**Assignee Lenders**") and Bank of America, N.A., as agent (the "**Equipment Agent**"). The Equipment Facility Amendment, among other things, replaces the guaranty by CSC thereunder with a guaranty by DXC, subject to certain conditions, including the consummation of the Merger and the delivery of customary closing documentation. On April 3, 2017, pursuant to the terms of the Equipment Facility Amendment, the guaranty by CSC under the Equipment Facility was replaced with a guaranty by DXC.

Terms and conditions of the Equipment Facility remain as previously described in CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on April 7, 2016 and February 23, 2017.

As previously announced, on February 16, 2017, CSC entered into an amendment to its €1,000,000,000 Euro Commercial Paper Programme (the "**Programme**") pursuant to which notes issued under the Programme on or after that date and before the consummation of the Merger would incorporate a provision pursuant to which DXC would be substituted as guarantor in place of CSC following the consummation of the Merger. On April 3, 2017, the substitution took effect in respect of notes issued on or after February 16, 2017 and before April 3, 2017. In addition, on April 3, 2017, the Programme was amended such that notes issued on or after April 3, 2017 will, at all times, be guaranteed by DXC. Notes issued on or after April 3, 2017 will not be guaranteed by CSC.

Terms and conditions of the Programme remain as previously described in CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on July 28, 2015 and February 23, 2017.

**Item 2.01 Completion of Acquisition or Disposition of Assets.**

On March 31, 2017, pursuant to the Separation and Distribution Agreement, dated as of May 24, 2016 (as amended on November 2, 2016, as further amended on December 6, 2016, as further amended on January 27, 2017, and as further amended on March 31, 2017, the "**Separation Agreement**"), by and among DXC and HPE, HPE completed the previously announced separation of its Enterprise Services business segment (the "**Separation**"), which was accomplished by the pro-rata distribution of all the issued and outstanding common stock, par value $0.01 per share, of DXC (the "**DXC Common Stock**") to HPE's stockholders as of the close of business on March 20, 2017, the record date for the distribution (the "**Distribution**"), and DXC paid the Everett Payment. In the Distribution, HPE stockholders received 0.085904 shares of DXC Common Stock for every one share of HPE common stock held at the close of business on the record date.

As a result of the Spin-Off, DXC is now an independent public company, and its common stock began regular-way trading under the symbol "DXC" on the New York Stock Exchange (the "**NYSE**") on April 3, 2017. HPE distributed a total of 141,865,656 shares of DXC Common Stock to HPE stockholders as of the close of business on the record date.

Effective as of 3:01 a.m. Eastern time on April 1, 2017, pursuant to the Agreement and Plan of Merger, dated as of May 24, 2016 (as amended on November 2, 2016 and as further amended on December 6, 2016, the "**Merger Agreement**"), by and among DXC, CSC, Everett Merger Sub Inc., New Everett Merger Sub Inc., a wholly owned subsidiary of DXC ("**Merger Sub**"), and HPE, CSC merged with Merger Sub, with CSC as the surviving corporation (the "**Merger**"). In the Merger, CSC stockholders received one share of DXC Common Stock for every one share of CSC common stock held immediately prior to the Merger. DXC issued a total of 141,298,797 shares of DXC Common Stock to CSC stockholders, representing approximately 49.9% of the outstanding shares of DXC Common Stock immediately following the Merger. As a result of the Merger, CSC is now a direct wholly owned subsidiary of DXC.

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

As a result of the Merger, each share of CSC Common Stock was automatically cancelled and converted into the right to receive the Merger Consideration. The shares of CSC Common Stock were suspended from trading on the New York Stock Exchange (the "**NYSE**") effective as of the opening of trading on April 3, 2017. The NYSE has filed a Notification of Removal from Listing and/or Registration on Form 25 to delist CSC Common Stock and terminate the registration of such shares under Section 12(b) of the Exchange Act of 1934, as amended (the "**Exchange Act**"). CSC intends to file a Form 15 with the SEC to terminate the registration of the shares of CSC Common Stock under the Exchange Act and suspend its reporting obligations under Section 13 and Section 15(d) of the Exchange Act. The information set forth in Item 2.01 and Item 5.01 of this Current Report on Form 8-K is incorporated by reference into this Item 3.01.

**Item 3.03 Material Modification to Rights of Securityholders.**

At the effective time of the Merger, each holder of CSC common stock issued and outstanding immediately prior to the effective time ceased to have any rights as a stockholder of CSC (other than the right to receive DXC Common Stock in the Merger).

