**IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| KEMPER CORPORATE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-CV-2769-S |
| | ) | |
| COMPUTER SCIENCES CORPORATION and | ) | Consolidated with Civil Action No. |
| DXC TECHNOLOGY COMPANY, | ) | 3:18-CV-0651-S |
| | ) | |
| Defendants. | ) | |

**KEMPER'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO VACATE
AND IN SUPPORT OF KEMPER'S AMENDED MOTION TO CONFIRM**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 4

    I.      THE ARBITRATION AGREEMENT ..................................................................... 4

    II.     THE DISPUTE AND ARBITRATION PROCESS ................................................... 5

    III.    PRE-HEARING BRIEFING, HEARING, POST-HEARING BRIEFING AND
          ARGUMENT ........................................................................................................ 7

    IV.    THE PARTIAL FINAL AWARD AND FINAL AWARD ........................................ 8

    V.     THE CONFIRMATION PROCEEDING ................................................................. 10

    VI.    CSC'S NEW YORK *VACATUR* PROCEEDING AND MOTION TO STAY THIS
          CASE ................................................................................................................... 10

ARGUMENT ........................................................................................................................ 11

    I.      THE AWARD SHOULD BE CONFIRMED UNDER THE APPLICABLE
          "EXCEEDINGLY DEFERENTIAL" STANDARD OF REVIEW .......................... 12

        A. An "Exceedingly Deferential" Standard of Review Applies, Not a *De Novo*
            Standard .................................................................................................... 12

        B. Under the "Exceedingly Deferential" Standard of Review, Mistakes of Law,
            Fact, and Other Merits-Based Challenges are No Basis to Vacate an Award .... 16

        C. The Arbitrator Did Not Ignore the Limits on his Authority, and the Award
            Should Be Confirmed Because He Interpreted the Parties' Agreement ............. 19

    II.     THE ARBITRATOR'S DECISION WAS CORRECT UNDER THE EVIDENCE
          PRESENTED AT HEARING, THE TERMS OF THE CONTRACT, AND NEW
          YORK LAW ......................................................................................................... 22

        A. Kemper was Entitled to Recover Payments Made to CSC on and After January
            2, 2011 ...................................................................................................... 22

        B. Kemper's Direct Damages Included Kemper's Substantial Investment in the
            Project, Which was Rendered Worthless as a Result of CSC's Breach .............. 24

        C. Kemper Was Entitled to All Payments Made to CSC for Work Related to the
            Exceed Project .......................................................................................... 28

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*21st Fin. Servs., L.L.C. v. Manchester Fin. Bank,*
747 F.3d 331 (5th Cir. 2014) ................................................13

*Am. Elec. Power Co. v. Westinghouse Elec. Corp.,*
418 F. Supp. 435 (S.D.N.Y. 1976).........................................26

*Barouh Eaton Allen Corp. v. Cillco, Inc.,*
2008 WL 465493 (E.D.N.Y. Feb. 15, 2008).........................28

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.,*
11 N.E.3d 676 (N.Y. 2014).....................................................26

*BNSF Ry. Co. v. Alstom Transp., Inc.,*
777 F.3d 785 (5th Cir. 2015) .............................13, 17, 20, 21

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
345 F.3d 347 (5th Cir. 2003) ...............................13, 14, 15

*Computer Sciences Corporation v. Kemper Corporate Services, Inc.,*
Case No. 1:17-cv-09551 (S.D.N.Y.).................................10, 11

*Cyberchron Corp. v. Calldata Sys. Dev., Inc.,*
47 F.3d 39 (2d Cir. 1995) .......................................................25

*Davey v. First Command Fin. Servs., Inc.,*
2012 WL 277968 (N.D. Tex. Jan. 31, 2012) ...................13, 15

*Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n,*
889 F.2d 599 (5th Cir. 1989) .................................................15

*Dole Ocean Liner Express v. Georgia Vegetable Co.,*
84 F.3d 772 (5th Cir. 1996) .............................................20, 21

*ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.,*
1999 WL 777883 (S.D.N.Y. Sept. 29, 1999).........................28

*Esso Expl. & Prod. Chad, Inc. v. Taylor's Int'l Servs., Ltd.,*
2006 WL 3377595 (S.D.N.Y. Nov. 14, 2006), *aff'd,* 293 F. App'x 34 (2d Cir.
2008) .......................................................................................18

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.,*
662 F. Supp. 798 (S.D.N.Y. 1987), *aff'd,* 865 F.2d 513 (2nd Cir. 1989).........................29, 30

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995).................................................................................................15

*H/R Stone, Inc. v. Phoenix Bus. Sys., Inc.*,
    1988 WL 96170 (S.D.N.Y. Aug. 26, 1988)....................................................23, 28

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)...........................................................................................12, 19

*Haven Assocs. v. Donro Realty Corp.*,
    503 N.Y.S.2d 826 (1986)....................................................................................24, 25

*JPMorgan Chase Bank, N.A. v. KB Home Nevada, Inc.*,
    469 F. App'x 619 (9th Cir. 2012) ..........................................................................18

*Judd Bernstein P.C. v. Long*,
    2017 WL 3535004 (S.D.N.Y. Aug. 16, 2017)......................................................28

*Kergosien v. Ocean Energy, Inc.*,
    390 F.3d 346 (5th Cir. 2004) .................................................................................17

*In re Lehman Bros. Holdings, Inc.*,
    2016 WL 7377272 (S.D.N.Y. Dec. 13, 2016) .......................................................29

*In re Lehman Bros. Holdings Inc.*,
    544 B.R. 62 (S.D.N.Y. 2015)..................................................................................26

*Liberty Bay Credit Union v. Open Sols., Inc.*,
    905 F. Supp. 2d 389 (D. Mass. 2012) ....................................................................27

*McKool Smith, P.C. v. Curtis Int'l, Ltd.*,
    2015 WL 5999654 (N.D. Tex. Oct. 14, 2015) (Lynn, J.), *aff'd*, 650 F. App'x
    208 (5th Cir. 2016).............................................................................................13, 16

*Oxford Health Plans, LLC v. Sutter*,
    569 U.S. 564 (2013)..................................................................................... *passim*

*Pfeifle v. Chemoil Corp.*,
    73 F. App'x 720 (5th Cir. 2003) .......................................................................12, 18

*PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*,
    73 F. Supp. 3d 358 (S.D.N.Y. 2014)...........................................................23, 27, 29

*Qube Films, Ltd. v. Padell*,
    2016 WL 881128 (S.D.N.Y. Mar. 1, 2016) ...........................................................27

*Rain CII Carbon, LLC v. ConocoPhillips Co.*,
    674 F.3d 469 (5th Cir. 2012) .................................................................................13

*Rogerson Aircraft Corp. v. Fairchild Indus., Inc.*,
  632 F. Supp. 1494 (C.D. Cal. 1986) ..................................................................25

*S&S Machinery Corp. v. Wuhan Heavy Duty Mach. Tool Grp. Co.*,
  2012 WL 958528 (E.D.N.Y. Jan. 13, 2012) ..........................................................29

*Sch. Dist. of Niagara Falls v. Crosspointe, LLC*,
  2011 WL 6208695 (W.D.N.Y. Dec. 14, 2015)......................................................28

*Siemens Westinghouse Power Corp. v. Dick Corp.*,
  320 F. Supp. 2d 120 (S.D.N.Y. 2004)..................................................................26

*Team Scandia, Inc. v. Greco*,
  6 F. Supp. 2d 795 (S.D. Ind. 1998) ....................................................................19

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc*,
  487 F.3d 89 (2d Cir. 2007)..................................................................................29

*U.S. Achievement Acad., LLC v. Pitney Bowes, Inc.*,
  458 F. Supp. 2d 389 (E.D. Ky. 2006) ..................................................................28

*United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*,
  363 U.S. 593 (1960)............................................................................................17

*Why Nada Cruz, L.L.C. v. Ace Am. Ins. Co.*,
  569 F. App'x 339 (5th Cir. 2014) ........................................................................13

**Statutes**

Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) ...................................................... *passim*

Plaintiff Kemper Corporate Services, Inc. ("Kemper") submits this response to Computer Sciences Corporation's ("CSC") and DXC Technology Company's ("DXC") (collectively, "Defendants") Brief in Support of Their Motion to Vacate an Arbitration Award and in Opposition to the Motion to Confirm (ECF No. 64).