The information set forth in Item 2.01 of this Current Report on Form 8-K is incorporated by reference into this Item 3.03.

141

**Item 5.01 Changes in Control of Registrant.**

On April 1, 2017, CSC merged with and into Merger Sub, with CSC continuing as the surviving company and a wholly owned subsidiary of DXC.

The information set forth in Item 2.01 of this Current Report on Form 8-K is incorporated by reference into this Item 5.01.

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

In connection with the consummation of the Merger, effective as of April 1, 2017 each of Mukesh Aghi, Herman E. Bulls, Bruce Churchill, Sachin Lawande, J. Michael Lawrie, Brian Patrick MacDonald, Peter Rutland, Robert F. Woods and Lizabeth H. Zlatkus resigned from CSC's board of directors. None of these resignations were a result of any disagreement with CSC, its management or its board of directors.

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On April 1, 2017, in accordance with the Merger Agreement, (i) the articles of incorporation of CSC were, by virtue of the Merger, amended and restated in their entirety to read as set forth in the Merger Agreement and (ii) the bylaws of CSC were, by virtue of the Merger, amended and restated in their entirety to read as set forth in the Merger Agreement.

Copies of the articles of incorporation and bylaws of CSC are attached as Exhibits 3.1 and 3.2, respectively, and are incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

The following exhibits are filed herewith:

| Exhibit No. | Description |
|---|---|
| 2.1 | Employee Matters Agreement, dated as of March 31, 2017, by and among Computer Sciences Corporation, Hewlett Packard Enterprise Company and Everett SpinCo, Inc. (Incorporated by reference to Exhibit 2.1 to the Current Report on Form 8-K filed with the Securities and Exchange Commission by DXC Technology Company on April 6, 2017.)* |
| 2.2 | Tax Matters Agreement, dated as of March 31, 2017, by and among Computer Sciences Corporation, Hewlett Packard Enterprise Company and Everett SpinCo, Inc. (Incorporated by reference to Exhibit 2.2 to the Current Report on Form 8-K filed with the Securities and Exchange Commission by DXC Technology Company on April 6, 2017.)* |
| 3.1 | Second Amended and Restated Articles of Incorporation, as filed with the Secretary of State of the State of Nevada on March 31, 2017 |
| 3.2 | Bylaws, effective April 1, 2017 |
| 99.1 | Proxy Statement of Computer Sciences Corporation dated as of February 27, 2017 |

* Schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company hereby undertakes to furnish copies of any of the omitted schedules and exhibits upon request by the SEC.

142

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereto duly authorized.

COMPUTER SCIENCES CORPORATION

Dated: April 6, 2017

By:  /s/ Paul N. Saleh
Paul N. Saleh
Executive Vice President and Chief Financial Officer

143

Exhibit Index

| Exhibit No. | Description |
|---|---|
| 2.1 | Employee Matters Agreement, dated as of March 31, 2017, by and among Computer Sciences Corporation, Hewlett Packard Enterprise Company and Everett SpinCo, Inc. (Incorporated by reference to Exhibit 2.1 to the Current Report on Form 8-K filed with the Securities and Exchange Commission by DXC Technology Company on April 6, 2017.)* |
| 2.2 | Tax Matters Agreement, dated as of March 31, 2017, by and among Computer Sciences Corporation, Hewlett Packard Enterprise Company and Everett SpinCo, Inc. (Incorporated by reference to Exhibit 2.2 to the Current Report on Form 8-K filed with the Securities and Exchange Commission by DXC Technology Company on April 6, 2017.)* |
| 3.1 | Second Amended and Restated Articles of Incorporation, as filed with the Secretary of State of the State of Nevada on March 31, 2017 |
| 3.2 | Bylaws, effective April 1, 2017 |
| 99.1 | Proxy Statement of Computer Sciences Corporation dated as of February 27, 2017 |

* Schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company hereby undertakes to furnish copies of any of the omitted schedules and exhibits upon request by the SEC.

144

# Exhibit C

10-Q 1 dxc630201710-q.htm 10-Q

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**FORM 10-Q**
**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the quarterly period ended June 30, 2017
OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission File No.: 1-4850

# DXC TECHNOLOGY COMPANY

**(Exact name of Registrant as specified in its charter)**

| | |
|---|---|
| **Nevada** | **61-1800317** |
| **(State of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1775 Tysons Boulevard** | |
| **Tysons, Virginia** | **22102** |
| **(Address of principal executive offices)** | **(zip code)** |

**Registrant's telephone number, including area code: (703) 245-9700**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one).