## PRELIMINARY STATEMENT

Kemper initiated this action seeking confirmation of an arbitration award.  In 2009, Kemper contracted with CSC to develop and implement a Java-based version of CSC's Exceed software for use in Kemper's property and casualty insurance business (the "Exceed Project"). The parties agreed to arbitrate if a dispute arose between them that could not be resolved through mediation.  They delegated the task of interpreting and enforcing their contract to a single arbitrator, and agreed the arbitrator would issue a written award setting forth the "findings of fact and conclusions of law upon which the decision is based."  (PA029)[1]  Stephen S. Strick (the "Arbitrator") was duly appointed and performed his job in exemplary fashion.  After supervising pre-hearing proceedings (including extensive fact and expert discovery) and presiding over a two-week hearing, the Arbitrator issued a 51-page Final Award that addressed and decided many vigorously contested questions.  (*See* PA606-59)

Having agreed to arbitrate, Defendants are now disinclined to accept the consequences of that choice.  Defendants' sole basis for opposing confirmation and urging partial *vacatur* of the Arbitrator's award is Section 10(a)(4) of the Federal Arbitration Act ("FAA"), which allows a court to vacate an award where "the arbitrator[] exceed[s] [his] powers."  9 U.S.C. § 10(a)(4). Defendants argue that "the arbitrator exceeded his powers by awarding consequential damages."

---

[1] References to pages of Plaintiff's Appendix in Support of Kemper's Brief in Response to Defendants' Motion to Vacate and In Support of Kemper's Amended Motion to Confirm are cited herein as "PA__".

(ECF No. 64 at 10)  But Defendants are simply dusting off arguments they already have made to the Arbitrator – unsuccessfully – in pre-hearing briefing, in post-hearing briefing, and in post-hearing argument.  The question Defendants ask this Court to address is *identical* to a question that was put to the Arbitrator:  whether any portion of the money Kemper paid CSC or the money Kemper spent internally on the Exceed Project constituted "consequential" damages under New York law.  On its face, the award demonstrates that the Arbitrator (1) was well aware of the contract's provisions relating to damages, and (2) expressly limited his award to precisely the damages allowed by the provision he found had been breached by CSC.  In sum, the Arbitrator construed the parties' contract, considered the facts, considered New York law, and determined the damages Kemper sought were recoverable.

While Kemper believes the Arbitrator's determination on the issue was well-founded in law and fact, both Kemper's and Defendants' beliefs, and whether the determination was well-founded, are entirely beside the point.  Even if the Arbitrator's decision was based on erroneous reasoning (in this case, it was not), this Court cannot revisit and reject the Arbitrator's determination.  Under Section 10(a)(4) of the FAA, a court can vacate an arbitrator's decision "only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly." *Oxford Health Plans, LLC v. Sutter*, 569 U.S. 564, 572 (2013).

In *Oxford Health*, the Supreme Court explained that an arbitrator's decision can be vacated "only in very unusual circumstances." *Id.* at 568 (citation omitted).  Otherwise, the Court explained, the "essential virtue" of arbitration – the resolution of disputes "straightaway" without "full-bore legal and evidentiary appeals" – would be lost. *Id.* (*quoting Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008)).  In unanimously rejecting a challenge under Section 10(a)(4), the Supreme Court stated:

All we say is that convincing a court of an arbitrator's error – even his grave error – is not enough.  So long as the arbitrator was "arguably construing" the contract ... a court may not correct his mistakes under § 10(a)(4). ... The potential for those mistakes is the price of agreeing to arbitration.  As we have held before, we hold again: "it is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation is different from his." ... The arbitrator's construction holds, however good, bad, or ugly.

* * *

In sum, [Appellant] chose arbitration, and it must now live with that choice. … The arbitrator did what the parties requested:  He provided an interpretation of the contract resolving [a] disputed issue.  His interpretation went against [Appellant], maybe mistakenly so.  But still, [Appellant] does not get to rerun the matter in a court.  Under § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all.  Because he did, and therefore did not "exceed his powers," we cannot give [Appellant] the relief it wants.

*Oxford Health*, 569 U.S. at 572-3 (internal citations omitted).

For what it's worth, the Arbitrator's decision here was neither bad, ugly, nor mistaken on *any* issue.  Frankly, the evidence supporting the award was overwhelming.  As detailed below, the contract provision CSC was found to have breached included a specific remedy allowing Kemper to recover all payments it made to CSC under the agreement regardless of when they were made, and any "additional proven direct damages" resulting from the breach.  (*See infra* at 8-9)  Kemper proved and was awarded damages totaling more than $58.5 million for payments made to CSC, and more than $25.7 million in money Kemper spent internally.  As to the latter, the Arbitrator expressly found "that the internal expenses claimed are properly recoverable *as direct damages*" after reviewing the evidence and legal authority cited by both parties in their pre- and post-hearing briefs.  (PA644) (emphasis added).  The balance of the approximately $135 million award is attributable to the addition of (still accruing) pre-judgment interest and expenses

(including attorneys' fees) – elements of the award that Defendants have not challenged.[2]

Consistent with the controlling Supreme Court precedent reflected in *Oxford Health* and the

Fifth Circuit, Defendants' request to partially vacate the damages award should be denied,

Kemper's motion to confirm should be granted, and judgment consistent with the award should

be entered promptly.[3]

## FACTUAL BACKGROUND

### I.     THE ARBITRATION AGREEMENT

Kemper's business is insurance, and CSC's business is software and technology services.

On January 2, 2009, the parties executed a Master Software License and Service Agreement (the

"MSLSA"), two work orders, a product order, and an addendum thereto.  (*See* PA008-70)  Under

these contract documents (collectively referred to here as the "Exceed Agreement"), Kemper

licensed CSC's Exceed software suite, and CSC agreed that it would transform Exceed from the

COBOL programming language into the Java programming language.  (*See id.*)  Specifically,

Section 3.4 of Addendum 1 required CSC to make a "Java version" of Exceed "generally

available" to its licensees, including Kemper, within 24 months after the execution of the initial

work orders (*i.e.*, by January 2, 2011).  (PA061)  This so-called "transformation" of Exceed from

COBOL to Java was a critical foundational step, because Kemper wanted to implement a

modern, Java-based platform.  (PA612-3)  Section 3.4 of Addendum 1 also provided that if CSC

---

[2] Defendants challenge the award of pre-judgment interest only insofar as it is calculated with reference to the base compensatory damages award, which it argues here should be reduced, and submits a declaration from its expert, Daniel Jackson, in which he purports to re-calculate pre-judgment interest if certain portions of the Arbitrator's award is vacated.  Because there is no basis to vacate any portion of the award, Mr. Jackson's calculations are irrelevant.

[3] Because pre-judgment interest continues to accrue on the award until it is reduced to judgment or paid, the total amount of the judgment entered by this Court should be calculated with reference to Table A attached to the Final Award.  (PA658)  The figure listed on Column C of the appropriate row of Table A should be added to the uncontested expense award of $7,176,095.23 to arrive at the total judgment amount.

failed to make a "Java version ... generally available," Kemper could declare breach and would be "entitled to all remedies set forth in this Addendum (including, without limitation, all payments made by Customer pursuant to the Agreements but without any limitations based upon when such payments were made) and to seek all additional proven direct damages resulting from such breach." (PA061)

With some exceptions not relevant to this dispute, Section 9 of the MSLSA prescribed the procedures to be followed for settling "all disputes arising out of or relating to this [MSLSA and related agreements], or the breach thereof…" (PA028) Section 9 required that the parties first submit a dispute to non-binding mediation. (PA029) If not resolved in mediation, either party could then submit the dispute to binding arbitration administered by the American Arbitration Association (the "AAA"). (*Id.*)

Over the course of the six-plus years that followed the January 2009 execution of the Exceed Agreement, the parties executed a number of additional work orders, statements of work, and addenda that related to the ongoing work on the Exceed Project. Most of these contracts referenced the MSLSA, but during the project the parties also entered a Master Outsourcing Services Agreement (the "MOSA") and a series of statements of work. (*See* PA071-224) The primary purpose of the MOSA was for CSC to provide support for Kemper's legacy software systems (the systems Exceed was supposed to replace) but Statements of Work 3, 5 and 6 under the MOSA all set terms for certain additional work to be performed on the Exceed Project.[4]