Large Accelerated Filer ☒          Accelerated Filer ☐

Non-accelerated Filer ☐ (do not check if a smaller reporting company)

Smaller reporting company ☐          Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐   Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

284,689,520 shares of Common Stock, par value $0.01 per share, were outstanding on August 1, 2017.

145

## TABLE OF CONTENTS

| Item | | Page |
|---|---|---|
| | **PART I - FINANCIAL INFORMATION** | |
| 1. | Financial Statements (unaudited) | 1 |
| 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| 3. | Quantitative and Qualitative Disclosures About Market Risk | 57 |
| 4. | Controls and Procedures | 58 |
| | **PART II - OTHER INFORMATION** | |
| 1. | Legal Proceedings | 59 |
| 1A. | Risk Factors | 59 |
| 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 75 |
| 3. | Defaults Upon Senior Securities | 75 |
| 4. | Mine Safety Disclosure | 75 |
| 5. | Other Information | 76 |
| 6. | Exhibits | 76 |

# PART I

## ITEM 1. FINANCIAL STATEMENTS

### Index to Condensed Consolidated Financial Statements

|  | Page |
|---|---|
| Condensed Consolidated Statements of Operations for the Three Months Ended June 30, 2017 and July 1, 2016 (unaudited) | 2 |
| Condensed Consolidated Statements of Comprehensive Income (Loss) for the Three Months Ended June 30, 2017 and July 1, 2016 (unaudited) | 3 |
| Condensed Consolidated Balance Sheets as of June 30, 2017 and March 31, 2017 (unaudited) | 4 |
| Condensed Consolidated Statements of Cash Flows for the Three Months Ended June 30, 2017 and July 1, 2016 (unaudited) | 5 |
| Condensed Consolidated Statements of Changes in Equity for the Three Months June 30, 2017 and July 1, 2016 (unaudited) | 6 |
| Notes to Consolidated Financial Statements (unaudited) |  |
| Note 1–Summary of Significant Accounting Policies | 7 |
| Note 2–Recent Accounting Pronouncements | 7 |
| Note 3–Acquisitions | 9 |
| Note 4–Earnings Per Share | 14 |
| Note 5–Sale of Receivables | 15 |
| Note 6–Fair Value | 16 |
| Note 7–Derivative Instruments | 17 |
| Note 8–Intangible Assets | 20 |
| Note 9–Goodwill | 20 |
| Note 10–Debt | 22 |
| Note 11–Restructuring Costs | 23 |
| Note 12–Pension and Other Benefit Plans | 26 |
| Note 13–Income Taxes | 27 |
| Note 14–Stockholders' Equity | 28 |
| Note 15–Stock Incentive Plan | 29 |
| Note 16–Cash Flows | 32 |
| Note 17–Segment Information | 32 |
| Note 18–Commitments and Contingencies | 34 |
| Note 19–Subsequent Events | 39 |

1

147

**DXC TECHNOLOGY COMPANY**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) - continued**

**Note 3 - Acquisitions**

*Fiscal 2018 Acquisitions*

*HPES Merger*

On April 1, 2017, Hewlett Packard Enterprise Company ("HPE") completed the spin-merger of its Enterprise Service segment, HPES, to form DXC. On that same date, CSC completed its merger with DXC, whereupon a wholly owned subsidiary of DXC merged with and into CSC with CSC surviving as a wholly owned subsidiary of DXC (the "Merger"). Following the completion of the Merger, DXC became a separate publicly traded company. The strategic combination of the two complementary businesses was to create a versatile global technology services business, well positioned to innovate, compete and serve clients in a rapidly changing marketplace.

In connection with the Merger, CSC's Mike Lawrie became chairman, president and CEO of DXC and HPE's president and CEO Meg Whitman joined the DXC board. The initial remaining board appointments are split equally between nominees of HPE and existing members of CSC's board.