## II.   THE DISPUTE AND ARBITRATION PROCESS

Kemper spent tens of millions of dollars on the Exceed Project, but never got a modern,

---

[4] *See* PA132, Statement of Work 3 ("for Services pertaining to [Kemper's] Exceed Billing Project"); PA164, Statement of Work 5 ("for Services pertaining to [Kemper's] Exceed J Billing, Exceed Policy…"); PA196, Statement of Work 6 ("for Services pertaining to Kemper's Exceed J Billing, Exceed Policy…).

robust software system from CSC.  (PA630-4)  In mid-2015, Kemper discontinued the project.
(PA617)  Although CSC had represented to both Kemper and to the public that it had delivered
and released a Java version of Exceed, that was false.  (PA630-4)  The truth was that even as late
as 2015, more than six years after the project had started and four years after CSC was supposed
to have made a Java version generally available, CSC had not successfully transformed its
Exceed software product from COBOL to Java, and instead delivered software that its own chief
architect on the project called "ugly," "[b]arely readable," and "malformed."  (PA630-4)  Given
the state of the project, in September 2014 and again in July 2015 Kemper was forced to take
two accounting charges, ultimately writing off the entire value of the Exceed software asset that
had been capitalized and carried on its balance sheet.  (PA617)  Essentially, Kemper's substantial
investment in the project was a total loss.

In its October 19, 2015 Demand for Arbitration, Kemper claimed, among other things,
that CSC breached Section 3.4 of Addendum 1 by failing to make a "Java version" of Exceed
"generally available" to its licensees, including Kemper.  (PA619-20)  Pursuant to Section 3.4 of
Addendum 1, Kemper sought damages of (1) "all payments made by Customer pursuant to the
Agreements"; and (2) "all additional proven direct damages," including internal salaries and
other expenses Kemper had incurred on the project.  (PA641-6)  Kemper did *not* seek
compensation for (a) the profits it could have realized through improved business operations had
CSC satisfied its obligations, (b) losses relating to the delay in modernizing the Kemper software
systems, (c) amounts Kemper spent continuing to run legacy software systems that should have
been retired, or (d) any portion of the money Kemper has spent and continues to spend to obtain
a new software system from a different vendor.  Nor did Kemper seek any recovery based on its
failure to realize royalty income from CSC licensing the Java version of Exceed to other

customers, which was contemplated in the Exceed Agreement.  (*See* PA049)

After selecting the Arbitrator pursuant to an agreed method, the parties finalized their responses to Kemper's Demand and to CSC's counterclaim and engaged in extensive fact discovery.  (PA003)  They exchanged over 600,000 documents, conducted 19 fact witness depositions, and briefed several motions.  (*Id.*)  Kemper retained two experts and CSC retained three experts, all of whom filed reports and were deposed.  (*Id.*)

## III.   PRE-HEARING BRIEFING, HEARING, POST-HEARING BRIEFING AND ARGUMENT

In March 2017, the parties submitted pre-hearing briefs to the Arbitrator addressing a range of issues.  (*See* PA225-311)  Among other issues, the pre-hearing briefs specifically addressed whether certain components of the damages award Kemper sought constituted direct or consequential damages under New York law.  In particular, Kemper argued that under § 3.4 of Addendum 1, it was entitled to all amounts it paid CSC during the Exceed Project, regardless of when the payments were made, along with the costs Kemper incurred internally on the Exceed Project, including internal salaries and hardware expenses, among others.  (PA243-8)  CSC countered that Kemper was "not entitled to recover the amounts spent by Kemper internally . . . because those amounts constitute consequential damages," and that Kemper was not entitled to amounts Kemper paid CSC after January 2, 2011.  (PA303-4)

Between April 13, 2017 and April 26, 2017, the Arbitrator presided over a 10-day hearing in Dallas.  (PA003)  He heard live testimony from 18 witnesses, deposition testimony from nine others (all but one by video), and received approximately 620 exhibits in evidence.  (PA003)  After the hearing, the parties submitted post-hearing briefs totaling more than 200 pages.  (*See* PA312-552)  Again, among the many issues addressed was the question of whether any portion of the damages Kemper sought constituted consequential damages under New York

law.  Echoing the pre-hearing briefs, Kemper argued that the recovery it sought was authorized by § 3.4 of Addendum 1, and that those amounts constituted direct (not consequential) damages under New York law.  (PA378-86)  CSC argued that "[a]ny payments [Kemper] made after January 2, 2011 are unrecoverable consequential damages" and that Kemper's "internal salaries, hardware, and other expenses" were also not recoverable because they "likewise are consequential damages" under New York law.  (PA541-7)

On July 25, 2017, the Arbitrator sent a letter to the parties stating that he had completed an initial review of the hearing transcripts, the parties' post-hearing briefing, related documents and cited case law.  (PA553-6)  He also provided a list of 15 "issues/areas on which I would suggest further discussion."  (*Id.*)  Among the issues he specifically asked the parties to address was:  "why the monetary claims made by Kemper other than the 'CSC spend' are direct or consequential damages under NY law."  (PA554)  On August 28, 2017, the Arbitrator heard closing arguments in Chicago, and the parties addressed the issues and topics the Arbitrator had listed in his July letter, including the "direct or consequential" damages question, as well as whether Kemper was entitled to damages on payments made after January 2, 2011, and whether Kemper was entitled to the amounts it paid CSC under Statements of Work signed pursuant to the MOSA.  (PA004)

## IV.    THE PARTIAL FINAL AWARD AND FINAL AWARD

On October 2, 2017, the Arbitrator issued a 46-page Partial Final Award in which he determined that Kemper had proven the elements of its breach of contract claim against CSC, and awarded Kemper $84,296,581 in damages.  (*See* PA557-605)  The Arbitrator found that CSC breached § 3.4 of Addendum 1, and that Kemper was therefore entitled to:  "all payments made by [Kemper] pursuant to the Agreements but without any limitations based upon when such payments were made . . . and . . . all additional proven direct damages resulting from such

breach." (PA592-7)  The award comprised:  (1) all of Kemper's payments to CSC from 2009

through 2015 (approximately $58 million); (2) Kemper's internal spend on the project

(approximately $22 million); (3) hardware expenses related to the project (approximately

$98,000); and (4) other related expenses (approximately $3 million).  (PA592-7)  In the Partial

Final Award, the Arbitrator expressly found that the internal expenses were recoverable as

"direct damages" under New York law.  (*See*, *e.g.*, PA602 ("Kemper is awarded **direct damages**

against CSC in the amount of **$84,296,581**") (emphases in original); PA595 ("Having reviewed

the evidence and the legal authority cited by both Parties in their pre- and post-hearing briefs, I

find that the internal expenses claimed are properly recoverable as direct damages..."); PA600 ("I

also find that amounts paid under the Outsourcing Agreement Statements of Work at issue

constitute direct damages recoverable under Section 3.4 of Addendum 1.").  The Arbitrator then

set a deadline in the Partial Final Award for further submissions regarding the calculation of pre-

judgment interest and an application for costs and expenses – issues the parties had agreed to

bifurcate and defer.  (PA602)

On October 11, 2017, Kemper submitted its petition to supplement the Partial Final

Award that included pre-judgment interest calculations and an application for costs and

expenses.  (PA004)  After CSC responded, the Arbitrator held a final hearing on November 3,

2017 in Chicago to address these and any other issues the parties wanted to raise.  (PA005)

In a 51-page Final Award dated November 15, 2017, the Arbitrator repeated his findings

from the Partial Final Award, and determined that Kemper was entitled to (a) pre-judgment

interest at the New York statutory rate of 9% per annum until the award is paid or reduced to a

judgment, and (b) arbitration costs and expenses (including attorneys' fees) of approximately $7

million.  (PA606-59)