The transaction between HPES and CSC is a reverse merger acquisition, with DXC representing the legal acquirer of the business and CSC representing the accounting acquirer. While purchase consideration transferred in a business combination is typically measured by reference to the fair value of equity issued or other assets transferred by the accounting acquirer, CSC did not issue any consideration in the Merger. CSC stockholders received one share of DXC common stock for every one share of CSC common stock held immediately prior to the Merger. DXC issued a total of 141,298,797 shares of DXC common stock to CSC stockholders, representing approximately 49.9% of the outstanding shares of DXC common stock immediately following the Merger.

All share and per share information has been restated to reflect the effects of the Merger. The reverse merger is deemed a capital transaction and the net assets of CSC (the accounting acquirer) are carried forward to DXC ( the legal acquirer and the reporting entity) at their carrying value before the combination. The acquisition process utilizes the capital structure of the Company and the assets and liabilities of CSC which are recorded at historical cost. The equity of the Company is the historical equity of CSC, retroactively restated to reflect the number of shares issued by DXC in the transaction.

In connection with the Merger, the Company entered into a number of agreements with HPE including the following:

Information Technology Services Agreement - The Company and HPE have entered into an Agreement pursuant to which the Company will provide information technology services to HPE. This agreement terminates on the fifth anniversary of its' effective date, unless earlier terminated by the parties in accordance with its terms.

Preferred Vendor Agreements - The Company and HPE have entered into Preferred Vendor Agreements, pursuant to which HPE will (1) make available to DXC for purchase hardware products sold by HPE and technology services provided by HPE and (2) make available to DXC for purchase and license software products sold or licensed by HPE, and technology (including SaaS), support, professional and other services provided by HPE.

Certain other additional agreements were entered into, including an employee matters agreement, a tax matters agreement, a transition services agreement, an intellectual property matters agreement, and certain real estate related agreements.

9

148

**DXC TECHNOLOGY COMPANY**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) - continued**

*Kemper Corporate Services, Inc. v. Computer Sciences Corporation*: In October 2015, Kemper Corporate Services, Inc. ("Kemper") filed a demand for arbitration against CSC with the American Arbitration Association ("AAA"), alleging that CSC breached the terms of a 2009 Master Software License and Services Agreement and related Work Orders (the "Agreement") by failing to complete a software translation and implementation plan by certain contractual deadlines. Kemper seeks rescission of the Agreement and approximately $100 million in damages, which includes refund of the fees paid under the contract as well as pre-judgment interest. CSC answered the demand for arbitration denying Kemper's claims and asserting a counterclaim for unpaid invoices for services rendered by CSC.

A single arbitrator conducted an evidentiary hearing on the merits of the claims and counterclaims in Dallas, Texas in April 2017. Post-trial briefs have been submitted, and oral argument is scheduled for August 28, 2017. An interim award is scheduled to be issued by October 9, 2017. Depending on the terms of the interim award, the arbitrator may then consider requests for attorneys' fees and expenses.

The Company believes that Kemper's claims are without merit and intends to continue to vigorously defend itself.

*Forsyth, et al. v. HP Inc. and Hewlett Packard Enterprise*: This purported class and collective action was filed on August 18, 2016 in the U.S. District Court for the Northern District of California, against HP and HPE alleging violations of the Federal Age Discrimination in Employment Act ("ADEA"), the California Fair Employment and Housing Act, California public policy and the California Business and Professions Code. Former business units of HPE now owned by the Company will be proportionately liable for any recovery by plaintiffs in this matter. Plaintiffs filed an amended complaint on December 19, 2016. Plaintiffs seek to certify a nationwide class action under the ADEA comprised of all U.S. residents employed by defendants who had their employment terminated pursuant to a work force reduction ("WFR") plan on or after December 9, 2014 (deferral states) and April 8, 2015 (non-deferral states), and who were 40 years of age or older at the time of termination. Plaintiffs also seek to represent a Rule 23 class under California law comprised of all persons 40 years or older employed by defendants in the state of California and terminated pursuant to a WFR plan on or after August 18, 2012. On January 30, 2017, defendants filed a partial motion to dismiss and a motion to compel arbitration of claims by opt-in plaintiffs who signed releases as part of their WFR packages. A decision is pending.

*Voluntary Disclosure of Certain Possible Sanctions Law Violations*: On February 2, 2017, CSC submitted an initial notification of voluntary disclosure to the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC") regarding certain possible violations of U.S. sanctions laws pertaining to insurance premium data and claims data processed by two partially-owned joint ventures of Xchanging, which CSC acquired during the first quarter of fiscal 2017. A copy of the disclosure was also provided to Her Majesty's Treasury Office of Financial Sanctions Implementation in the U.K. The Company's related internal investigation is continuing, and the Company has undertaken to cooperate with and provide a full report of its findings to OFAC when completed.