## V.      THE CONFIRMATION PROCEEDING

Section 9.3(e) of the agreement provides that the Arbitrator's award "may be entered by either party in any court having jurisdiction." (PA029)  Accordingly, on October 10, 2017, pursuant to Sections 9 and 13 of the FAA (9 U.S.C. §§ 9, 13), Kemper initiated this action against CSC and DXC[5] to confirm the Partial Final Award. (ECF No. 1)  On November 17, 2017, after the Arbitrator issued the Final Award, Kemper filed an amended motion to confirm the Final Award. (ECF No. 16)  In early December, Defendants' current counsel, who replaced CSC's arbitration counsel, agreed to accept service of these replacement papers, copies of which had already been delivered to Defendants' corporate offices and arbitration counsel. (PA688-9)

## VI.     CSC'S NEW YORK *VACATUR* PROCEEDING AND MOTION TO STAY THIS CASE

On December 6, 2017, CSC notified Kemper that it filed, that day, a Petition to Vacate Arbitration Award in the United States District Court for the Southern District of New York (the "New York Court"), initiating a case captioned *Computer Sciences Corporation v. Kemper Corporate Services, Inc.*, Case No. 1:17-cv-09551 (the "New York Action"), which was assigned to Judge Ronnie Abrams. (PA660-1)  The petition sought to partially vacate the Final Award on the grounds that some of the amounts awarded to Kemper constituted "consequential" damages. (PA662-87)  CSC also filed an emergency rule to show cause in the New York Action seeking to stay *this* action to allow the *vacatur* motion in New York to proceed first.  Following expedited briefing and a hearing, Judge Abrams made an oral ruling that denied CSC's motion to stay this action and, instead, stayed the New York Action. (PA691-7)

---

[5] Kemper initiated the confirmation proceedings against both CSC and DXC because CSC was a party to the MSLSA and the respondent in the arbitration, and DXC is the successor to CSC following a merger that was completed on April 1, 2017. (PA701, 705)  The MSLSA is "binding upon…each of the parties and their successors." (PA032)

Defendants then appeared in this action and, on January 12, 2018, filed a motion to stay this action or transfer venue to the Southern District of New York.  (ECF No. 44)  On March 5, 2018, this Court denied Defendants' motion, holding that "[t]he confirmation and the vacatur proceedings should be consolidated in this Court."  (ECF No. 51 at 5)  Accordingly, on March 12, 2018, the parties submitted a joint motion in the New York Action requesting transfer to this Court and consolidation with this action, which the New York Court granted, and on March 20, 2018, the New York Action was transferred to this Court.  (ECF No. 38 in 3:18-cv-651-S)  On March 30, 2018, the parties filed a joint motion to consolidate the New York Action with this case (ECF No. 55), and on April 2, 2018, the Court granted the motion, consolidating the two cases.  (ECF No. 58)  Finally, on March 30, 2018, Defendants filed a brief in support of their motion to vacate and in opposition to Kemper's amended motion to confirm, arguing that portions of the Final Award should be vacated because certain amounts the Arbitrator awarded "are plainly consequential under governing New York law."  (ECF No. 64 at 2)

## ARGUMENT

The parties agreed nearly a decade ago that an arbitrator – not a judge or jury – would decide disputes arising out of the Exceed Agreement.  They delegated *all* issues that might arise – not a subset of such issues – to an arbitrator.  Among the issues for an arbitrator to decide were issues related to the remedy for any breach of contract.  While Kemper and CSC agreed that "consequential" damages were not recoverable, they left the arbitrator to decide *all* disputes – including any dispute as to whether the damages either party sought were direct (and therefore recoverable), or consequential (and therefore not recoverable).  Here, the Arbitrator not only had the *authority* to decide that issue, he was *required* to decide that issue in order to do his job and issue a reasoned, written award.  And just as Defendants concede that they must accept the Arbitrator's decision that CSC breached the contract even though they think he was "patently

wrong" (ECF No. 64 at 7), they also must accept the decisions that factored into determining the appropriate remedy for that breach. Both parties entered the MSLSA knowing full well that dramatically limiting their rights to appeal an adverse result is the price parties agree to pay in exchange for the substantial benefits afforded by arbitration.

Defendants' sole challenge here is that the Arbitrator "exceeded [his] powers" under FAA § 10(a)(4) because he "ignored" the contractual limitation against consequential damages. *Id.* But the Arbitrator did not "ignore" that limitation. He considered the contract language and the evidence, reviewed New York law, and determined that the damages Kemper sought were permitted direct damages, not prohibited consequential damages. At bottom, Defendants are arguing the Arbitrator made a mistake. He did not. Even so, a mistake in his analysis or conclusions, if any, would provide no basis for vacating the Arbitrator's award. Defendants agreed to arbitrate this issue, and now they must live with the Arbitrator's decision, "however good, bad, or ugly." *Oxford Health*, 569 U.S. at 573.

I. **THE AWARD SHOULD BE CONFIRMED UNDER THE APPLICABLE "EXCEEDINGLY DEFERENTIAL" STANDARD OF REVIEW**

A. **An "Exceedingly Deferential" Standard of Review Applies, Not a *De Novo* Standard**

Defendants assert that courts review an award challenged under FAA § 10(a)(4) "*de novo*" and "without any deference to [the arbitrator's] decision." (ECF No. 64 at 1, 11, 12) They are simply wrong, as indicated by settled Supreme Court and Fifth Circuit case law. "Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Oxford Health*, 569 U.S. at 568 (citation omitted). FAA § 10 provides for only "limited review" based on "extreme arbitral conduct[.]" *Hall St.,* 552 U.S. at 586, 588. This standard is "among the narrowest known to the law[.]" *Pfeifle v. Chemoil Corp.*, 73 F. App'x 720, 723 (5th Cir. 2003) (citation omitted).

Where a losing party "invokes § 10(a)(4)" on the grounds that the arbitrator "exceeded [his] powers," that party "bears a heavy burden. 'It is not enough … to show that the [arbitrator] committed an error – or even a serious error.'"  *Oxford Health*, 569 U.S. at 569 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)).  Instead, the court's "review of the underlying award is ***exceedingly deferential***."  *BNSF Ry. Co. v. Alstom Transp., Inc.*, 777 F.3d 785, 787 (5th Cir. 2015) (emphasis added) (citation omitted).

Defendants' cited authority does not support their assertion that a *de novo* standard applies.  (ECF No. 64 at 10-11)  Instead, their cited cases confirm that the highly deferential standard applies.  *See 21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014) ("We … give deference to … the arbitrator" and "[j]udicial review of an arbitration award is extraordinarily narrow") (citation omitted); *McKool Smith, P.C. v. Curtis Int'l, Ltd.*, 2015 WL 5999654, at *2 (N.D. Tex. Oct. 14, 2015) (Lynn, J.) (review is "exceedingly deferential" and "[e]ven a misapplication of law or a misinterpretation of fact is not a sufficient basis for setting aside the final award of an arbitrator") (citation omitted), *aff'd*, 650 F. App'x 208 (5th Cir. 2016); *Davey v. First Command Fin. Servs., Inc.*, 2012 WL 277968, at *2, 5 (N.D. Tex. Jan. 31, 2012) (§ 10(a)(4) review is "exceedingly deferential") (citation omitted); *Why Nada Cruz, L.L.C. v. Ace Am. Ins. Co.*, 569 F. App'x 339, 341-42 (5th Cir. 2014) ("[a]n award may not be set aside for a mere mistake of fact or law" and rejecting challenge under § 10(a)(4) "[g]iven the 'exceedingly deferential' standard of review") (citations omitted); *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012) (rejecting § 10(a)(4) challenge "[g]iven the considerable deference afforded arbitration awards").

Defendants cite *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 365 (5th Cir. 2003) for the principle that no deference applies, but *Bridas* supports Kemper's position, not

Defendants'.  In *Bridas*, the arbitration agreement prohibited punitive damages, and the damages award against defendants "did not explicitly award punitive damages." *Id*. at 365. "[U]ndeterred," defendants argued that the arbitrators exceeded their authority by "implicitly" awarding punitive damages in violation of the agreement. *Id*.  The Fifth Circuit rejected this argument.  It recognized that "if punitive damages were indeed awarded in this case, it would be incumbent upon us to vacate such an award[.]" *Id*.  But the Fifth Circuit refused to second-guess the arbitrators' legal analysis because of the "high degree of deference we afford arbitral decisions[.]" *Id*.  Urged to determine whether the arbitrators awarded punitive damages by engaging in a plenary review on the merits, the Fifth Circuit refused, properly looking instead at the face of the award.  "[B]ecause there was no explicit award of punitive damages" in the award, there was no basis to conclude that the arbitrators purported to award punitive damages. *Id*. at 365-66.  Therefore, the Court found the arbitrators did not exceed their authority.  *Id*.