In addition to the matters noted above, the Company is currently subject in the normal course of business to various claims and contingencies arising from, among other things, disputes with customers, vendors, employees, contract counterparties and other parties, as well as inquiries and investigations by regulatory authorities and government agencies. Some of these disputes involve or may involve litigation. The consolidated financial statements reflect the treatment of claims and contingencies based on management's view of the expected outcome. DXC consults with outside legal counsel on issues related to litigation and regulatory compliance and seeks input from other experts and advisors with respect to matters in the ordinary course of business. Although the outcome of these and other matters cannot be predicted with certainty, and the impact of the final resolution of these and other matters on the Company's results of operations in a particular subsequent reporting period could be material and adverse, management does not believe based on information currently available to the Company, that the resolution of any of the matters currently pending against the Company will have a material adverse effect on the financial position of the Company or the ability of the Company to meet its financial obligations as they become due. Unless otherwise noted, the Company is unable to determine at this time a reasonable estimate of a possible loss or range of losses associated with the foregoing disclosed contingent matters.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

DXC TECHNOLOGY COMPANY

Dated:   August 9, 2017

By:   /s/ Neil A. Manna

Name:   **Neil A. Manna**

Title:   **Senior Vice President, Corporate Controller Principal Accounting Officer**

78

# Exhibit D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

---

## CURRENT REPORT
## PURSUANT TO SECTION 13 OR 15(d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): September 26, 2017**

---

# DXC TECHNOLOGY COMPANY
(Exact name of Registrant as specified in its charter)

| Nevada | 001-38033 | 61-1800317 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**1775 Tysons Boulevard**
**Tysons, Virginia**                         **22102**
**(Address of Principal Executive Offices)**     **(Zip Code)**

**Registrant's telephone number, including area code (703) 245-9675**

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant.**

On September 26, 2017, DXC Technology Company (the "Company") received commitments to extend the maturity date (the "Extension") of the Company's existing revolving credit agreement (as amended, supplemented or otherwise modified from time to time, the "Revolving Credit Agreement"; and the unsecured revolving credit facility thereunder, the "Revolving Credit Facility") by and among the Company (as successor to Computer Sciences Corporation ("CSC")), the subsidiary borrowers from time to time party thereto, the lenders from time to time party thereto, Citibank, N.A. ("Citibank"), as administrative agent, Citicorp International Limited as tranche B sub-agent, and Citibank International PLC, London Branch as swing line sub-agent. The Extension will become effective on the anniversary of the closing date of the Revolving Credit Agreement on October 11, 2017.

On September 27, 2017, certain incremental lenders committed to provide the Company with $120 million of incremental commitments under the Revolving Credit Agreement (the "Incremental Revolving Commitments"). The Incremental Revolving Commitments will become effective concurrently with the effectiveness of the Extension, subject to delivery of customary closing documentation. The incurrence of the Incremental Revolving Commitments will result in an increase in the aggregate outstanding size of the Revolving Credit Facility from $3.69 billion to $3.81 billion, consisting of $3.24 billion under the Tranche A Facility (as defined in the Revolving Credit Agreement), which are available to be drawn in US dollars, Euro and Sterling, and $570 million under the Tranche B Facility (as defined in the Revolving Credit Agreement), which are available to be drawn in US dollars, Euro, Sterling, Yen, Singapore Dollars and Australian Dollars.

As a result of the Extension and the incurrence of the Incremental Revolving Commitments, $3.74 billion of the commitments under the Revolving Credit Agreement will mature on January 15, 2023 and $70 million of the commitments under the Revolving Credit Agreement will mature on January 15, 2021.

Terms and conditions of the Revolving Credit Agreement remain as previously described in (i) CSC's current reports on Form 8-K filed with the Securities and Exchange Commission on October 17, 2013, June 21, 2016, September 29, 2016, February 23, 2017 and April 6, 2017 and (ii) the Company's current report on Form 8-K filed with the Securities and Exchange Commission on April 6, 2017.

152

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

**DXC TECHNOLOGY COMPANY**

Dated: October 2, 2017

| | |
|---|---|
| By: | /s/ Paul N. Saleh |
| Name: | Paul N. Saleh |
| Title: | Executive Vice President and Chief Financial Officer |

153