The same analysis applies here.  If the Arbitrator had expressly concluded that some component of the award Kemper sought constituted consequential damages, but for some reason defiantly decided to award those damages notwithstanding the contract's consequential damages limitation, Defendants' argument for *vacatur* might have merit.  But that is not what happened here.  The Arbitrator was well aware of the consequential versus direct damages issue, and the need to resolve it.  He received substantial briefing and argument regarding New York law on that issue before and after the hearing, specifically asked the parties to address it during oral argument, and expressly acknowledged CSC's argument in his Final Award.  (*Supra* at 7-8; PA623, 644)  After considering CSC's arguments, he rejected them, and stated that the amounts he awarded were "direct damages" recoverable under Section 3.4 of the Agreement.  (PA643-4, 649, 653-5)  Just as the Fifth Circuit looked to the face of the award in *Bridas* and concluded

"there was no explicit award of punitive damages," here too "there was no explicit award of" consequential damages in the Final Award and no basis to suggest that the Arbitrator simply missed the issue and "re-labeled" the damages direct damages, as Defendants suggest (ECF No. 64 at 15).  As in *Bridas*, the Arbitrator's decision is entitled to a "high degree of deference."[6]

Defendants also cite *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), and *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599 (5th Cir. 1989), for the principle that a deferential standard of review only applies if the arbitration agreement "gave the arbitrator the power to do something[.]"  (ECF No. 64 at 11)  That principle clearly supports Kemper's position, because the parties here clearly gave the Arbitrator authority to determine – among many other things – whether the damages Kemper sought were direct or consequential.  In *Delta Queen*, the arbitration agreement gave the arbitrator the power to determine whether there was proper cause for discipline against union employees because of employee carelessness.  889 F.2d at 604.  But his authority stopped there, because the agreement shifted "sole responsibility for" any resulting disciplinary action to management, not the arbitrator.  While the arbitrator acted within his authority in finding there was proper cause to discipline the employee, he exceeded his authority by ordering reinstatement of the employee because the parties had reserved sole responsibility for that question to management.  *Id*.

Unlike the agreement in *Delta Queen*, the agreement here gave the Arbitrator the power to determine an appropriate remedy, which in this case necessarily involved determining whether Kemper sought consequential damages by considering the facts and New York law.  MSLSA § 9.3(e) gave the Arbitrator the authority to "make a decision having regard to the intentions of the

---

[6] Defendants' reliance on *Davey* is similarly misplaced.  In *Davey*, the agreement prohibited an award of punitive damages, but the arbitrators ignored that provision:  their award expressly stated that they were awarding punitive damages.  2012 WL 277968, at *1-2, 4.  By contrast, the Arbitrator here never stated that he awarded consequential damages.  He stated that he awarded direct damages, which are recoverable under the contract.

parties" and "the terms of this Agreement," which included Addendum No. 1.  (PA029)  He obviously had authority to issue an appropriate damages award – indeed CSC itself sought damages on its counterclaim.  (*See* PA622-3)  As noted above, in the event of breach, § 3.4 of Addendum 1 provided that Kemper was "entitled to all remedies set forth in this Addendum," expressly including "without limitation, all payments made by [Kemper] pursuant to the Agreements *but without any limitations based upon when such payments were made*" and "*all additional proven direct damages* resulting from such breach."  (PA061, emphases added)  And MSLSA § 11.7 provided that New York law governed.  (PA032)  Thus, in order to carry out his duties, the Arbitrator was not only *authorized*, but was *required*, to interpret and apply the contract and New York law, and to decide whether the damages Kemper sought were consequential or direct.  Defendants do not contend otherwise.  They are simply re-hashing arguments on the merits that they already presented to the Arbitrator on multiple occasions.  (*See* PA623; *supra* at 7-8).[7]

B.   **Under the "Exceedingly Deferential" Standard of Review, Mistakes of Law, Fact, and Other Merits-Based Challenges are No Basis to Vacate an Award**

Defendants strain mightily to portray the Arbitrator's decision as beyond his authority so they can use the hook of FAA § 10(a)(4).  Put simply, Defendants are foreclosed from appealing the merits of the Arbitrator's decision, so they are attempting – in obvious strokes – to portray an argument about the merits of the Arbitrator's decision as an argument about whether he had the power to make the decision.  Defendants' argument goes something like this:  (a) the Arbitrator erred in his legal and factual analysis when he concluded that the damages he awarded were direct damages, and not consequential damages, under New York law; (b) the contract prohibits

---

[7] *See, e.g., McKool Smith*, 2015 WL 5999654, at *3 (arbitrator acted within his authority because both sides had submitted the issue to the arbitrator and "[a] party cannot assert a § 10(a)(4) to challenge the arbitrator's decision as outside his authority after awaiting an unfavorable arbitration decision on an issue clearly under consideration").

consequential damages; (c) therefore, the Arbitrator awarded damages not permitted by the contract and thereby exceeded his powers.  But, of course, if the Arbitrator's legal and factual determinations are correct (*i.e.*, if (a) above is not true), Defendants' entire argument falls apart.  Thus, Defendants' entire challenge depends on convincing this Court that the Arbitrator's legal and factual determinations were incorrect.  But the Court – in reviewing an arbitral award – simply cannot even entertain such a challenge.

As the Supreme Court and Fifth Circuit have made clear, even if the Arbitrator made a "grave error" in his factual and legal determinations or interpretation of the contract, that is not a basis to set aside his award under § 10(a)(4).  *Oxford Health*, 569 U.S. at 573 ("courts have no business overruling [arbitrator] because their interpretation of the contract is different from his"); *BNSF*, 777 F.3d at 789 (the "sole question" under § 10(a)(4) "is ***not*** whether [arbitrators'] interpretations of the Agreement or the governing law were correct") (emphasis added); *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 356 (5th Cir. 2004) ("the failure of an arbitrator to correctly apply the law is not a basis for setting aside an arbitrator's award"); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final.").

In *Kergosien*, the Fifth Circuit reversed the district court for doing exactly what Defendants ask this Court to do here: "mix[] a statutory basis for vacatur (exceeded his powers) with a nonstatutory basis, not recognized by the Fifth Circuit, that is, that the arbitrator failed to follow the law…. This court has never affirmed such a holding, but has repeatedly held that the failure of an arbitrator to correctly apply the law is not a basis for setting aside an arbitrator's award."  390 F.3d at 354, 356.  Indeed, before re-assigning this case, Chief Judge Lynn correctly

held that "the court's legal analysis" in reviewing the Final Award will "not center on the intricacies of interpreting the substantive law at issue in the arbitration."  (ECF No. 51 at 8 (quoting *Tres Tech Corp. v. Carefusion Corp.*, 2013 WL 4603329, at *4 (N.D. Tex. Aug. 29, 2013)) ("[e]ven if" review of award "revealed misinterpretations of [state] law, confirmation would still be required.")).

And in *Pfeifle*, the Fifth Circuit rejected an identical challenge to the one Defendants raise here.  In *Pfeifle*, the agreement prohibited an award of consequential damages.  73 F. App'x. at 721.  Pfeifle moved to vacate an award entered against him on the grounds that the arbitrators exceeded their powers by awarding what amounted to consequential damages under Texas law.  *Id*.  Although the Fifth Circuit found Pfeifle's substantive argument "compelling," it nonetheless held that the award must be confirmed because the award did not "expressly" award consequential damages.  *Id*. at 721-23.  Moreover, even if Pfeifle were correct that "the arbitrators incorrectly calculated the damage award," that would not matter, because "an arbitrator's erroneous interpretation of law or facts is not a basis for vacatur of an award."  *Id*.

Courts in other federal districts have similarly rejected motions to vacate an award based on the arbitrator's supposed error in deciding whether damages are consequential or direct.  *See, e.g., Esso Expl. & Prod. Chad, Inc. v. Taylor's Int'l Servs., Ltd.*, 2006 WL 3377595, at *4-5 (S.D.N.Y. Nov. 14, 2006) (arbitration award confirmed where there was "at least" a "colorable justification" for conclusion that damages were direct, not consequential) (citation omitted), *aff'd*, 293 F. App'x 34, 35-36 (2d Cir. 2008) (a "court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law") (citation omitted); *JPMorgan Chase Bank, N.A. v. KB Home Nevada, Inc.*, 469 F. App'x 619, 620 (9th Cir. 2012) (rejecting argument that "arbitrators exceeded their authority by awarding what [party

seeking vacatur] would construe as consequential damages"); *Team Scandia, Inc. v. Greco*, 6 F. Supp. 2d 795, 799-800 (S.D. Ind. 1998) (rejecting argument to overturn award on the ground that arbitrator's decision amounted to an award of prohibited consequential damages because "the arbitrator's written decision demonstrates his knowledge and acceptance of that restriction").

Tellingly, Defendants did not cite a single case where a court has vacated an arbitration award on the grounds that the arbitrator or panel erred in rejecting an argument that amounts sought were consequential damages. They likely failed to find any such case because second-guessing an arbitrator's substantive decision is precisely the type of plenary judicial review on the merits that the FAA forbids. Were the rule otherwise, this would undermine "arbitration's essential virtue of resolving disputes straightaway." *Hall St.,* 552 U.S. at 588. FAA § 10 "substantiat[es] a national policy favoring arbitration with just … limited review," and "[a]ny other reading opens the door to the full-bore legal and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process." *Id*. (citation omitted). As discussed below, the Arbitrator did not err. But even if he did, that would not matter, because "an arbitrator's error – even his grave error – is not enough…. The potential for … mistakes is the price of agreeing to arbitration." *Oxford Health*, 569 U.S. at 572-3.

C.    **The Arbitrator Did Not Ignore the Limits on his Authority, and the Award Should Be Confirmed Because He Interpreted the Parties' Agreement**

If the Court is not to evaluate an arbitrator's legal or factual analysis or correct an arbitrator's mistakes, then what *is* the Court's task? It is straightforward, and quite limited: the sole issue for the Court to decide is whether the Arbitrator even arguably interpreted the parties' contract. If he did, that ends the inquiry, and the Final Award should be confirmed.

"[T]he Supreme Court has made clear that district courts' review of arbitrators' awards under § 10(a)(4) is limited to the 'sole question … [of] whether the arbitrator (even arguably) interpreted the parties' contract,'" "not whether he got its meaning right or wrong," and "not whether [his] interpretations of … the governing law were correct." *BNSF*, 777 F.3d at 787-89 (quoting *Oxford Health*, 569 U.S. at 569). "Under § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all." *Oxford Health*, 569 U.S. at 573. If the Court concludes that the Arbitrator "even arguably" construed the contract, that ends the inquiry: the Arbitrator "therefore did not 'exceed his powers,'" and the award must stand, "however good, bad, or ugly." *Id.* at 569, 573.

For example, in *BNSF*, BNSF moved to vacate an award under § 10(a)(4) on the grounds that the arbitrators awarded "damages that were forbidden under the Agreement." 777 F.3d at 787. Like Defendants here, BNSF argued that the arbitrators misinterpreted the contract and "'completely botched' the application of [state] law[.]" *Id.* at 788-89. The Fifth Circuit rejected these arguments. It held that whether the arbitrators' "interpretations of the Agreement or the governing law were correct" was irrelevant. Whether the reviewing court "might interpret the Agreement differently than the Panel" was "entirely beside the point because it is not *our* interpretation that the parties bargained for." *Id.* at 789 (emphasis added). Instead, "[t]he sole question is whether the arbitrators even arguably interpreted the Agreement in reaching their award," and because they did, they did not exceed their authority under § 10(a)(4). *Id.*

Likewise, in *Dole Ocean Liner Express v. Georgia Vegetable Co.*, 84 F.3d 772 (5th Cir. 1996), the arbitrators awarded damages against defendant for breach of contract, and ruled that a contractual bar against liquidated damages did not apply under governing Mississippi law. Defendant moved to vacate on the grounds that the damages were excessive in light of the

contract's liquidated damages prohibition.  *Id*. at 773-74.  The Fifth Circuit rejected Defendant's

challenge.  The contract provided that the arbitrators were to interpret the contract in accordance

with Mississippi law, which gave them authority to determine whether the liquidated damages

clause applied under Mississippi law.  *Id*. at 774.  Because the contract gave the arbitrators the

power to interpret and apply the governing state law, and the arbitrators did so, they did not

"exceed their powers" under § 10(a)(4), regardless of whether their interpretation was correct.

All that mattered was that they attempted to interpret and apply the governing law.  *Id*.

In deciding whether or not an arbitrator has interpreted the contract, the Fifth Circuit has

instructed that "[t]he award itself will often suggest on its face that the arbitrator was arguably

interpreting the contract."  *BNSF*, 777 F.3d at 788.  "Several pieces of relevant evidence can be

gleaned from the award's text, including but not limited to: (1) whether the arbitrator identifies

her task as interpreting the contract; (2) whether she cites and analyzes the text of the contract;

and (3) whether her conclusions are framed in terms of the contract's meaning."  *Id*.

Here, the Final Award itself makes clear that the Arbitrator was interpreting the contract.

It expressly states that the Arbitrator's task was to interpret the contract and apply New York

law.  (PA610-1, 618)  It repeatedly quotes, cites, and analyzes the text of the contract, and the

Arbitrator's conclusions regarding damages are framed in terms of the contract's language.

(PA641-6)  The Final Award acknowledges the contract's consequential damages limitation

(PA623, 644), and is permeated with citations and analysis of the agreement, including at least

36 references to § 3.4, the provision outlining the remedies to which Kemper was entitled.

(PA607-56)  To be sure, the Arbitrator *disagreed with* Defendants' arguments, but he plainly did

not *ignore* their arguments or the contract's consequential damages limitations.

In sum, the Arbitrator had the authority to determine whether the damages Kemper

sought were direct or consequential in light of the evidence presented to him, the contractual

provisions, and the governing law, and that is exactly what he did.  He therefore did not exceed

his authority under § 10(a)(4).  That ends the inquiry, and the Final Award should be confirmed.

## II.    THE ARBITRATOR'S DECISION WAS CORRECT UNDER THE EVIDENCE PRESENTED AT HEARING, THE TERMS OF THE CONTRACT, AND NEW YORK LAW

As discussed above, the Court's task is not to evaluate whether the Arbitrator correctly

interpreted and applied the contract, the facts, or the law.  Thus, as Chief Judge Lynn already

noted in denying Defendants' attempt to have the case litigated in New York, there is no need for

the Court to wade into the "the intricacies of interpreting the substantive law at issue in the

arbitration."  (ECF No. 51 at 8) (citation omitted).

Even so, given Defendants' contention to the contrary, Kemper would be remiss in not

offering the counterpoint:  the Arbitrator did *not* err.  Defendants argue that three categories of

damages awarded constitute consequential damages: (1) any payments Kemper made to CSC

after January 2, 2011, (2) other amounts Kemper invested in the project, (3) any payments

Kemper made to CSC that Defendants argue arose under the MOSA.  Each argument is

addressed in turn below.

### A.    Kemper was Entitled to Recover Payments Made to CSC on and After January 2, 2011

Defendants argue that because CSC was in breach as of January 2, 2011, Kemper was

only permitted to recover payments made to CSC *prior to* that date, but not any payments made

on or after that date.  This argument is frivolous, and the Arbitrator correctly rejected it.

Defendants' argument ignores the plain language of § 3.4, which says nothing suggesting

that Kemper's right to recover payments to CSC was limited to payments made before January 2,

2011.  To the contrary, § 3.4 explicitly states that Kemper was entitled to "***all*** payments …

*without* any limitations based upon when such payments were made." (PA061, emphases added) This is in stark contrast to an adjacent provision in § 3.1 of the Addendum 1, demonstrating that when the parties intended to impose date restrictions on the recoverable amount, they stated so expressly in the contract. (PA061) (limiting remedy under § 3.1 to payments to CSC "during the twelve calendar month period immediately preceding the Completion Date"). Thus, whatever the contours of the law regarding consequential versus direct damages, the Arbitrator correctly rejected Defendants' argument as contrary to "a plain reading of Section 3.4[.]" (PA643)[8]

Defendants also contend that Kemper could have declared a breach on January 2, 2011, but because Kemper continued to place its trust in CSC and continue with the project, the post-January 2011 payments were really Kemper's fault. (ECF No. 64 at 21) This is meritless. As the Arbitrator concluded "[b]ased on the evidence," and the "plain language of Addendum 1," there was "no language … that required Kemper to terminate the Exceed Agreement to invoke the remedy of Section 3.4," and "Kemper was under no obligation to declare a breach at any particular time in order to pursue its remedy under Section 3.4." (PA647) Defendants also ignore that Kemper did not become aware that a breach had even occurred (and thus would have been in no position to know to declare a breach) in January 2011 because CSC falsely represented to Kemper and the public that it had released a Java version of Exceed. (PA630-4)

Finally, Defendants argue that the amounts Kemper paid to CSC on or after January 2, 2011 are consequential damages "because § 3.4 applied to the first phase of the project (transformation), while these later payments related primarily to the second phase (implementation)." (ECF No. 64 at 21) Not true. Nothing in § 3.4 suggests that it only applied

---

[8] *H/R Stone, Inc. v. Phoenix Bus. Sys., Inc.*, 1988 WL 96170 (S.D.N.Y. Aug. 26, 1988), and *PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358 (S.D.N.Y. 2014) (ECF No. 64 at 21) do not help Defendants, because neither case involved a contract that specifically permitted the recovery of the payments regardless of whether the payments occurred before or after the breach, as Section 3.4 provides here. (*See* PA061)

to payments regarding "transformation" – it specifically says Kemper was entitled to recover "*all* payments made by Customer pursuant to the *Agreements*."  (PA061, emphases added)  The term "Agreements" is defined in Addendum No. 1 to include the MSLSA Product Order 1, "*Work Order No. 1*, and Work Order No. 2…"  (PA060, emphasis added)  Work Order No. 1 related to implementation, so § 3.4 expressly permits Kemper to recover payments made to CSC for work related to implementation.  Indeed, this makes perfect sense.  A Java version of Exceed was the foundation for the entire project.  Recognizing this, the parties agreed that if CSC failed to deliver a Java version, then CSC would be liable to Kemper for "all" payments made to CSC under the Agreements – relating to both transformation *and* implementation – because all of those payments would end up being wasted if the underlying code was a jumbled mess, and not a "Java version" that Java programmers could understand.  That is exactly what happened.[9]

### B.    Kemper's Direct Damages Included Kemper's Substantial Investment in the Project, Which was Rendered Worthless as a Result of CSC's Breach

Kemper also was entitled to recover its additional investment in the project, including amounts Kemper paid to its employees to the extent they worked on the Exceed J Project, and costs for hardware and other expenses incurred as an investment in the project.  All of these amounts are recoverable as "direct damages resulting from [CSC's] breach" under § 3.4.  Courts permit recovery of amounts a plaintiff invested where the investment is lost or rendered worthless as a result of a counter-party's failure.  For example, in *Haven Assocs. v. Donro Realty Corp.*, 503 N.Y.S.2d 826 (1986), after defendant had agreed to construct pump stations on

---

[9] Defendants assert that the Arbitrator "decided that pre-judgment interest should start running from January 3, 2011."  (ECF No. 64 at 20)  That is not entirely accurate, because with respect to damages incurred in January 2011 or later, no interest was calculated on damages incurred during a particular month until the first date of the following month.  (*See* PA652)  For example, if Kemper incurred damages in the form of a $100,000 payment to CSC in March 2013, interest would not begin to run on that particular amount until the following month.  In any event, Defendants do not challenge the Arbitrator's award of pre-judgment interest.

several lots purchased by plaintiff, plaintiff incurred substantial expenses improving the properties. The defendant breached the contract and, as a result, plaintiff was unable to sell many of the properties. The court held that defendant's breach "directly caused [plaintiff] to suffer substantial damages." *Id*. at 829. It held that "[t]o the extent that [plaintiff's] investment in these improvements was lost due to the inability to sell the lots" as a result of defendant's breach, "[plaintiff] should be compensated for this as well." *Id*. at 830. The same is true here. Kemper invested substantial amounts of money, not only in the form of payments to CSC, but also in payments to its own employees and for other costs, and its investment was entirely lost and rendered worthless as a direct consequence of CSC's failure to deliver the foundational software upon which the success of the entire project depended.

Under New York law, there is no "bar against the recovery of reasonable overhead expenses as long as they are normally allocated to specific projects in accordance with [plaintiff's] standard cost accounting practices," *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 41, 46 (2d Cir. 1995), and there is no dispute that Kemper's standard cost accounting practices were followed here: Kemper only sought recovery of the portion of employee salaries and costs that related to the Exceed Project. *See also Rogerson Aircraft Corp. v. Fairchild Indus., Inc.*, 632 F. Supp. 1494, 1504 n.8 (C.D. Cal. 1986) (under New York law, "a failure to award overhead damages would force [plaintiff] to fully absorb the … overhead it had allocated to the … contract").

Defendants advocate for a bright-line rule under which anything beyond payments to a counter-party under a contract constitute consequential damages. (ECF No. 64 at 14) But Defendants' argument ignores § 3.4, which permits Kemper to recover not only "all payments made by [Kemper] pursuant to the Agreements," but *also* "all additional proven direct damages

resulting from such breach." If "direct damages" were limited to payments to CSC, then the phrase "all additional proven direct damages" would be superfluous. Thus, as a matter of basic contract interpretation, "direct damages" must include more than just payments to CSC.

Defendants' argument is also contradicted by their own case law. In *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676 (N.Y. 2014), the court held that the "lost profits" plaintiff sought constituted direct, "not consequential, damages." *Id.* at 679. Because direct damages can include lost profits, they clearly are not limited to payments to a counter-party. Under New York law, courts use a "case-specific approach … to distinguish general damages from consequential damages," and instead of adopting "bright-line rule[s]" like the one Defendants propose, "damages must be evaluated within the context of the" parties' agreement. *Id.* at 679, 682. Thus, "the precise demarcation between direct and consequential damages is a question of fact." *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976). And, as discussed above, disagreement with an arbitrator's resolution of a question of fact is not a basis for setting aside an Arbitrator's decision. *Supra* at 19-22.

The inquiry for the Arbitrator here was whether the damages were "the natural and probable consequence of the breach[.]" *Biotronik*, 11 N.E.3d at 680 (citation omitted). "Direct damages are those which are the natural and probable consequence of the breach," *In re Lehman Bros. Holdings Inc.,* 544 B.R. 62, 71 (S.D.N.Y. 2015) (internal quotation marks and citation omitted), whereas consequential damages are those that "arise from intervention of special circumstances." *Siemens Westinghouse Power Corp. v. Dick Corp.*, 320 F. Supp. 2d 120, 122 (S.D.N.Y. 2004) (citation omitted). None of the amounts that the Arbitrator awarded here were the result of unforeseen, intervening special circumstances. To the contrary, Kemper regularly kept CSC updated on the costs Kemper incurred on the project, including Kemper's internal

salary costs.  (*See* PA383)  And one does not need a crystal ball to foresee that if CSC failed to deliver the foundational Java code, the project would fail and Kemper's investment would be rendered a total loss.

The cases Defendants cite (ECF No. 64 at 14-17) do not support the bright-line rule they advocate here.  For example, in *PNC Bank Nat'l Ass'n  v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358 (S.D.N.Y. 2014), defendant breached a software design contract, which led to a failure to timely transmit copies of loan disclosures to the plaintiff bank's customers.  The bank, "of its own accord" and without consulting the defendant, took the extraordinary step of issuing refunds of residential mortgage closing costs to its customers, which the court found was not required by the governing regulatory agency and was completely unprecedented in the industry. *Id*. at 373-74.  Because of the unprecedented nature of the bank's actions, the court held that "the payment of the refunds was not a 'natural and probable consequence'" of the breach.  *Id*. at 374 (citation omitted).  By contrast, as discussed above, Kemper's loss was a natural and probable consequence of CSC's breach, as the Arbitrator correctly concluded.[10]

In *Liberty Bay Credit Union v. Open Sols., Inc.*, 905 F. Supp. 2d 389 (D. Mass. 2012), the court held that damages sought for lost profits and lost employee time were not recoverable because the agreement contained an express provision providing that plaintiff's "exclusive remedy" was the amounts paid to the defendant, and in any event, the amounts sought were unduly speculative.  *Id*. at 398-99.  By contrast, as noted above § 3.4 does not limit Kemper's recovery to payments made to CSC, and in fact, says the opposite.  And as discussed above, the

---

[10] Defendants argue that "out-of-pocket expenses of the purchaser are consequential damages under New York law" (ECF No. 64 at 17), but the authority they cite does not support such a rule.  To the contrary, *Qube Films, Ltd. v. Padell*, 2016 WL 881128 (S.D.N.Y. Mar. 1, 2016) held that although it was a "close[] question," the expenses sought were consequential only because the plaintiff conceded that the losses "indirectly" resulted from the breach. *Id*. at *6.  Kemper has never conceded that its damages were an indirect result of CSC's breach.

fact that Kemper's investment would be rendered worthless if no "Java version" of Exceed was delivered was not "speculative."[11]

In *Judd Bernstein P.C. v. Long*, 2017 WL 3535004 (S.D.N.Y. Aug. 16, 2017), the court held that a former client could recover the fees paid to his former attorney, but not fees paid to a successor attorney hired to complete the work the first attorney was supposed to have performed. *Id*. at *4-5.  But here, Kemper did not seek recovery of the costs it has incurred in hiring a replacement vendor to develop and implement the system CSC failed to deliver.  And unlike *Judd Bernstein*, the contract here does not limit Kemper's recovery to fees paid to CSC.[12]

## C.   Kemper Was Entitled to All Payments Made to CSC for Work Related to the Exceed Project

Defendants assert that approximately $9.8 million in payments for work orders issued under the MOSA are not recoverable because they were not made until after January 2, 2011 (*See* ECF No. 64 at 18).  As discussed above, § 3.4 does not limit Kemper's recovery to payments made to CSC before that date.  *Supra* at 22-24.  In addition, Defendants are incorrect that the payments are not recoverable just because they were "issued" under a separate agreement.  It was undisputed that these were amounts paid to CSC for work on the Exceed

---

[11] Moreover, Kemper did not seek, and was not awarded, lost profits.  Defendants also argue that the employee salaries "would have been paid anyway" (ECF. No. 64 at 16), but this misses the point.  The issue is not whether the salary payments would or would not have been made regardless of the breach; the issue is whether, as a result of the breach, the investment made in paying those salaries for work on the Exceed Project was rendered worthless, which it indisputably was.

[12] Much of Defendants' authority does not even discuss the difference between direct and consequential damages, in many cases because there was no dispute on that issue because the contract allowed consequential damages.  *See Sch. Dist. of Niagara Falls v. Crosspointe, LLC*, 2011 WL 6208695, *7 (W.D.N.Y. Dec. 14, 2015) (no analysis of the difference between direct and consequential damages, and no detail on what comprised plaintiff's request for "damages suffered while 'attempting to work on the [computer] system"); *ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*, 1999 WL 777883 (S.D.N.Y. Sept. 29, 1999) (no discussion or analysis of the difference between direct and consequential damages); *U.S. Achievement Acad., LLC v. Pitney Bowes, Inc.*, 458 F. Supp. 2d 389 (E.D. Ky. 2006) (no analysis of difference between direct and consequential damages, and no analysis of New York law, as Kentucky law governed); *H/R Stone*, 1988 WL 96170  (no discussion of difference between direct and consequential damages); *Barouh Eaton Allen Corp. v. Cillco, Inc.*, 2008 WL 465493 (E.D.N.Y. Feb. 15, 2008) (same).

Project, just like all of the other payments to CSC and the other investments Kemper made.

Section 3.4 did not limit Kemper's recovery to payments "issued" under the MSLSA – it also

permitted Kemper to recover "all additional proven direct damages resulting from such breach."

These amounts were yet another component of Kemper's investment in the Exceed Project, an

investment rendered worthless as a natural and probable consequence of CSC's failure to deliver

a "Java version" of Exceed.  The Arbitrator correctly concluded that amounts paid under certain

MOSA statements of work were "direct damages recoverable under § 3.4 of Addendum 1."

(PA649)

Once again, Defendants fail to cite a single case that supports their argument on this

point.  In *S&S Machinery Corp. v. Wuhan Heavy Duty Mach. Tool Grp. Co.*, 2012 WL 958528

(E.D.N.Y. Jan. 13, 2012), the plaintiff simply described its requested damages as consequential

damages (*id*. at *7), but plaintiff's right to recovery did not turn on the difference between

consequential and direct damages, and the court did not address that issue.  *Tractebel Energy

Mktg., Inc. v. AEP Power Mktg., Inc*, 487 F.3d 89, 109 (2d Cir. 2007) and *In re Lehman Bros.

Holdings, Inc.*, 2016 WL 7377272, at *3 (S.D.N.Y. Dec. 13, 2016) (citation omitted) addressed

"lost profits" related to "collateral business arrangements" and business relationships with third

parties.  Kemper has never sought lost profits, and its payments to CSC obviously did not

involve a third party.  As discussed above, *PNC Bank*, also cited by Defendants, concerned

payments a bank made to third parties, a step which was unprecedented and therefore not a

natural and probable consequence of the defendant's breach, which is not the case here.  And

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 662 F. Supp. 798 (S.D.N.Y. 1987),

*aff'd*, 865 F.2d 513 (2nd Cir. 1989) addressed finance charges incurred as a result of plaintiff

defaulting on a loan with a third party after defendant's breach, which were "neither a natural nor

probable consequence" of the breach because defendant "had [no] reason to know of the details of [plaintiff's] financial arrangements" with the third party. *Id*. at 807.  Here, the payments at issue were made directly to CSC, not a third party, and CSC obviously knew about the payments. It was indeed natural and probable that Kemper's investment in the form of its payments to CSC would be rendered worthless if CSC failed to hold up its end of the bargain, which is exactly what happened.[13]

**<u>CONCLUSION</u>**

For the foregoing reasons, Kemper respectfully requests that the Court deny Defendants' motion to vacate, grant Kemper's amended motion to confirm, and enter an order consistent with the Proposed Report and Recommendation attached as Exhibit D (PA707-8) and emailed in a modifiable format to the Magistrate Judge's orders inbox (Ramirez_Orders@txnd.uscourts.gov).

Dated:  April 30, 2018          Respectfully submitted,

/s/ Paul E. Veith
Paul E. Veith (pveith@sidley.com) (admitted *pro hac vice*)
Chris K. Meyer (cmeyer@sidley.com) (admitted *pro hac vice*)
Christopher Y. Lee (chris.lee@sidley.com) (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

Penny P. Reid (preid@sidley.com)
State Bar No. 15402570
**SIDLEY AUSTIN LLP**
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:  (214) 981-3300
Facsimile:  (214) 981-3400

*Counsel for Kemper Corporate Services, Inc.*

---

[13] Defendants note that the Arbitrator included alternative calculations that removed these payments, which is set forth in Table B to the Final Award.  Because there is no basis to vacate this portion of the Arbitrator's award, the alternative calculations set forth in Table B to the Final Award are irrelevant.

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2018, I electronically filed the foregoing Brief in Response to Defendants' Motion to Vacate and In Support of Plaintiff's Amended Motion to Confirm using the CM/ECF system, which will send notification of such filing to the following:

Christopher D. Kratovil (ckratovil@dykema.com)
Kyle A. Owens (kowens@dykema.com)
**DYKEMA GOSSET PLLC**
1717 Main Street, Suite 4000
Dallas, Texas 75201
Telephone:  (214) 462-6400
Fax:  (214) 462-6401

Peter J.W. Sherwin (psherwin@proskauer.com)
Mark D. Harris (mharris@proskauer.com)
Ana Vermal (avermal@proskauer.com)
Stacey P. Eilbaum (seilbaum@proskauer.com)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Fax:  (212) 969-2900

*Counsel for Computer Sciences Corporation*
*and DXC Technology Company*

/s/ Paul E. Veith
Paul E. Veith